B"H

# THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

Case No. **17-20859-CV-SCOLA-OTAZO-REYES**

FILED by _____ D.C.

MAR 0 6 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA, AND
THE STATE OF FLORIDA,


ex rel.,


JAMES PRICE,
SHELDON JOEL RAMNARAINE,
AND LAWRENCE S. SMITH,           **FILED UNDER SEAL PURSUANT TO:**

   Plaintiff/Relators,          **TITLE 31 U.S.C. § 3730(b)(2);**
                                   **FLA. STAT. § 68.082**


v.


CHILD RESCUE COALITION, INC., AND
TRANSUNION, INC., AND
TRANSUNION INTERMEDIATE HOLDINGS, INC., AND
TLO, LLC., AND
TRANSUNION RISK AND ALTERNATIVE
DATA SOLUTIONS, INC., AND
THE EXECUTIVE OFFICE OF THE
UNITED STATES ATTORNEY GENERAL, AND
CAROLYN AHSER-YOOST, AND
ELIZA DESIREE ASHER, AND
DANIEL MACLACHLAN, AND
WILLIAM WILTSE, AND
DERECK DUBNER, AND
OLE POULSEN, AND
JOHN WALSH, AND
GARY MYHRE,

   Defendants.

_____/

1

<u>**COMPLAINT**</u>

FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 et seq., and
FLORIDA FALSE CLAIMS ACT, FLA. STAT. §§ 68.081 et seq.

**COMES NOW,** James Price, Sheldon Joel Ramnaraine, and Lawrence S. Smith (hereinafter "the Relators"), on behalf of the United States of America (hereinafter "United States"), and the State of Florida (hereinafter "Florida"), and respectfully represent as follows:

## I.   INTRODUCTION

1.    The Relators bring this action on behalf of the United States of America and the State of Florida against the Defendants for treble damages and civil penalties arising from the Defendants' false claims and fraud, in violation of the federal False Claims Act, Title 31 U.S.C. § 3729 et seq. (hereinafter "FCA"), and the Florida False Claims Act (hereinafter "FFCA"), FLA. STAT. § 68.081 et seq.

2.    This case arises out of the endemic fraudulent presentation of "loose-link" values in lieu of the stated Secure Hash Algorithm version 1 ("SHA-1") values to local, state and federal law enforcement agencies for use in criminal investigations and prosecutions in Florida, forty-nine (49) additional state jurisdictions, ninety-three (93) federal judicial districts, and fifty-five (55) international jurisdictions.  These fraudulent claims were presented by

2

TransUnion, Inc. ("TransUnion"), TransUnion Risk and Alternative Data Solutions, Inc. ("TRADS"), TransUnion Intermediate Holdings, Inc. ("TIH"), TLO, LLC. ("TLO"), and the Child Rescue Coalition, Inc. ("the CRC"). These fraudulent loose-link values were used as the basis to conduct fully-funded Internet Crimes Against Children ("ICAC") task force operations. Local and state ICAC task forces submitted claims for monetary reimbursements to the United States for ICAC operations based on **fraudulent** information provided by the Defendants. Additionally, the United States financed full criminal prosecutions based on the fraudulent information provided by the Defendants.

3.     As required by the FCA, 31 U.S.C. § 3729(b)(2), the Relators have made disclosures by providing a statement of all material evidence and information related to the Complaint to the office of the Honorable Jeff Sessions, United States Attorney General and the office of the Honorable Pamela Jo Bondi, Attorney General for the State of Florida. See "Firm Mailing Book for Accountable Mail" at Exhibit "A". This disclosure statement is supported by material evidence evidence known to the Relators at the time of their filing, infra, establishing the existence of the Defendants' false claims. Because the statement includes attorney communications, the Relators' work product, and was submitted to the aforementioned government officials in their capacity as potential co-counsel in the litigation, the Relators' understand this disclosure to be confidential.

## II.   JURISDICTION AND VENUE

4.    This action arises under the FCA and the FFCA.  This Court has jurisdiction over the entire case pursuant to Title 31 U.S.C. § 3732(a) and (b).  This Court also has jurisdiction pursuant to Title 28 U.S.C. §§ 1331, § 1345, and § 1367.

5.    The venue is proper in this District pursuant to Title 31 U.S.C. § 3732(a) and Title 28 U.S.C. § 1391(b), where all of the illegal acts complained of herein either occurred in this District, or arose out of the same occurrences or transactions as such acts; and where each and every Defendant resides and or transacts business in this District.

## III.   A PRELIMINARY HISTORY OF THE DEFENDANTS

6.    A preliminary understanding of the various Defendants, and their relationships to each other, is necessary to understand the issue at hand.  These matters begin with Henry "Hank" Asher. Asher was a technology innovator and the owner/founder of Technology Investors Incorporated.  Asher developed a specialized form of data mining by leveraging business intelligence methods and predictive analytics techniques to "fuse", i.e., "loosely-link," vast amounts of data collected from various sources.  That data was organized in a manner to build comprehensive profiles and records of internet users and their activity worldwide. Asher was also well known to the Drug Enforcement Agency and the Federal Bureau of Investigation as a **cocaine smuggler.**  See DE:438 at Pg. 3, USBCFLSD, Case No. 14-01793, at Exhibit "E"

4

7.     William Wiltse was a disgraced former detective from Salem, Oregon, where, inter alia, he was charged with official misconduct.  See Troy Hudson, Sr. et al., v. Officer William Wiltse, et al., 2009 U.S. Dist. LEXIS 38511 (2009).  Wiltse, along with Flint Waters of the Wyoming Division of Criminal Investigations, co-opted various open-source software packages and amalgamated them into a program called Peer Precision, also known as the "Wyoming Toolkit".  See Third Affidavit of William Wiltse, at Exhibit "B".  Wiltse co-opted Peer Precision, renaming it Peer Spectre, and distributed it to law enforcement agents. Peer Spectre identified networks and computers alleged to be trafficking in child pornography.  Wiltse later relocated to Boca Raton, Florida, a location renown for internet scams, to work with Asher.

8.     Ole Poulsen was a longtime associate of Asher.  He joined Asher and Wiltse as the Chief Science Officer directing strategic product development for their operating concept.  See Bloomberg Company Overview Report, at Exhibit "C".  As Chief Science Officer, Poulsen had intimate knowledge of the Defendants' technical infrastructure, operations and the interworkings of the products.

9.     Daniel MacLachlan was the Defendants' Chief Financial Officer.  In his role as CFO, MacLachlan had detailed knowledge of the Defendants' revenues and operational expenses. Additionally, MacLachlan was an integral part of the Defendants'

management team with key influence on the Defendants' business and operating strategy. Thus, MacLachlan was material to the effectuation of the fraud. TransUnion Risk and Alternative Data Solutions, Inc. v. MacLachlan, 2016 U.S. Dist. LEXIS 24569 (2016).

10.    Gary Myhre was the architect of the "Business Plan" i.e., the Defendants' business plan. Myhre's role in developing the strategic operations plan and the tactical implementation strategy, was critical to the success of the Defendants' operation. Myhre sought $25 million in compensation for his role in designing the the "Business Plan". See Myhre v. TLFO, LLC., 2015 U.S. Dist. LEXIS 49497 (2015).

11.    On March 20, 2009, TLO, LLC. ("TLO"), now known as TFLO, LLC., was co-founded by John Walsh and Technology Investors Inc., i.e., Hank Asher.  Asher's daughters, Caroline Asher-Yoost and Eliza Desiree Asher served as co-CEOs of TLO; Dereck Dubner served as corporate counsel. See Affidavit of Dereck Dubner, at Exhibit "D". TLO/TLFO implemented Asher's data mining operation, and predictive analytics technology, to identify, track, and rank persons allegedly engaged in criminal activity. It was used under contract by the United States Government. See TransUnion Risk and Alternative Solutions, Inc. v. Challa, 2016 U.S. Dist. LEXIS 3781; United States v. Ocasio, 2015 W.L. 2458617, n. 1, at Pg. 8 (2016). The founders, however, disguised TLO's true objectives, claiming it provided "data solutions for identity, authentication, fraud prevention, and debt recovery." Wiltse

thereafter contributed "his" Peer Spectre program to further facilitate TLO's objective. Peer Spectre placed special focus on crimes involving the sexual exploitation of children to capitalize on the increased federal funding for law enforcement technology and training.

12.    TLO exploited a flaw in Asher's loose-linking algorithms, where data was **partially matched** based on the "likelihood of its reliability", rather than the result being **actually factual.** TLO began offering its services to the United States as early as 2009. It created "criminal investigatory leads" and provided them to law enforcement for full criminal investigation. The investigatory leads contained fraudulent information that formed the basis for ICAC task force operations for which local, state, and federal agencies submitted false claims for reimbursement.

13.    TLO collected both private and public data from disparate sources, including but not limited to, financial institutions and other companies **that specialized in data aggregation.** TLO specifically collected proprietary data including, but not limited to, financial, identity, Internet, and utility data. After its collection, the data was ingested, normalized and structured to create "actionable views". That is to say the data (private and public) was **co-mingled** and presented in such a way, as to be readable and accessible for use by Government agents and prosecutors in criminal cases. In simple terms, TLO indiscriminately collected, co-mingled, and organized, any and all types of data regarding every Internet-connected

person in the world.  TLO then utilized Asher's loose-linking algorithms to "loosely link" individuals to potential crimes.

14.    TLO entered bankruptcy soon after Asher's death in 2013.  The company immediately agreed to sell the majority of its assets to TIH, a subsidiary company of TransUnion, whose corporate partner was TLO.  See DE:438, USBCFLSD Case No. 14-01793-PGH, at Exhibit "E".  The remaining portion of TLO was reorganized as a Florida-based 501(c)(3) non-profit organization called the Child Rescue Coalition, Inc., of which Caroline Asher-Yoost serves as CEO and Eliza Desiree Asher serves as Director. See Florida Department of State, Division of Corp. Entity Record, at Exhibit "F".  Thereafter, CRC and TRADS, continued to utilize Asher's loose-linking algorithm and exploit its weaknesses.  It [Asher's loose-link algorithm] effectively co-mingled private and public data to create "criminal investigative leads" on individuals allegedly involved in crimes involving child pornography via the internet.  The CRC, TLO and TRADS continue to operate from the same physical office location in Boca Raton and share communication, hardware and resources.

15.    The functions and operations of CRC are identical to that of TLO's, with specific focus placed on crimes involving child pornography.  After it's formation through the bankruptcy/restructuring of TLO, CRC became the provider of data and services available exclusively through the Child Protection System ("CPS").  The Child Protection System became the "one-stop-shop" for any and all information necessary to identify,

locate, indict, prosecute, and convict individuals for their alleged involvement in child pornography. Wiltse currently serves as President of the CRC.

### IV.  THE CHILD PROTECTION SYSTEM AND ITS CONTRACTUAL SERVICE TO THE GOVERNMENT

16.  CPS was provided to the Government as a combination of services including specialized software, applications, and training for law enforcement agents and Assistant United States Attorneys ("AUSAs"). It was distributed to fifty-six (56) countries throughout the world, including the United States. On its surface, CRC, its business model, and its services appeared as an effective and efficient cooperative effort, between the private sector and the Government, to protect children from dangerous sexual predators. That, however, is simply untrue. In point of fact, CPS provided, and continues to provide, fraudulent information that is unaudited, unauthenticated and fraudulent to law enforcement agents. The fraudulent information provided by the Defendants is the primary source, and often the sole source, of information and evidence used to prosecute and convict individuals of crimes relating to child pornography. The Government sought the assistance of the Defendants to obtain information it was unable to obtain on its own, and that would otherwise have required the Government to obtain subpoenas and warrants. In so doing, the Government violated the Fourth Amendment where it deliberately ignored the plain view requirement for a warrant by using the Defendants as a proxy. In

2013, Wiltse, testified that the system had collected over **10 billion criminal investigative leads** for the Government thus far. See <u>First Affidavit of William Wiltse</u>, at Exhibit "G".

## V.  THE GOVERNMENT, THE CHILD PROTECTION SYSTEM AND SHA-1

17.  The CPS software first identifies Internet Protocol ("IP") addresses of internet users alleged to be in possession of, or trafficking in, child pornography, via various P2P networks. <u>The system claims to provide verified identification of specific child pornography files and those involved in its commerce, using values produced by the Secure Hash Algorithm version 1 ("SHA-1").</u> This mathematical algorithm was developed by the U.S. Government and published in the Federal Register under the Federal Information Processing Standard ("FIPS") 180-4. See <u>FIPS PUB 180-4</u>, at Exhibit "H".

18.  The U.S. Government established SHA-1 as **the definitive method** of verifying and authenticating digital files alleged to be child pornography. However, the loose-link values provided by the Defendants **are fundamentally different from SHA-1 values.** Due to their material differences, the Defendants defrauded the U.S. Government by **falsely claiming** the loose-link values it provided were, in fact, valid SHA-1 values. This claim is both untrue and unsupported by the facts.

19.  When conducting investigations involving child pornography, an investigator first calculates the SHA-1 value of

file(s) alleged to be child pornography. The investigator then compares the calculated value to a centralized repository of child pornography with known SHA-1 values. This database is maintained by the National Center for Missing and Exploited Children ("NCMEC"), as directed by Congress under 42 U.S.C. § 17615, at Exhibit "I". If the SHA-1 value calculated by the investigator matches that of a SHA-1 value available in the NCMEC database, the file is confirmed as being child pornography.

20.     Use of the CPS software automates the investigative process, as explained above, by purportedly providing investigators with "pre-calculated" SHA-1 values for the files alleged to be child pornography. Investigators therefore, **do not** calculate SHA-1 values themselves, **nor do they compare** those values with verified SHA-1 values available in the NCMEC database. See Affidavit of Robert Mauro, Pgs.7-8 ¶1 at Exhibit "J". Furthermore, contrary to its claims, CPS **does not** calculate SHA-1 values; it **does not** use the SHA-1 algorithm nor does it provide investigators with SHA-1 values. Rather, the CPS software provides investigators with loose-link values, fraudulently represented as SHA-1 values. **The loose-link values DO NOT uniquely identify any specific file.** Loose-link values are assigned using an undocumented, unaudited, and unauthenticated source, and are **fraudulently alleged** to identify and "verify" files that are asserted to be child pornography. The Defendants fraudulently misrepresented loose-link values as SHA-1 values to law enforcement officers and United States Attorneys nationwide.

## V.  UNDERSTANDING SHA-1

21.    To better understand the severity and harm caused by the Defendants' fraudulent information, one must understand the key differences between **valid** SHA-1 values and the fraudulent values i.e., "loose-link" values fraudulently **misrepresented as** SHA-1 values by the Defendants. **A valid SHA-1 value is a 40-character Hexadecimal value.** In simple terms, valid SHA-1 values are 40-characters long and contain only the letters "a" through "f", and the numbers "0" through "9". See FIPS PUB 180-4, Pg. 18, ¶ 6.1 at Exhibit "H".

22.    In numerous cases the Government proffered valid SHA-1 values. See NIST SHA-1 Computation and Output Example at Exhibit "K" Pg. 3 and United States v. Burns, 2015 U.S. Dist. LEXIS 50220, where the Government offered three (3) valid SHA-1 values, listed below:

|     |          |          |          |          |          |
|-----|----------|----------|----------|----------|----------|
| 1.) | 519814bc | 620eb52d | 8babb54b | 7f7b086f | 7d5196ab |
| 2.) | 29807e70 | 52c9ec75 | 9fe7027e | fc6b0732 | 642ff7e0 |
| 3.) | 2dcbe0bf | 3a4e8f3c | 03bd83ee | 52249de6 | 027bd7d3 |

23.    Conversely, in United States v. Price, 582 Fed. Appx. 846 (2014), and more than 10,000 other § 2252/§ 2252A cases, the Government proffered a series of loose-link values that were fraudulently misrepresented as SHA-1 values from the Defendants. Three (3) of those loose-link values, provided by the Defendants under contract to the Government, are listed below:

     **1.)**   2L3VMMDDYMNJHU566DIK26BXGCZJD0QY

     **2.)**   SJNX5JEQY2L3RWH4YSKFJL2BQA6SR6SJ

     **3.)**   4GNSYJKR5WKBC5CXGMI0AX5M0VHKKN7C

24.     The values in <u>Price</u> do not follow the form of valid SHA-1 values. Specifically, the values in <u>Price</u> contain only **32 characters**, where all valid SHA-1 values contain **40 characters**. Additionally, the values in <u>Price</u> contain characters that are **not part of the Hexadecimal number system**. That is, the values in <u>Price</u> contain all letters of the alphabet where valid SHA-1 values contain only the letters "a" through "f", and the numbers "0" through "9". A plain comparison of the values proffered in <u>Burns</u>, verses those in <u>Price</u>, reveal that the values proffered in <u>Price</u> are **not valid SHA-1 values**, in direct conflict with the Government's claims. See also <u>Affidavit of Special Agent David Catlin</u>, Pg. 8-9 at Exhibit "L". <u>**The Government's false claims were based solely on the fraudulent information provided by the Defendants through CPS, under contract for use by the Government**</u>.

## VI.    DATA PROVIDED BY THE DEFENDANTS WAS KNOWN TO BE FRAUDULENT

25.     The Defendants, by and through CPS, provided fraudulent information to the Government in **thousands of cases nationwide.** Subsequently, the fraudulent values proffered by the Government were neither audited nor verified as alleged, and thus rendered all proffered "certifications" facially invalid and of questionable admissibility. The OUSA was on notice of the issues with the Defendants, CPS, and the fraudulent information they

provided for more than five (5) years. The OUSA, aware of the fraudulent conduct, continued to rely on the fraudulent information provided by the Defendants through CPS in order to obtain unlawful convictions. See also EEOC v. Freeman, 778 F.3d 463 (4th Cir. 2015) where the court rejected the Government's "expert", who had previously found to be unreliable by four (4) other courts.

26.    When courts ordered the independent examination of the Defendants' source code, object code and any CPS related application components, or the data it produced, the OUSA moved to dismiss the indictments, or supersede the indictments to dismiss all sex offense counts in more than seventy (70) cases. Four examples of those occurrences are as follows:

a.   In United States v. John Crowe, U.S. Dist. Court, Case No. 11-CR-1690-MV, the OUSA withdrew from the case following an order for testing of the CPS software and dismissed counts 1 through 5 and 7.

b.   In United States v. Angel Ocasio, U.S. Dist. Court, Western Dist. of Texas, Case No. EP-11-CR-2728-KC-1, the Government superseded the indictment, dismissed all sex offenses, and agreed to a plea following a court Order compelling inspection of the CPS Source Code, training documentation, and Government contracts.

c.   In United States v. Todd Hartman, U.S. Dist. Court, Central Dist. of California, Case No. SA-CR-15-63(A)-JLS, the Government dismissed the indictment following a court Order to compel inspection of the CPS software.

d.  In <u>United States v. Edward Shia</u>, U.S. Dist. Court,
Northern Dist. of California, Case No. CR-15-257-VC,
where the Court ordered the CPS software examined by an
independent expert.  Further, the trial court stated, **"A
non-party, third party, fighting crime for the
Government under contract makes this even more
suspect...** We know more about police dogs and training
than we do of this software that is being used all over
the country in hundreds of prosecutions."

## VII.   THE CLAIMS AND THE ACTS OF FRAUD

27.   The Internet Crimes Against Children ("ICAC") task
force is a program which was established by Congress under 42
U.S.C. § 17612 (See Exhibit "M") to prevent child abuse and child
exploitation throughout the United States.  The Attorney General
is authorized to "award grants to State and local ICAC task
forces to assist in carrying out [its] duties and functions." 42
U.S.C. § 17616 (See Exhibit "N").  The United States was
defrauded by the Defendants and the OUSA where: (1) the United
States authorized appropriations and grants for ICAC operations,
based on fraudulent information provided by the companies; and
(2) where the OUSA took aggressive measures to conceal the
ongoing fraud.

28.   Under Title 31 U.S.C. § 3729(a), the Defendants are:

"liable to the United States Government for a
civil penalty of no less than $5,000 and not
more than $10,000, as adjusted by the Federal

15

Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person."

Specifically, the Defendants and the OUSA violated 31 U.S.C. §§ 3729(a)(1)(B), § 3729(a)(1)(C), § 3729(a)(1)(E) and § 3729(a)(1)(G), where the Defendants and the OUSA:

"**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspire[d] to commit a violation of subparagraph (A), (B), (C), (D), (E), (F), or (G)...;

**(E)** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true...;

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

29. The Relators present the following claims under the aforementioned statutes:

a. **CLAIM ONE:** The Defendants by and through key executives and employees developed, organized and participated in a scheme (the "SHA-1 Scam"), wherein it presented fraudulent loose-link values to law enforcement agencies in lieu of **actual SHA-1 values**, and in direct conflict with the Defendants' marketing, documentation and training materials.

b. **CLAIM TWO:** The Defendants, by and through key executives and employees developed, organized and participated in a scheme, wherein it provided training, documentation and other materials which contained fraudulent information and claims in furtherance of their "SHA-1 Scam".

c. **CLAIM THREE:** The OUSA was an active participant and beneficiary of the "SHA-1 Scam". The OUSA acted in such a manner as to conceal the otherwise plain, fraudulent conduct of the Defendants. The OUSA aided and abetted the fraud where it knowingly dismissed counts, or superseded indictments: (1) to divert attention away from cases which risked exposure of the "SHA-1 Scam"; (2) to curtail investigations into the fraudulent conduct of the "SHA-1 Scam" to prevent exposure of the fraud; and (3) where it knowingly continued to prosecute defendants, and obtain unlawful convictions, based on the fraudulent information from the Defendants, as a product of the "SHA-1 Scam".

30. The specific elements of the "SHA-1 Scam" are as follows:

a. The Defendants developed software to "fuse" large volumes of disparate data from multiple sources using flawed algorithms specifically designed by Hank Asher and Ole Poulsen.

b. The Defendants through their key executives and employees provided its services, in the form of CPS, for use by law enforcement agencies. The Defendants falsely claimed that their software and services (CPS): (1) identified and located alleged child pornography traffickers; and (2) identified alleged files of child pornography by providing the valid SHA-1 values of those files to law enforcement agents and prosecutors. In point of fact, the Defendants **did not** provide valid SHA-1 values, nor did they implement the SHA-1 algorithm. Instead, the Defendants provided law enforcement agents and prosecutors with loose-link values and <u>fraudulently misrepresented those values as actual SHA-1 values.</u>

c. Law enforcement agencies used the fraudulent information provided by the Defendants to conduct ICAC task force operations and <u>received reimbursements for false claims</u> from the United States based on the fraudulent information provided by the Defendants.

d. The OUSA, as a part of the Executive Office of the United States Attorney General ("EOUSAG") was aware that the information provided by the Defendants was fraudulent but continued to seek and obtain, criminal convictions based on the fraudulent information and false claims. The OUSA moved to dismiss charges, and indictments, in cases where the "SHA-1 Scam" was at risk of exposure through further prosecution. In so doing, <u>the OUSA directly and aggressively sought to conceal the fraudulent conduct and false claims from the United States, the courts, and the EOUSAG.</u>

e.  The United States was defrauded by the Defendants where: (1) the ICAC task force submitted claims for monetary reimbursement by the United States, for ICAC operations based on fraudulent information provided by the Defendants and (2) where the United States financed full criminal investigations and prosecutions, including but not limited to costs and fees, based on the fraudulent information provided by the Defendants through the "SHA-1 Scam".

f.  The Defendants, their executives and key employees continue to operate the "SHA-1 Scam" with the assistance of the OUSA.

31.    In 2008 the "Providing Resources, Officers, and Technology to Eradicate Cyber Threats to Our Children Act" ("the Protect Act", PL 110-401, codified at 42 U.S.C. § 17601) established the basis of federal funding for law enforcement technology and training related to child pornography.   The following year, 2009, the Ashers (Hank, Desiree, and Carolyn), Poulsen and Wiltse formed TLO, LLC and devised the "SHA-1 Scam" as a Bait-and-Switch scheme to obtain Government contracts and leverage the more than $212.7 million taxpayer dollars authorized by Congress from FY 2009 through FY 2014.   The Ashers and Wiltse cemented the scheme by giving John Walsh eight (8) million shares of TLO in exchange for his joining the scheme to "sell" the fraudulent scheme to law enforcement agencies leveraging his notoriety.

32.    The Office of the United States Attorney subsequently benefited from the conspiracy with the Defendants.   In this

19

manner, the OUSA actively furthered the fraud by failing in its duty to report the fraudulent conduct, investigate plain view evidence of fraudulent claims, and conspired with the Defendants, to conceal the fraudulent conduct. The OUSA devised a system to conceal material records in the state courts and routinely failed to produce "a true and legible copy of ... all documents previously filed" in the record of the federal proceedings as required under the local rules (See Local Rule 7.2 of the Southern Distirct of Florida) in every jurisdiction to further conceal the fraudulent conduct and false claims.

### VIII.    CONCLUSION

33.    In simple terms, the Defendants knowingly and fraudulently presented loose-link values, co-mingled with private and public data, as part of a software, services, and training scam (the "SHA-1 Scam), to law enforcement agencies and the OUSA. The fraudulent information was subsequently used as the basis for ICAC task force operations for which local, state, and federal agencies submitted claims for reimbursement under 42 U.S.C. § 17616, the ICAC Grant Program. See Exhibit "N". The United States was defrauded where any and all ICAC task force operations that were initiated or based on the fraudulent information, knowingly provided by the Defendants, was a product of the fraud. As such, all grants, authorizations, reimbursements, or disbursements paid in connection to the aforementioned statutes, and 42 U.S.C. § 16987 (see Exhibit "O") were false claims, made or caused to be made, by the fraudulent conduct of the Defendants

and their key executives and employees, in violation of Title 31 U.S.C. § 3729(a)(1). See Exhibit "P".

34.    Due to the extensive relationship between the Department of Justice attorneys, the various U.S. Attorneys, law enforcement and the Defendants, the Relators move this Court to appoint a **special prosecutor** in this matter.

**WHEREFORE,** the Relators respectfully request this Court to enter judgement against the Defendants, jointly and severally, as follows:

a. That the United States be awarded damages in the amount of three (3) times the damage sustained by the United States because of the false claims and fraud alleged within this Complaint, as the FCA, 31 U.S.C. §§ 3729 et seq. provides;

b. That civil penalties of $10,000 be imposed for each and every false claim that the Defendants made, caused to be made, or arose as a result of their actions to be presented to the United States and/or its grantees;

c. That pre- and post-judgement interests be awarded along with reasonable attorney's fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

d. That this Court grant permanent injunctive relief to prevent and recurrence of the violations of the FCA  for which redress is sought in this Complaint;

e.  That the Relators be awarded the maximum amounts
    allowed to them pursuant to the FCA;

f.  That this Court award such other and further relief as
    deemed fair and equitable.

Respectfully Submitted,

_____            _____
James Price                                Sheldon Joel Ramnaraine

_____
Lawrence S. Smith

## CERTIFICATE OF SERVICE

### United States v. Child Rescue Coalition, Inc.

### Case No.:_____

We, the Relators, hereby declare that on this date, March 3, 2017, have filed the enclosed COMPLAINT pursuant to the "Mailbox Rule" for incarcerated persons with the Clerk of the Court.  The Complaint is served upon this Court under SEAL for review in camera pursuant to 31 U.S.C. § 3730(b)(2).

We declare that under the penalty of perjury, pursuant to Title 28 U.S.C. § 1746, the foregoing is true and correct.

Executed on March 2, 2017.

By:_____
    James Price - 98922004

_____
Sheldon Joel Ramnaraine - 55635018

_____
Lawrence S. Smith - 42473019