**EXHIBIT "A"**

FIRM MAILING BOOK FOR ACCOUNTABLE MAIL

UNITED STATES POSTAL SERVICE®

# Firm Mailing Book For Accountable Mail

Name and Address of Sender

Check type of mail or service

- ☐ Adult Signature Required
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery (COD)
- ☐ Insured Mail
- ☐ Priority Mail
- ☐ Priority Mail Express
- ☐ Registered Mail
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation
- ☐ Signature Confirmation Restricted Delivery

Affix Stamp Here
*(for additional copies of this receipt).*
***Postmark with Date of Receipt.***

2-28-17

| | USPS Tracking/Article Number | Addressee (Name, Street, City, State, & ZIP Code™) | Postage | (Extra Service) Fee | Handling Charge | Actual Value if Registered | Insured Value | Due Sender if COD | ASR Fee | ASRD Fee | RD Fee | RR Fee | SC Fee | SCRD Fee | SH Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 9114 9011 5981 8575 3487 02 | The Honorable Pam Bondi, Attorney General for the State of Florida, Office of the Attorney General State of Florida, Tallahassee FL 32399-1050 | | | | | Price 98922-004, Rannarine 55635-018, Smith 42473-019 | | | | | | | | |
| 2. | 9114 9011 5981 8575 3486 89 | The Honorable Jeff Sessions, United States Attorney General, 950 Pennsylvania Ave NW, Washington DC 20503 | | | | | Price 28522-004, Rannarine 55635-018, Smith 42473-019 | | | | | | | | |
| 3. | | | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | | | |

Handling Charge - if Registered and over $50,000 in value

Adult Signature Required | Adult Signature Restricted Delivery | Restricted Delivery | Return Receipt | Signature Confirmation | Signature Confirmation Restricted Delivery | Special Handling

| Total Number of Pieces Listed by Sender | Total Number of Pieces Received at Post Office | Postmaster, Per (Name of receiving employee) |
|---|---|---|
| 2 | 2 | [signature] |

Complete in Ink

PS Form **3877**, January 2017 *(Page 1 of 2)*
PSN 7530-02-000-9098

**Privacy Notice: For more information on USPS privacy policies, visit *usps.com/privacypolicy.***

A

STATE OF FLORIDA )
) ss.
COUNTY OF PALM BEACH )

**AFFIDAVIT**

I, William S. Wiltse, being first duly sworn on oath, hereby depose and say:

1. I am a former police detective for the City of Salem, Oregon. I worked as a police officer in the State of Oregon for 18 years, during which time I conducted criminal investigations into the sexual abuse and exploitation of children. I am currently sworn as a reserve deputy sheriff with the Palm Beach County Sheriff's Office in Palm Beach County, Florida.
2. I am the developer of the law enforcement computer application known as "Peer Spectre". This application was created in conjunction with Flint Waters of the Wyoming Division of Criminal Investigations as part of an investigative effort formerly known as Peer Precision. This effort, now known as the Child Protection System (CPS), focuses on the development of software tools to identify computers trading files depicting the sexual abuse of children and training law enforcement officers in their use. The Child Protection System was developed by TLO, LLC, a private company located in Boca Raton, Florida. I am currently employed as the Director of Law Enforcement Programming at TLO and oversee all development activities related to the aforementioned Child Protection System. I am also

GOVERNMENT EXHIBIT
CASE NO. EP-11-CR-2728-KC
EXHIBIT NO. A (MTC)

certified as an instructor for the Child Protection System and regularly provide instruction to law enforcement officers prior to providing them access to the system.

3. The Child Protection System and related applications are only made available to specifically trained and licensed law enforcement officers and their use is restricted to only those law enforcement officers in the performance of law enforcement activity.

4. As part of a basic CPS "peer to peer" course, law enforcement investigators are taught the process of downloading freely available file-sharing software from the Internet and using that software to locate files depicting child sexual abuse on the Gnutella file-sharing network. This process begins by typing in descriptive text as key words and allowing the software to conduct a search of the network for files containing those key words. Officers are taught to use search terms, which are known by experienced investigators to return a greater than average number of files depicting the sexual abuse of children. Once offending files have been identified, the Internet Protocol, or IP addresses of the computers sharing those files are submitted to law enforcement servers located within the office of TLO in Boca Raton, Florida.

5. The software created for the Child Protection System was designed to replicate the process taught to investigators in their basic peer-to-peer training. Using a list of known key words, CPS software submits those as search terms on file sharing networks in the same fashion as freely

available software tools. The computers present on the these file sharing networks respond to these CPS requests in the same way they respond to any other program capable of operating on those networks. Included in those responses, participating computers provide their IP addresses, which are subsequently logged into the law enforcement database.

6. All components of the Child Protection System, to include the Peer Spectre application, function within established protocols of the file sharing networks on which they operate. All content received from participating computers is the result of requests sent to these computers using aforementioned protocols. None of the CPS software tools receive data beyond that which individual users make publicly available on these networks.

7. All computers actively connected to the Gnutella network communicate in a request / response manner. Every Gnutella message must adhere to a pre-defined structure, which is freely and publicly documented in the Gnutella network protocol. Any request that does not conform to this standard will be ignored by every other computer operating on the Gnutella network. For this reason, there is no way for an application such as Peer Spectre to "search" the entirety of a Gnutella-connected computer's contents or perform any other intrusive operation. The application simply sends a Gnutella "query" message to the receiving computer, consisting only of the keyword requested. It is the Gnutella software installed and running on the receiving

computer that performs a search within shared folders for that keyword and provides a pre-defined response.

8. Child Protection System software tools are copyrighted computer applications for which the source code has never been distributed. The source code is not distributed with the CPS software that is provided to trained law enforcement officers. Without the source code, it is not possible to authenticate the function of the application or validate its "calibration". Investigators do not receive the source code for CPS tools as part of their training, but only the applications themselves. Officers are taught how to validate the findings of the CPS system by conducting similar searches on the Gnutella network using freely available software applications.

9. The source code used by the Child Protection System is not accessible by the use of any of its related applications.

10. The source code used by the Child Protection System and related applications has not been, and will not be, distributed to any law enforcement officer or agency, to include Special Agent Melissa De La Rosa or Special Agent Nicolas Marquez of the Department of Homeland Security, Immigration and Customs Enforcement.

11. When Child Protection System applications are run, they submit lead information automatically into a law enforcement server located at TLO. There are no configuration options in any of the programs to prevent this from occurring. Only trained and licensed law enforcement investigators

receive the Child Protection System applications and they understand that the leads generated are from other licensed investigators running the application. To distribute this application to untrained and unlicensed persons would be a violation of the terms of use and compromise the training points already delivered to hundreds of investigators across the country.

12. Child Protection System applications submit all criminal lead information via the Internet to a single server by referencing a specific web address or Uniform Resource Locator (URL). This web location is not disclosed during training, but is programmed directly into the source code of the application. Users of Child Protection System applications cannot modify this address directly, but could easily expose it by using freely available network interrogation software. To distribute the application to untrained and unlicensed, non-law enforcement users could expose this web address, thereby making the law enforcement server located at TLO susceptible to digital interrogation or attack.

13. In addition to exposing the web address, distributing Child Protection System related applications could expose the format in which they communicate with the law enforcement server located at TLO. This knowledge could be used for nefarious purposes, allowing untrained and unlicensed non-law enforcement persons to submit false information into the law enforcement server. This act would not only create false leads for

investigators, but could also implicate an innocent person's IP address as participating in the collection, manufacture or distribution of child exploitation files.

14. The Child Protection System applications have been deployed since 2009 and are currently being used by investigators throughout the United States and around the world. Based on leads these applications generate, hundreds of search warrants have been written resulting in the rescue of many children. Since the release of the Child Protection System and related applications, I am not aware of any problems affecting the reliability of the data they collect.

[signature]

William S. Wiltse

I, Lynn Dallmer, a Notary Public of the County and State aforesaid, hereby certify that William Wiltse personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the 11th day of Apr., 2013.

[signature]
Notary Public

My Commission expires:

LYNN DALLMER
MY COMMISSION # EE222695
EXPIRES October 06, 2016
(407) 398-0153 FloridaNotaryService.com

**EXHIBIT "C"**

BLOOMBERG COMPANY OVERVIEW REPORT

Case 1:17-cv-20859-RNS Document 1-2 Entered on FLSD Docket 03/07/2017 Page 10 of 140

December 07, 2016 8:17 PM ET

## Internet Software and Services
## Company Overview of TLO, LLC

Snapshot | People

### Company Overview

TLO, LLC provides search and locating technology solutions. Its search and locating technology provides insights for debt/asset recovery, identify authentication, investigation, corporate risk management and due diligence, threat assessment, fraud mitigation, skip tracing and collections, insurance claims management, fraud detection and prevention, and legislative compliance. It serves public and private sector organizations, such as collections, attorneys and law firms, licensed investigators, financial services, insurance, corporate risk fraud and security, investigative reporters, law enforcements, governments, and repossession industries worldwide. The company was incorporated in 2009 and is based in Boca Raton, Florida. As of December 16, 2013, TLO, LLC operates as a subsidiary of TransUnion Intermediate Holdings, Inc.

Hide Detailed Description

4530 Conference Way South
Boca Raton, FL 33431
United States

**Phone:** 561-988-4200
**Fax:** 561-998-8628
**www.tlo.com**

Founded in **2009**

### Key Executives For TLO, LLC

**Desiree Asher**
Co-Chief Executive Officer

**Carly Asher Yoost**
Co-Chief Executive Officer

**Mr. John Walsh**
Founder

**Mr. Ole Poulsen**
Founder

**Mr. Daniel MacLachlan**
Chief Financial Officer
Age: 37

Compensation as of Fiscal Year 2016.

### Similar Private Companies By Industry

| Company Name | Region |
|---|---|
| "Atlantic Tele-Satellite, Inc. | United States |
| .Club Domains LLC | United States |
| .Comdaq Corporation | United States |
| @Court | United States |
| 0 Food Waste LLC | United States |

### Recent Private Companies Transactions

| Type Date | Target |
|---|---|

No transactions available in the past 12 months.

**Request Profile Update**

Case 1:17-cv-20859-RNS Document 1-2 Entered on FLSD Docket 03/07/2017 Page 11 of 140

## Internet Software and Services
## Company Overview of TLO, LLC

December 07, 2016 8:22 PM ET

**Snapshot** **People**

Overview | Board Members | Committees

**Executive Profile**

# Carly Asher Yoost

Co-Chief Executive Officer, TLO, LLC

| Age | Total Calculated Compensation |
|---|---|
| -- | -- |

This person is connected to **0** Board Members in **0** different organizations across **1** different industries.

**Background**

Carly Asher Yoost serves as the Co-Chief Executive Officer of TLO, LLC.

**Corporate Headquarters**

4530 Conference Way South
Boca Raton, Florida 33431

United States

Phone: 561-988-4200
Fax: 561-998-8628

**Board Members Memberships**

There is no Board Members Memberships data available.

**Education**

There is no Education data available.

**Other Affiliations**

There is no Company Affiliations data available.

**Annual Compensation**

There is no Annual Compensation data available.

**Stocks Options**

There is no Stock Options data available.

**Total Compensation**

There is no Total Compensation data available.

**Request Profile Update**

## From Around the Web

Sponsored Links by Taboola

**"Shark Tank" Star's Brilliant Mortgage Payoff Tip**

**The Easy Loan Site by Bills.com**

December 07, 2016 8:21 PM ET

**Internet Software and Services**
**Company Overview of TLO, LLC**

Snapshot | People

Overview | Board Members | Committees

**Executive Profile**

# Desiree Asher

Co-Chief Executive Officer, TLO, LLC

| Age | Total Calculated Compensation |
|---|---|
| -- | -- |

This person is connected to **0** Board Members in **0** different organizations across **1** different industries.

**Background**

Desiree Asher serves as the Co-Chief Executive Officer of TLO, LLC.

**Corporate Headquarters**

4530 Conference Way South
Boca Raton, Florida 33431

United States

Phone: 561-988-4200
Fax: 561-998-8628

**Board Members Memberships**

There is no Board Members Memberships data available.

**Education**

There is no Education data available.

**Other Affiliations**

There is no Company Affiliations data available.

**Annual Compensation**

There is no Annual Compensation data available.

**Stocks Options**

There is no Stock Options data available.

**Total Compensation**

There is no Total Compensation data available.

**Request Profile Update**

## From Around the Web

Sponsored Links by Taboola

**"Shark Tank" Star's Brilliant Mortgage Payoff Tip**
**The Easy Loan Site by Bills.com**

**Internet Software and Services**
**Company Overview of TLO, LLC**

December 07, 2016 8:23 PM ET

**Snapshot** **People**

**Overview** | **Board Members** | **Committees**

**Executive Profile**

# John Walsh

Founder, TLO, LLC

| Age | Total Calculated Compensation |
|---|---|
| -- | -- |

This person is connected to **0** Board Members in **0** different organizations across **1** different industries.

**Background**

Mr. John Walsh is Founder of TLO, LLC.

**Corporate Headquarters**

4530 Conference Way South
Boca Raton, Florida 33431

United States

Phone: 561-988-4200
Fax: 561-998-8628

**Board Members Memberships**

There is no Board Members Memberships data available.

**Education**

There is no Education data available.

**Other Affiliations**

There is no Company Affiliations data available.

**Annual Compensation**

There is no Annual Compensation data available.

**Stocks Options**

There is no Stock Options data available.

**Total Compensation**

There is no Total Compensation data available.

**Request Profile Update**

## From Around the Web

Sponsored Links by Taboola

**"Shark Tank" Star's Brilliant Mortgage Payoff Tip**

**The Easy Loan Site by Bills.com**

Case 1:17-cv-20859-RNS Document 1-2 Entered on FLSD Docket 03/07/2017 Page 14 of 140

**Professional Services**
**Company Overview of Cogint, Inc.**

December 07, 2016 8:24 PM ET

Snapshot | People

Overview | Board Members | Committees

**Executive Profile**

# Ole Poulsen

Chief Science Officer, Cogint, Inc.

| Age | Total Calculated Compensation |
|---|---|
| -- | -- |

This person is connected to **0** Board Members in **0** different organizations across **3** different industries.

**Background**

Mr. Ole Poulsen serves as Chief Science Officer of IDI, Inc. and served as its Chief Scientific Officer. Mr. Poulsen has been Chief Science Officer of Interactive Data, LLC since April 01, 2015. Mr. Poulsen is a Co-Founder of TLO, LLC. Mr. Poulsen served as Chief Technology Officer of data fusion company Seisint, which was acquired by LexisNexis in 2004 for $775 million. Mr. Poulsen was the Primary Systems Architect of leading data fusion products LexisNexis (formerly, ...

Read Full Background

**Corporate Headquarters**

2650 North Military Trail
Boca Raton, Florida 33431

United States

Phone: 561-757-4000
Fax: --

**Board Members Memberships**

There is no Board Members Memberships data available.

**Education**

There is no Education data available.

**Other Affiliations**

Interactive Data, LLC
TLO, LLC

**Annual Compensation**

There is no Annual Compensation data available.

**Stocks Options**

There is no Stock Options data available.

**Total Compensation**

There is no Total Compensation data available.

**Request Profile Update**

December 07, 2016 8:25 PM ET

**Professional Services**
**Company Overview of Cogint, Inc.**

**Snapshot** **People**

**Overview** **Board Members** **Committees**

**Executive Profile**

## Daniel MacLachlan

Chief Financial Officer, Cogint, Inc.

| Age | Total Calculated Compensation |
|---|---|
| **37** | **--** |

This person is connected to **0** Board Members in **0** different organizations across **3** different industries.

**Background**

Mr. Daniel MacLachlan, also known as Dan, has been Chief Financial Officer of IDI, Inc. since March 29, 2016. Mr. MacLachlan served as Chief Financial Officer of TLO, LLC from January 09, 2009 to December 2013. He served as the Chief Financial Officer of The Best One, Inc. (TBO) from October 2014 to February 2015, facilitating its merger with Tiger Media, Inc. Mr. MacLachlan has over a decade of experience as the Chief Financial Officer of data-driven technology companies. ...

Read Full Background

**Corporate Headquarters**

2650 North Military Trail
Boca Raton, Florida 33431

United States

Phone: 561-757-4000
Fax: --

**Board Members Memberships**

There is no Board Members Memberships data available.

**Education**

**BS**
Nova Southeastern University

**BBA**
Florida Atlantic University

**MBA**
Florida Gulf Coast University

**Other Affiliations**

**Annual Compensation**

There is no Annual Compensation data available.

**Stocks Options**

There is no Stock Options data available.

**Total Compensation**

There is no Total Compensation data available.

**EXHIBIT "D"**

AFFIDAVIT OF DERECK DUBNER

Case 3:11-cr-02728-KC Document 148-1 Filed 06/10/13 Page 1 of 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Cause No. EP-11-CR-2728-KC** |
| | § | |
| **ANGEL OCASIO** | § | |

**AFFIDAVIT OF DEREK A. DUBNER**

Before me, the undersigned authority, personally appeared DEREK A. DUBNER, who, being by me duly sworn, deposed as follows:

"My name is DEREK A. DUBNER, I am over the age of 21 years, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

"1. I currently reside in Palm Beach County, Florida.

"2. I am an attorney licensed to practice law in the State of Florida. I am currently serving as general counsel to TLO, LLC (TLO).

"3. TLO is a privately-held company formed in 2009 and headquartered in Boca Raton, Florida.

"4. TLO owns and maintains an advanced software suite known internationally as the Child Protection System (CPS) which is designed to assist law enforcement in the detection of Internet-based child pornography and the prosecution of those responsible for its proliferation.

"5. The CPS tools have been exclusively developed by TLO over the last four years. TLO has spent in excess of two million ($2,000,000) dollars developing and maintaining CPS and ensuring its security and confidentiality, including hardware and programming services.

"6. TLO vigorously protects the source and object code of the CPS as its value is

D

derived from not being generally known to, nor readily ascertainable by, any persons not employed by TLO. The source code is not distributed with the CPS software that is provided to trained law enforcement officers.

"7. Further, the CPS software tools are copyrighted computer applications for which the source code has never been distributed.

"8. Because it is an advanced application for tracking online predators used by law enforcement in over 43 countries and all 50 states of the United States, information relating to the function and uses is guarded with the highest level of caution. Providing access to anyone outside of law enforcement would compromise the value of the CPS as well as present and ongoing criminal investigations around the world.

"9. Based on TLO's success in the law enforcement sector, the CPS technology has attracted the attention of both government and private-sector entities that similarly require Internet-based file detection capability. These organizations seek technology solutions for problems ranging from intellectual property right protection to the securing of national security interests. As their efforts are largely cloaked in secrecy, providing CPS source code would adversely affect TLO's ability to pursue these commercial opportunities.

"10. Furthermore, competitors would exploit any form of source code disclosure to identify TLO's proprietary techniques for locating files on the Internet. This would diminish TLO as an industry leader and cause financial harm for which no adequate recompense would exist.

Case 3:11-cr-02729-KC Document 148-1 Filed 06/13/13 Page 3 of 3

I declare under criminal penalty of perjury that the foregoing is true and correct.

FURTHER SAYETH AFFIANT NOT.

DATED this 4th day of June, 2013.

DEREK A. DUBNER

I, Lynn Dallmer, a Notary Public of the County and State aforesaid, hereby certify that Derek A. Dubner personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the 4th day of June, 2013.

Notary Public

My Commission expires:

LYNN DALLMER
MY COMMISSION # EE222695
EXPIRES October 06, 2016
(407) 398-0153 FloridaNotaryService.com

**EXHIBIT "E"**

DE:438 OF CASE NO. 14-01793-PGH IN THE
UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

Seeking Alpha$^{\alpha}$

# IDI Inc. And TransUnion Enter Into Settlement Negotiations

Jun.20.16 | About: Cogint, Inc. (COGT)

Today, Monday June 20, 2016, IDI, Inc. (IDI) an emerging company in the data fusion and digital marketing industry and TransUnion (TRU), the credit agency and consumer data behemoth have entered in court mandated settlement discussions. Judge Paul G Hyman, Jr., Chief United States Bankruptcy Judge signed this order in his court on May 26, 2016. His signed order can be seen here:

Docket #436

Case 14-01793-PGH Doc 436 Filed 05/26/16 Page 1 of 2

**ORDERED in the Southern District of Florida on May 26, 2016.**

**Paul G. Hyman, Jr.**
**Chief United States Bankruptcy Judge**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | Chapter 11<br>Case No. 13-20853-PGH |
| TLFO, LLC,<br><br>Reorganized Debtor.<br>_______________/ | |
| TRANSUNION RISK AND ALTERNATIVE DATA SOLUTIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE BEST ONE, INC. and OLE POULSEN,<br><br>Defendants.<br>_______________/ | Adv. Pro. No. 14-01793-PGH |

**ORDER OF REFERRAL TO SETTLEMENT CONFERENCE**

TRU Legal Filing May 27 2016 - Judicial Settlement Conference

E

Case 1:17-cv-20859-RNS Document 1-2 Entered on FLSD Docket 03/07/2017 Page 22 of 140

ORDERED in the Southern District of Florida on May 25, 2016

Robert A. Mark, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re

TFLO, LLC,

Debtor.

CASE NO. 13-20853-BKC-PGH
CHAPTER 11

TRANSUNION RISK and ALTERNATIVE DATA SOLUTIONS, INC.,

Plaintiff,

vs.

THE BEST ONE, INC., and OLE

ADV. NO. 14-01793-PGH

This judicial settlement conference is scheduled to begin at 9:30am and is scheduled to terminate at 11pm EST. Representatives of both IDI Inc. and TransUnion will be on site to confer with their respective counsel and to utilize their best efforts to settle this litigation.

To review, TransUnion's subsidiary - TransUnion Risk and Alternative Data Solutions (TRADS) is the plaintiff against The Best One (TBO) and Ole Poulsen, who is the Chief Science Officer & Systems Architect of IDI Inc. These legal proceedings began back in October 2014 after TransUnion purchased the assets of TLO LLC (The Last One - formed by the late father of Data Fusion, Hank Asher and his business partner Ole Poulsen) out of bankruptcy. Florida Southern Bankruptcy Court Case #14 - 01793 (source).

For those who are unfamiliar with Mr. Asher - here is a noteworthy piece on him in a Vanity Fair article from December 2004.

And here is a definitive timeline of events leading up to this litigation:

IDI Inc. And TransUnion Enter Into Settlement Negotiations - Cogint... http://seekingalpha.com/article/3983141-idi-inc-transunion-enter-set...
Case 1:17-cv-20859-RNS Document 1-2 Entered on FLSD Docket 03/07/2017 Page 23 of 140

+ 1992 - Mr. Asher formed DBT Technologies with a proprietary product called AutoTrack (for Florida's DMV).

+ 1999 - Asher gets pushed out of DBT Technologies (allegedly by billionaire Ken Langone) due to Asher's past; FBI/DEA suspends contracts. He collects $140 million upon his departure.

+ 1999 - Asher forms Seisint with Michael Brauser (current Chairman of IDI, Inc.) with product called Accurint to compete against his former company DBT Technologies. Derek Dubner (current CEO of IDI, Inc.) joins Seisint in 1999 as Corporate Counsel (Dubner also served as Asher's personal lawyer). Ole Poulsen (current Chief Science Officer & Systems Architect of IDI, Inc.) also joins Seisint in 1999 and becomes lead programmer.

**EXHIBIT "F"**

FLORIDA DEPARTMENT OF STATE,
DIVISION OF CORPORATIONS ENTITY RECORD



Detail by Entity Name Page 1 of 2

FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

# Detail by Entity Name

**Florida Not For Profit Corporation**

CHILD RESCUE COALITION, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | N13000011073 |
| **FEI/EIN Number** | 45-5358378 |
| **Date Filed** | 12/11/2013 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | AMENDED AND RESTATED ARTICLES |
| **Event Date Filed** | 12/02/2015 |
| **Event Effective Date** | NONE |

**Principal Address**

4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431

**Mailing Address**

4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431

**Registered Agent Name & Address**

Yoost, Caroline Asher
4530 Conference Way South
Boca Raton, FL 33431

Name Changed: 01/21/2016

Address Changed: 01/21/2016

**Officer/Director Detail**

**Name & Address**

Title PRESIDENT/TREASURER/DIRECTOR

ASHER YOOST, CAROLINE
4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431

Title SECRETARY/DIRECTOR

ASHER, DESIREE



4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431

Title DIRECTOR

REDDEN ASHER, JUDITH
4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2014 | 03/25/2014 |
| 2015 | 02/06/2015 |
| 2016 | 01/21/2016 |

## Document Images

| | |
|---|---|
| 01/21/2016 -- ANNUAL REPORT | View image in PDF format |
| 12/02/2015 -- Amended and Restated Articles | View image in PDF format |
| 02/06/2015 -- ANNUAL REPORT | View image in PDF format |
| 03/25/2014 -- ANNUAL REPORT | View image in PDF format |
| 12/11/2013 -- Domestic Non-Profit | View image in PDF format |

Copyright © and Privacy Policies
State of Florida, Department of State

**2016 FLORIDA NOT FOR PROFIT CORPORATION ANNUAL REPORT**

**FILED**
**Jan 21, 2016**
**Secretary of State**
**CC0740756253**

DOCUMENT# N13000011073

**Entity Name:** CHILD RESCUE COALITION, INC.

**Current Principal Place of Business:**

4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431

**Current Mailing Address:**

4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431

**FEI Number: 45-5358378**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

YOOST, CAROLINE ASHER
4530 CONFERENCE WAY SOUTH
BOCA RATON, FL 33431 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: CAROLINE ASHER YOOST — 01/21/2016

Electronic Signature of Registered Agent — Date

**Officer/Director Detail :**

| | | | |
|---|---|---|---|
| Title | PRESIDENT/TREASURER/DIRECTOR | Title | SECRETARY/DIRECTOR |
| Name | ASHER YOOST, CAROLINE | Name | ASHER, DESIREE |
| Address | 4530 CONFERENCE WAY SOUTH | Address | 4530 CONFERENCE WAY SOUTH |
| City-State-Zip: | BOCA RATON FL 33431 | City-State-Zip: | BOCA RATON FL 33431 |

| | |
|---|---|
| Title | DIRECTOR |
| Name | REDDEN ASHER, JUDITH |
| Address | 4530 CONFERENCE WAY SOUTH |
| City-State-Zip: | BOCA RATON FL 33431 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 617, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: CAROLINE ASHER YOOST — PRESIDENT — 01/21/2016

Electronic Signature of Signing Officer/Director Detail — Date

**EXHIBIT "G"**

FIRST AFFIDAVIT OF WILLIAM WILTSE

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Cause No. EP-11-CR-2728-KC** |
| | § | |
| **ANGEL OCASIO** | § | |

**AFFIDAVIT OF WILLIAM S. WILTSE**

Before me, the undersigned authority, personally appeared WILLIAM S. WILTSE, who, being by me duly sworn, deposed as follows:

"My name is WILLIAM S. WILTSE, I am over the age of 21 years, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

"1. I currently reside in Palm Beach County, Florida.

"2. I am a former police detective for the City of Salem, Oregon. I worked as a police officer in the State of Oregon for the past 18 years, during which time I conducted criminal investigations into the sexual abuse and exploitation of children. I am currently sworn as a reserve Deputy Sheriff with the Palm Beach County Sheriff's Office in Palm Beach County, Florida.

"3. I am employed by TLO, LLC, as its Security Director over Law Enforcement Systems. I am neither an officer nor a director of TLO, LLC.

"4. TLO is a private company located in Boca Raton, Florida, that provides software and databases for the law enforcement community and other private investigators.

"5. TLO also manages the licensing for, and access to, the CPS, which is an application developed by TLO to allow law enforcement officers around the world to track the use and distribution of child pornography online.

"6. The "source and object code" comprised within the CPS system and that of "any application called by the Child Protection System when executing" requested by the Federal Public Defender's office is extremely voluminous. At more than 4.7 million lines of code, it would be difficult for TLO to compile and virtually impossible for receiving parties to review prior to trial. This line count does not include source code for the proprietary database storage system designed by TLO.

"7. In addition to the programming code, the data accessed by the CPS system is also voluminous and extremely sensitive. The criminal lead data alone is in excess of ten billion records since collection began at TLO in 2009. There are currently more than 15 thousand active criminal investigations identified in CPS by investigators from around the world. Providing this information would not only compromise those investigations, but would also undermine CPS as an investigative tool for law enforcement.

I declare under criminal penalty of perjury that the foregoing is true and correct.

FURTHER SAYETH AFFIANT NOT.

DATED this 3rd day of June, 2013.

WILLIAM S. WILTSE

I, Lynn Dallmer, a Notary Public of the County and State aforesaid, hereby certify that William S. Wiltse personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the 3rd day of June, 2013.

Notary Public

My Commission expires:

LYNN DALLMER
COMMISSION # EE222695
EXPIRES October 06, 2016
(407) 398-0153 FloridaNotaryService.com

____ / ____ / ______

**EXHIBIT "H"**

FEDERAL INFORMATION PROCESSING STANDARDS PUBLICATION,

FIPS PUB 180-4

# FIPS PUB 180-4

## FEDERAL INFORMATION PROCESSING STANDARDS PUBLICATION

# Secure Hash Standard (SHS)

**CATEGORY: COMPUTER SECURITY SUBCATEGORY: CRYPTOGRAPHY**

Information Technology Laboratory
National Institute of Standards and Technology
Gaithersburg, MD 20899-8900

This publication is available free of charge from:
http://dx.doi.org/10.6028/NIST.FIPS.180-4

August 2015

**U.S. Department of Commerce**
*Penny Pritzker, Secretary*

**National Institute of Standards and Technology**
*Willie E. May, Under Secretary for Standards and Technology and Director*



## FOREWORD

The Federal Information Processing Standards Publication Series of the National Institute of Standards and Technology (NIST) is the official series of publications relating to standards and guidelines adopted and promulgated under the provisions of the Federal Information Security Management Act (FISMA) of 2002.

Comments concerning FIPS publications are welcomed and should be addressed to the Director, Information Technology Laboratory, National Institute of Standards and Technology, 100 Bureau Drive, Stop 8900, Gaithersburg, MD 20899-8900.

Charles H. Romine, Director
Information Technology Laboratory

**Abstract**
This standard specifies hash algorithms that can be used to generate digests of messages. The digests are used to detect whether messages have been changed since the digests were generated.

*Key words*: computer security, cryptography, message digest, hash function, hash algorithm, Federal Information Processing Standards, Secure Hash Standard.

**Federal Information**
**Processing Standards Publication 180-4**

August 2015

**Announcing the**

# SECURE HASH STANDARD

Federal Information Processing Standards Publications (FIPS PUBS) are issued by the National Institute of Standards and Technology (NIST) after approval by the Secretary of Commerce pursuant to Section 5131 of the Information Technology Management Reform Act of 1996 (Public Law 104-106), and the Computer Security Act of 1987 (Public Law 100-235).

1. **Name of Standard**: Secure Hash Standard (SHS) (FIPS PUB 180-4).

2. **Category of Standard**: Computer Security Standard, Cryptography.

3. **Explanation**: This Standard specifies secure hash algorithms - SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256 - for computing a condensed representation of electronic data (message). When a message of any length less than $2^{64}$ bits (for SHA-1, SHA-224 and SHA-256) or less than $2^{128}$ bits (for SHA-384, SHA-512, SHA-512/224 and SHA-512/256) is input to a hash algorithm, the result is an output called a message digest. The message digests range in length from 160 to 512 bits, depending on the algorithm. Secure hash algorithms are typically used with other cryptographic algorithms, such as digital signature algorithms and keyed-hash message authentication codes, or in the generation of random numbers (bits).

The hash algorithms specified in this Standard are called secure because, for a given algorithm, it is computationally infeasible 1) to find a message that corresponds to a given message digest, or 2) to find two different messages that produce the same message digest. Any change to a message will, with a very high probability, result in a different message digest. This will result in a verification failure when the secure hash algorithm is used with a digital signature algorithm or a keyed-hash message authentication algorithm.

This Standard supersedes FIPS 180-3 [FIPS 180-3].

4. **Approving Authority**: Secretary of Commerce.

5. **Maintenance Agency**: U.S. Department of Commerce, National Institute of Standards and Technology (NIST), Information Technology Laboratory (ITL).

**6. Applicability**: This Standard is applicable to all Federal departments and agencies for the protection of sensitive unclassified information that is not subject to Title 10 United States Code Section 2315 (10 USC 2315) and that is not within a national security system as defined in Title 40 United States Code Section 11103(a)(1) (40 USC 11103(a)(1)). Either this Standard or Federal Information Processing Standard (FIPS) 202 must be implemented wherever a secure hash algorithm is required for Federal applications, including as a component within other cryptographic algorithms and protocols. This Standard may be adopted and used by non-Federal Government organizations.

**7. Specifications**: Federal Information Processing Standard (FIPS) 180-4, Secure Hash Standard (SHS) (affixed).

**8. Implementations:** The secure hash algorithms specified herein may be implemented in software, firmware, hardware or any combination thereof. Only algorithm implementations that are validated by NIST will be considered as complying with this standard. Information about the validation program can be obtained at http://csrc.nist.gov/groups/STM/index.html.

**9. Implementation Schedule**: Guidance regarding the testing and validation to FIPS 180-4 and its relationship to FIPS 140-2 can be found in IG 1.10 of the Implementation Guidance for FIPS PUB 140-2 and the Cryptographic Module Validation Program at http://csrc.nist.gov/groups/STM/cmvp/index.html.

**10. Patents**: Implementations of the secure hash algorithms in this standard may be covered by U.S. or foreign patents.

**11. Export Control**: Certain cryptographic devices and technical data regarding them are subject to Federal export controls. Exports of cryptographic modules implementing this standard and technical data regarding them must comply with these Federal regulations and be licensed by the Bureau of Export Administration of the U.S. Department of Commerce. Information about export regulations is available at: http://www.bis.doc.gov/index.htm.

**12. Qualifications:** While it is the intent of this Standard to specify general security requirements for generating a message digest, conformance to this Standard does not assure that a particular implementation is secure. The responsible authority in each agency or department shall assure that an overall implementation provides an acceptable level of security.  This Standard will be reviewed every five years in order to assess its adequacy.

**13. Waiver Procedure:** The Federal Information Security Management Act (FISMA) does not allow for waivers to a FIPS that is made mandatory by the Secretary of Commerce.

**14. Where to Obtain Copies of the Standard**: This publication is available electronically by accessing http://csrc.nist.gov/publications/.  Other computer security publications are available at the same web site.

**Federal Information**
**Processing Standards Publication 180-4**

**Specifications for the**

# SECURE HASH STANDARD

## Table of Contents

**1. INTRODUCTION** .......... **3**

**2. DEFINITIONS** .......... **4**

2.1 GLOSSARY OF TERMS AND ACRONYMS .......... 4
2.2 ALGORITHM PARAMETERS, SYMBOLS, AND TERMS .......... 4
*2.2.1 Parameters* .......... *4*
*2.2.2 Symbols and Operations* .......... *5*

**3. NOTATION AND CONVENTIONS** .......... **7**

3.1 BIT STRINGS AND INTEGERS .......... 7
3.2 OPERATIONS ON WORDS .......... 8

**4. FUNCTIONS AND CONSTANTS** .......... **10**

4.1 FUNCTIONS .......... 10
*4.1.1 SHA-1 Functions* .......... *10*
*4.1.2 SHA-224 and SHA-256 Functions* .......... *10*
*4.1.3 SHA-384, SHA-512, SHA-512/224 and SHA-512/256 Functions* .......... *11*
4.2 CONSTANTS .......... 11
*4.2.1 SHA-1 Constants* .......... *11*
*4.2.2 SHA-224 and SHA-256 Constants* .......... *11*
*4.2.3 SHA-384, SHA-512, SHA-512/224 and SHA-512/256 Constants* .......... *12*

**5. PREPROCESSING** .......... **13**

5.1 PADDING THE MESSAGE .......... 13
*5.1.1 SHA-1, SHA-224 and SHA-256* .......... *13*
*5.1.2 SHA-384, SHA-512, SHA-512/224 and SHA-512/256* .......... *13*
5.2 PARSING THE MESSAGE .......... 14
*5.2.1 SHA-1, SHA-224 and SHA-256* .......... *14*
*5.2.2 SHA-384, SHA-512, SHA-512/224 and SHA-512/256* .......... *14*
5.3 SETTING THE INITIAL HASH VALUE ($H^{(0)}$) .......... 14
*5.3.1 SHA-1* .......... *14*
*5.3.2 SHA-224* .......... *14*
*5.3.3 SHA-256* .......... *15*
*5.3.4 SHA-384* .......... *15*
*5.3.5 SHA-512* .......... *15*
*5.3.6 SHA-512/t* .......... *16*

**6. SECURE HASH ALGORITHMS** .......... **18**

6.1 SHA-1 .......... 18
*6.1.1 SHA-1 Preprocessing* .......... *18*
*6.1.2 SHA-1 Hash Computation* .......... *18*

*6.1.3 Alternate Method for Computing a SHA-1 Message Digest* ..... *20*
6.2 SHA-256 ..... 21
*6.2.1 SHA-256 Preprocessing* ..... *22*
*6.2.2 SHA-256 Hash Computation* ..... *22*
6.3 SHA-224 ..... 23
6.4 SHA-512 ..... 24
*6.4.1 SHA-512 Preprocessing* ..... *24*
*6.4.2 SHA-512 Hash Computation* ..... *24*
6.5 SHA-384 ..... 26
6.6 SHA-512/224 ..... 26
6.7 SHA-512/256 ..... 26

**7. TRUNCATION OF A MESSAGE DIGEST ..... 27**

**APPENDIX A: ADDITIONAL INFORMATION ..... 28**

A.1 SECURITY OF THE SECURE HASH ALGORITHMS ..... 28
A.2 IMPLEMENTATION NOTES ..... 28
A.3 OBJECT IDENTIFIERS ..... 28

**APPENDIX B: REFERENCES ..... 29**

**APPENDIX C: TECHNICAL CHANGES FROM FIPS 180-3 ..... 30**

**ERRATUM ..... 31**

# 1. INTRODUCTION

This Standard specifies secure hash algorithms, SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256. All of the algorithms are iterative, one-way hash functions that can process a message to produce a condensed representation called a *message digest*. These algorithms enable the determination of a message's integrity: any change to the message will, with a very high probability, result in a different message digest. This property is useful in the generation and verification of digital signatures and message authentication codes, and in the generation of random numbers or bits.

Each algorithm can be described in two stages: preprocessing and hash computation. Preprocessing involves padding a message, parsing the padded message into *m*-bit blocks, and setting initialization values to be used in the hash computation. The hash computation generates a *message schedule* from the padded message and uses that schedule, along with functions, constants, and word operations to iteratively generate a series of hash values. The final hash value generated by the hash computation is used to determine the message digest.

The algorithms differ most significantly in the security strengths that are provided for the data being hashed. The security strengths of these hash functions and the system as a whole when each of them is used with other cryptographic algorithms, such as digital signature algorithms and keyed-hash message authentication codes, can be found in [SP 800-57] and [SP 800-107].

Additionally, the algorithms differ in terms of the size of the blocks and words of data that are used during hashing or message digest sizes. Figure 1 presents the basic properties of these hash algorithms.

| Algorithm | Message Size (bits) | Block Size (bits) | Word Size (bits) | Message Digest Size (bits) |
|---|---|---|---|---|
| **SHA-1** | $< 2^{64}$ | 512 | 32 | 160 |
| **SHA-224** | $< 2^{64}$ | 512 | 32 | 224 |
| **SHA-256** | $< 2^{64}$ | 512 | 32 | 256 |
| **SHA-384** | $< 2^{128}$ | 1024 | 64 | 384 |
| **SHA-512** | $< 2^{128}$ | 1024 | 64 | 512 |
| **SHA-512/224** | $< 2^{128}$ | 1024 | 64 | 224 |
| **SHA-512/256** | $< 2^{128}$ | 1024 | 64 | 256 |

**Figure 1: Secure Hash Algorithm Properties**

# 2. DEFINITIONS

## 2.1 Glossary of Terms and Acronyms

| | |
|---|---|
| Bit | A binary digit having a value of 0 or 1. |
| Byte | A group of eight bits. |
| FIPS | Federal Information Processing Standard. |
| NIST | National Institute of Standards and Technology. |
| SHA | Secure Hash Algorithm. |
| SP | Special Publication |
| Word | A group of either 32 bits (4 bytes) or 64 bits (8 bytes), depending on the secure hash algorithm. |

## 2.2 Algorithm Parameters, Symbols, and Terms

### 2.2.1 Parameters

The following parameters are used in the secure hash algorithm specifications in this Standard.

| | |
|---|---|
| $a, b, c, \ldots, h$ | Working variables that are the $w$-bit words used in the computation of the hash values, $H^{(i)}$. |
| $H^{(i)}$ | The $i^{th}$ hash value. $H^{(0)}$ is the *initial* hash value; $H^{(N)}$ is the *final* hash value and is used to determine the message digest. |
| $H_j^{(i)}$ | The $j^{th}$ word of the $i^{th}$ hash value, where $H_0^{(i)}$ is the left-most word of hash value $i$. |
| $K_t$ | Constant value to be used for the iteration $t$ of the hash computation. |
| $k$ | Number of zeroes appended to a message during the padding step. |
| $\ell$ | Length of the message, $M$, in bits. |
| $m$ | Number of bits in a message block, $M^{(i)}$. |
| $M$ | Message to be hashed. |

| | |
|---|---|
| $M^{(i)}$ | Message block $i$, with a size of $m$ bits. |
| $M_j^{(i)}$ | The $j^{th}$ word of the $i^{th}$ message block, where $M_0^{(i)}$ is the left-most word of message block $i$. |
| $n$ | Number of bits to be rotated or shifted when a word is operated upon. |
| $N$ | Number of blocks in the padded message. |
| $T$ | Temporary $w$-bit word used in the hash computation. |
| $w$ | Number of bits in a word. |
| $W_t$ | The $t^{th}$ $w$-bit word of the message schedule. |

### 2.2.2 Symbols and Operations

The following symbols are used in the secure hash algorithm specifications; each operates on $w$-bit words.

| | |
|---|---|
| $\wedge$ | Bitwise AND operation. |
| $\vee$ | Bitwise OR ("inclusive-OR") operation. |
| $\oplus$ | Bitwise XOR ("exclusive-OR") operation. |
| $\neg$ | Bitwise complement operation. |
| $+$ | Addition modulo $2^w$. |
| $<<$ | Left-shift operation, where $x << n$ is obtained by discarding the left-most $n$ bits of the word $x$ and then padding the result with $n$ zeroes on the right. |
| $>>$ | Right-shift operation, where $x >> n$ is obtained by discarding the right-most $n$ bits of the word $x$ and then padding the result with $n$ zeroes on the left. |

The following operations are used in the secure hash algorithm specifications:

| | |
|---|---|
| $ROTL^n(x)$ | The *rotate left* (circular left shift) operation, where $x$ is a $w$-bit word and $n$ is an integer with $0 \leq n < w$, is defined by $ROTL^n(x) = (x << n) \vee (x >> w - n)$. |
| $ROTR^n(x)$ | The *rotate right* (circular right shift) operation, where $x$ is a $w$-bit word and $n$ is an integer with $0 \leq n < w$, is defined by $ROTR^n(x) = (x >> n) \vee (x << w - n)$. |

***SHR***$^n$**(*x*)** The *right shift* operation, where $x$ is a $w$-bit word and $n$ is an integer with $0 \leq n < w$, is defined by $SHR^n(x)=x >> n$.

# 3. NOTATION AND CONVENTIONS

## 3.1 Bit Strings and Integers

The following terminology related to bit strings and integers will be used.

1. A *hex digit* is an element of the set {0, 1,..., 9, a,..., f}. A hex digit is the representation of a 4-bit string. For example, the hex digit "7" represents the 4-bit string "0111", and the hex digit "a" represents the 4-bit string "1010".

2. A *word* is a *w*-bit string that may be represented as a sequence of hex digits. To convert a word to hex digits, each 4-bit string is converted to its hex digit equivalent, as described in (1) above. For example, the 32-bit string

   ```
   1010 0001 0000 0011 1111 1110 0010 0011
   ```

   can be expressed as "a103fe23", and the 64-bit string

   ```
   1010 0001 0000 0011 1111 1110 0010 0011
   0011 0010 1110 1111 0011 0000 0001 1010
   ```

   can be expressed as "a103fe2332ef301a".

   *Throughout this specification, the "big-endian" convention is used when expressing both 32- and 64-bit words, so that within each word, the most significant bit is stored in the left-most bit position.*

3. An *integer* may be represented as a word or pair of words. A word representation of the message length, $\ell$, in bits, is required for the padding techniques of Sec. 5.1.

   An integer between 0 and $2^{32}$-1 *inclusive* may be represented as a 32-bit word. The least significant four bits of the integer are represented by the right-most hex digit of the word representation. For example, the integer $291=2^8 + 2^5 + 2^1 + 2^0=256+32+2+1$ is represented by the hex word "00000123".

   The same holds true for an integer between 0 and $2^{64}$-1 *inclusive*, which may be represented as a 64-bit word.

   If $Z$ is an integer, $0 \leq Z < 2^{64}$, then $Z=2^{32}X + Y$, where $0 \leq X < 2^{32}$ and $0 \leq Y < 2^{32}$. Since $X$ and $Y$ can be represented as 32-bit words $x$ and $y$, respectively, the integer $Z$ can be represented as the pair of words $(x, y)$. This property is used for SHA-1, SHA-224 and SHA-256.

If $Z$ is an integer, $0 \le Z < 2^{128}$, then $Z=2^{64}X + Y$, where $0 \le X < 2^{64}$ and $0 \le Y < 2^{64}$. Since $X$ and $Y$ can be represented as 64-bit words $x$ and $y$, respectively, the integer $Z$ can be represented as the pair of words $(x, y)$. This property is used for SHA-384, SHA-512, SHA-512/224 and SHA-512/256.

4. For the secure hash algorithms, the size of the *message block* - $m$ bits - depends on the algorithm.

   a) For **SHA-1, SHA-224** and **SHA-256**, each message block has **512 bits**, which are represented as a sequence of sixteen **32-bit words**.

   b) For **SHA-384, SHA-512, SHA-512/224** and **SHA-512/256** each message block has **1024 bits**, which are represented as a sequence of sixteen **64-bit words**.

## 3.2 Operations on Words

The following operations are applied to $w$-bit words in all five secure hash algorithms. SHA-1, SHA-224 and SHA-256 operate on 32-bit words ($w$=32), and SHA-384, SHA-512, SHA-512/224 and SHA-512/256 operate on 64-bit words ($w$=64).

1. Bitwise *logical* word operations: $\wedge$, $\vee$, $\oplus$, and $\neg$ (see Sec. 2.2.2).

2. Addition modulo $2^w$.

   The operation $x + y$ is defined as follows. The words $x$ and $y$ represent integers $X$ and $Y$, where $0 \le X < 2^w$ and $0 \le Y < 2^w$. For positive integers $U$ and $V$, let $U \bmod V$ be the remainder upon dividing $U$ by $V$. Compute

   $$Z = (X + Y) \bmod 2^w.$$

   Then $0 \le Z < 2^w$. Convert the integer $Z$ to a word, $z$, and define $z = x + y$.

3. The *right shift* operation ***SHR*** $^n$**(*x*)**, where $x$ is a $w$-bit word and $n$ is an integer with $0 \le n < w$, is defined by

   $$SHR^n(x) = x >> n.$$

   This operation is used in the SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256 algorithms.

4. The *rotate right* (circular right shift) operation ***ROTR*** $^n$**(*x*)**, where $x$ is a $w$-bit word and $n$ is an integer with $0 \le n < w$, is defined by

   $$ROTR^n(x) = (x >> n) \vee (x << w - n).$$

Thus, $ROTR^n(x)$ is equivalent to a circular shift (rotation) of $x$ by $n$ positions to the right.

This operation is used by the SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256 algorithms.

5. The *rotate left* (circular left shift) operation, $\boldsymbol{ROTL^n(x)}$, where $x$ is a $w$-bit word and $n$ is an integer with $0 \leq n < w$, is defined by

   $$ROTL^n(x)=(x \ll n) \vee (x \gg w - n).$$

   Thus, $ROTL^n(x)$ is equivalent to a circular shift (rotation) of $x$ by $n$ positions to the left.

   This operation is used only in the SHA-1 algorithm.

6. Note the following equivalence relationships, where $w$ is fixed in each relationship:

   $$ROTL^n(x) \approx ROTR^{w-n}(x)$$

   $$ROTR^n(x) \approx ROTL^{w-n}(x)$$

# 4. FUNCTIONS AND CONSTANTS

## 4.1 Functions

This section defines the functions that are used by each of the algorithms. Although the SHA-224, SHA-256, SHA-384,SHA-512, SHA-512/224 and SHA-512/256 algorithms all use similar functions, their descriptions are separated into sections for SHA-224 and SHA-256 (Sec. 4.1.2) and for SHA-384, SHA-512, SHA-512/224 and SHA-512/256 (Sec. 4.1.3), since the input and output for these functions are words of different sizes. Each of the algorithms include $Ch(x, y, z)$ and $Maj(x, y, z)$ functions; the exclusive-OR operation ($\oplus$) in these functions may be replaced by a bitwise OR operation ($\vee$) and produce identical results.

### 4.1.1 SHA-1 Functions

SHA-1 uses a sequence of logical functions, $f_0, f_1, \ldots, f_{79}$. Each function $f_t$, where $0 \le t \le 79$, operates on three 32-bit words, $x$, $y$, and $z$, and produces a 32-bit word as output. The function $f_t(x, y, z)$ is defined as follows:

$$f_t(x, y, z) = \begin{cases} Ch(x, y, z) = (x \wedge y) \oplus (\neg x \wedge z) & 0 \le t \le 19 \\ Parity(x, y, z) = x \oplus y \oplus z & 20 \le t \le 39 \\ Maj(x, y, z) = (x \wedge y) \oplus (x \wedge z) \oplus (y \wedge z) & 40 \le t \le 59 \\ Parity(x, y, z) = x \oplus y \oplus z & 60 \le t \le 79. \end{cases} \tag{4.1}$$

### 4.1.2 SHA-224 and SHA-256 Functions

SHA-224 and SHA-256 both use six logical functions, where *each function operates on 32-bit words*, which are represented as $x$, $y$, and $z$. The result of each function is a new 32-bit word.

$$Ch(x,y,z) = (x \wedge y) \oplus (\neg x \wedge z) \tag{4.2}$$

$$Maj(x,y,z) = (x \wedge y) \oplus (x \wedge z) \oplus (y \wedge z) \tag{4.3}$$

$$\textstyle\sum_0^{\{256\}}(x) = ROTR^2(x) \oplus ROTR^{13}(x) \oplus ROTR^{22}(x) \tag{4.4}$$

$$\textstyle\sum_1^{\{256\}}(x) = ROTR^6(x) \oplus ROTR^{11}(x) \oplus ROTR^{25}(x) \tag{4.5}$$

$$\sigma_0^{\{256\}}(x) = ROTR^7(x) \oplus ROTR^{18}(x) \oplus SHR^3(x) \tag{4.6}$$

$$\sigma_1^{\{256\}}(x) = ROTR^{17}(x) \oplus ROTR^{19}(x) \oplus SHR^{10}(x) \tag{4.7}$$

### 4.1.3 SHA-384, SHA-512, SHA-512/224 and SHA-512/256 Functions

SHA-384, SHA-512, SHA-512/224 and SHA-512/256 use six logical functions, where *each function operates on 64-bit words*, which are represented as $x$, $y$, and $z$. The result of each function is a new 64-bit word.

$$Ch(x,y,z) = (x \wedge y) \oplus (\neg x \wedge z) \quad (4.8)$$

$$Maj(x,y,z) = (x \wedge y) \oplus (x \wedge z) \oplus (y \wedge z) \quad (4.9)$$

$$\textstyle\sum_0^{\{512\}}(x) = ROTR^{28}(x) \oplus ROTR^{34}(x) \oplus ROTR^{39}(x) \quad (4.10)$$

$$\textstyle\sum_1^{\{512\}}(x) = ROTR^{14}(x) \oplus ROTR^{18}(x) \oplus ROTR^{41}(x) \quad (4.11)$$

$$\sigma_0^{\{512\}}(x) = ROTR^{1}(x) \oplus ROTR^{8}(x) \oplus SHR^{7}(x) \quad (4.12)$$

$$\sigma_1^{\{512\}}(x) = ROTR^{19}(x) \oplus ROTR^{61}(x) \oplus SHR^{6}(x) \quad (4.13)$$

## 4.2 Constants

### 4.2.1 SHA-1 Constants

SHA-1 uses a sequence of eighty constant 32-bit words, $K_0, K_1, \ldots, K_{79}$, which are given by

$$K_t = \begin{cases} \texttt{5a827999} & 0 \le t \le 19 \\ \texttt{6ed9eba1} & 20 \le t \le 39 \\ \texttt{8f1bbcdc} & 40 \le t \le 59 \\ \texttt{ca62c1d6} & 60 \le t \le 79 \end{cases} \quad (4.14)$$

### 4.2.2 SHA-224 and SHA-256 Constants

SHA-224 and SHA-256 use the same sequence of sixty-four constant 32-bit words, $K_0^{\{256\}}, K_1^{\{256\}}, \ldots, K_{63}^{\{256\}}$. These words represent the first thirty-two bits of the fractional parts of the cube roots of the first sixty-four prime numbers. In hex, these constant words are (from left to right)

```
428a2f98 71374491 b5c0fbcf e9b5dba5 3956c25b 59f111f1 923f82a4 ab1c5ed5
d807aa98 12835b01 243185be 550c7dc3 72be5d74 80deb1fe 9bdc06a7 c19bf174
e49b69c1 efbe4786 0fc19dc6 240ca1cc 2de92c6f 4a7484aa 5cb0a9dc 76f988da
983e5152 a831c66d b00327c8 bf597fc7 c6e00bf3 d5a79147 06ca6351 14292967
27b70a85 2e1b2138 4d2c6dfc 53380d13 650a7354 766a0abb 81c2c92e 92722c85
a2bfe8a1 a81a664b c24b8b70 c76c51a3 d192e819 d6990624 f40e3585 106aa070
19a4c116 1e376c08 2748774c 34b0bcb5 391c0cb3 4ed8aa4a 5b9cca4f 682e6ff3
748f82ee 78a5636f 84c87814 8cc70208 90befffa a4506ceb bef9a3f7 c67178f2
```

### 4.2.3   SHA-384, SHA-512, SHA-512/224 and SHA-512/256 Constants

SHA-384, SHA-512, SHA-512/224 and SHA-512/256 use the same sequence of eighty constant 64-bit words, $K_0^{\{512\}}, K_1^{\{512\}}, \ldots, K_{79}^{\{512\}}$. These words represent the first sixty-four bits of the fractional parts of the cube roots of the first eighty prime numbers. In hex, these constant words are (from left to right)

```
428a2f98d728ae22  7137449123ef65cd  b5c0fbcfec4d3b2f  e9b5dba58189dbbc
3956c25bf348b538  59f111f1b605d019  923f82a4af194f9b  ab1c5ed5da6d8118
d807aa98a3030242  12835b0145706fbe  243185be4ee4b28c  550c7dc3d5ffb4e2
72be5d74f27b896f  80deb1fe3b1696b1  9bdc06a725c71235  c19bf174cf692694
e49b69c19ef14ad2  efbe4786384f25e3  0fc19dc68b8cd5b5  240ca1cc77ac9c65
2de92c6f592b0275  4a7484aa6ea6e483  5cb0a9dcbd41fbd4  76f988da831153b5
983e5152ee66dfab  a831c66d2db43210  b00327c898fb213f  bf597fc7beef0ee4
c6e00bf33da88fc2  d5a79147930aa725  06ca6351e003826f  142929670a0e6e70
27b70a8546d22ffc  2e1b21385c26c926  4d2c6dfc5ac42aed  53380d139d95b3df
650a73548baf63de  766a0abb3c77b2a8  81c2c92e47edaee6  92722c851482353b
a2bfe8a14cf10364  a81a664bbc423001  c24b8b70d0f89791  c76c51a30654be30
d192e819d6ef5218  d69906245565a910  f40e35855771202a  106aa07032bbd1b8
19a4c116b8d2d0c8  1e376c085141ab53  2748774cdf8eeb99  34b0bcb5e19b48a8
391c0cb3c5c95a63  4ed8aa4ae3418acb  5b9cca4f7763e373  682e6ff3d6b2b8a3
748f82ee5defb2fc  78a5636f43172f60  84c87814a1f0ab72  8cc702081a6439ec
90befffa23631e28  a4506cebde82bde9  bef9a3f7b2c67915  c67178f2e372532b
ca273eceea26619c  d186b8c721c0c207  eada7dd6cde0eb1e  f57d4f7fee6ed178
06f067aa72176fba  0a637dc5a2c898a6  113f9804bef90dae  1b710b35131c471b
28db77f523047d84  32caab7b40c72493  3c9ebe0a15c9bebc  431d67c49c100d4c
4cc5d4becb3e42b6  597f299cfc657e2a  5fcb6fab3ad6faec  6c44198c4a475817
```

# 5. PREPROCESSING

Preprocessing consists of three steps: padding the message, $M$ (Sec. 5.1), parsing the message into message blocks (Sec. 5.2), and setting the initial hash value, $H^{(0)}$ (Sec. 5.3).

## 5.1 Padding the Message

The purpose of this padding is to ensure that the padded message is a multiple of 512 or 1024 bits, depending on the algorithm. Padding can be inserted before hash computation begins on a message, or at any other time during the hash computation prior to processing the block(s) that will contain the padding.

### 5.1.1 SHA-1, SHA-224 and SHA-256

Suppose that the length of the message, $M$, is $\ell$ bits. Append the bit "1" to the end of the message, followed by $k$ zero bits, where $k$ is the smallest, non-negative solution to the equation $\ell + 1 + k \equiv 448 \bmod 512$. Then append the 64-bit block that is equal to the number $\ell$ expressed using a binary representation. For example, the (8-bit ASCII) message "**abc**" has length $8 \times 3 = 24$, so the message is padded with a one bit, then $448 - (24 + 1) = 423$ zero bits, and then the message length, to become the 512-bit padded message

$$\underbrace{01100001}_{\text{“a”}}\ \underbrace{01100010}_{\text{“b”}}\ \underbrace{01100011}_{\text{“c”}}\ 1\ \overbrace{00\ldots00}^{423}\ \overbrace{00\ldots0\underbrace{11000}_{\ell=24}}^{64}$$

The length of the padded message should now be a multiple of 512 bits.

### 5.1.2 SHA-384, SHA-512, SHA-512/224 and SHA-512/256

Suppose the length of the message $M$, in bits, is $\ell$ bits. Append the bit "1" to the end of the message, followed by $k$ zero bits, where $k$ is the smallest non-negative solution to the equation $\ell + 1 + k \equiv 896 \bmod 1024$. Then append the 128-bit block that is equal to the number $\ell$ expressed using a binary representation. For example, the (8-bit ASCII) message "**abc**" has length $8 \times 3 = 24$, so the message is padded with a one bit, then $896 - (24 + 1) = 871$ zero bits, and then the message length, to become the 1024-bit padded message

$$\underbrace{01100001}_{\text{“a”}}\ \underbrace{01100010}_{\text{“b”}}\ \underbrace{01100011}_{\text{“c”}}\ 1\ \overbrace{00\ldots00}^{871}\ \overbrace{00\ldots0\underbrace{11000}_{\ell=24}}^{128}$$

The length of the padded message should now be a multiple of 1024 bits.

## 5.2 Parsing the Message

The message and its padding must be parsed into $N$ $m$-bit blocks.

### 5.2.1 SHA-1, SHA-224 and SHA-256

For SHA-1, SHA-224 and SHA-256, the message and its padding are parsed into $N$ 512-bit blocks, $M^{(1)}, M^{(2)},..., M^{(N)}$. Since the 512 bits of the input block may be expressed as sixteen 32-bit words, the first 32 bits of message block $i$ are denoted $M_0^{(i)}$, the next 32 bits are $M_1^{(i)}$, and so on up to $M_{15}^{(i)}$.

### 5.2.2 SHA-384, SHA-512, SHA-512/224 and SHA-512/256

For SHA-384, SHA-512, SHA-512/224 and SHA-512/256, the message and its padding are parsed into $N$ 1024-bit blocks, $M^{(1)}, M^{(2)},..., M^{(N)}$. Since the 1024 bits of the input block may be expressed as sixteen 64-bit words, the first 64 bits of message block $i$ are denoted $M_0^{(i)}$, the next 64 bits are $M_1^{(i)}$, and so on up to $M_{15}^{(i)}$.

## 5.3 Setting the Initial Hash Value ($H^{(0)}$)

Before hash computation begins for each of the secure hash algorithms, the initial hash value, $H^{(0)}$, must be set. The size and number of words in $H^{(0)}$ depends on the message digest size.

### 5.3.1 SHA-1

For SHA-1, the initial hash value, $H^{(0)}$, shall consist of the following five 32-bit words, in hex:

$$H_0^{(0)} = \texttt{67452301}$$
$$H_1^{(0)} = \texttt{efcdab89}$$
$$H_2^{(0)} = \texttt{98badcfe}$$
$$H_3^{(0)} = \texttt{10325476}$$
$$H_4^{(0)} = \texttt{c3d2e1f0}$$

### 5.3.2 SHA-224

For SHA-224, the initial hash value, $H^{(0)}$, shall consist of the following eight 32-bit words, in hex:

$$H_0^{(0)} = \texttt{c1059ed8}$$
$$H_1^{(0)} = \texttt{367cd507}$$
$$H_2^{(0)} = \texttt{3070dd17}$$
$$H_3^{(0)} = \texttt{f70e5939}$$
$$H_4^{(0)} = \texttt{ffc00b31}$$
$$H_5^{(0)} = \texttt{68581511}$$
$$H_6^{(0)} = \texttt{64f98fa7}$$

$H_7^{(0)}$ = befa4fa4

### 5.3.3 SHA-256

For SHA-256, the initial hash value, $H^{(0)}$, shall consist of the following eight 32-bit words, in hex:

$H_0^{(0)}$ = 6a09e667
$H_1^{(0)}$ = bb67ae85
$H_2^{(0)}$ = 3c6ef372
$H_3^{(0)}$ = a54ff53a
$H_4^{(0)}$ = 510e527f
$H_5^{(0)}$ = 9b05688c
$H_6^{(0)}$ = 1f83d9ab
$H_7^{(0)}$ = 5be0cd19

These words were obtained by taking the first thirty-two bits of the fractional parts of the square roots of the first eight prime numbers.

### 5.3.4 SHA-384

For SHA-384, the initial hash value, $H^{(0)}$, shall consist of the following eight 64-bit words, in hex:

$H_0^{(0)}$ = cbbb9d5dc1059ed8
$H_1^{(0)}$ = 629a292a367cd507
$H_2^{(0)}$ = 9159015a3070dd17
$H_3^{(0)}$ = 152fecd8f70e5939
$H_4^{(0)}$ = 67332667ffc00b31
$H_5^{(0)}$ = 8eb44a8768581511
$H_6^{(0)}$ = db0c2e0d64f98fa7
$H_7^{(0)}$ = 47b5481dbefa4fa4

These words were obtained by taking the first sixty-four bits of the fractional parts of the square roots of the ninth through sixteenth prime numbers.

### 5.3.5 SHA-512

For SHA-512, the initial hash value, $H^{(0)}$, shall consist of the following eight 64-bit words, in hex:

$H_0^{(0)}$ = 6a09e667f3bcc908
$H_1^{(0)}$ = bb67ae8584caa73b

$H_2^{(0)}$ = 3c6ef372fe94f82b
$H_3^{(0)}$ = a54ff53a5f1d36f1
$H_4^{(0)}$ = 510e527fade682d1
$H_5^{(0)}$ = 9b05688c2b3e6c1f
$H_6^{(0)}$ = 1f83d9abfb41bd6b
$H_7^{(0)}$ = 5be0cd19137e2179

These words were obtained by taking the first sixty-four bits of the fractional parts of the square roots of the first eight prime numbers.

### 5.3.6 SHA-512/*t*

"SHA-512/*t*" is the general name for a *t*-bit hash function based on SHA-512 whose output is truncated to *t* bits. Each hash function requires a distinct initial hash value. This section provides a procedure for determining the initial value for SHA-512/ *t* for a given value of *t*.

For SHA-512/*t*, *t* is any positive integer without a leading zero such that $t < 512$, and *t* is not 384. For example: *t* is 256, but not 0256, and "SHA-512/*t*" is "SHA-512/256" (an 11 character long ASCII string), which is equivalent to 53 48 41 2D 35 31 32 2F 32 35 36 in hexadecimal.

The initial hash value for SHA-512/*t*, for a given value of *t*, shall be generated by the *SHA-512/t IV Generation Function* below.

*SHA-512/t IV Generation Function*

(begin:)

Denote $H^{(0)'}$ to be the initial hash value of SHA-512 as specified in Section 5.3.5 above.

Denote $H^{(0)''}$ to be the initial hash value computed below.

$H^{(0)}$ is the IV for SHA-512/*t*.

For $i = 0$ to 7
{
$H_i^{(0)''} = H_i^{(0)'} \oplus$ a5a5a5a5a5a5a5a5(in hex).
}

$H^{(0)}$ = SHA-512 ("SHA-512/*t*") using $H^{(0)''}$ as the IV, where *t* is the specific truncation value.

(end.)

SHA-512/224 ($t = 224$) and SHA-512/256 ($t = 256$) are **approved** hash algorithms. Other SHA-512/$t$ hash algorithms with different $t$ values may be specified in [SP 800-107] in the future as the need arises. Below are the IVs for SHA-512/224 and SHA-512/256.

#### 5.3.6.1 SHA-512/224

For SHA-512/224, the initial hash value, $H^{(0)}$, shall consist of the following eight 64-bit words, in hex:

$$H_0^{(0)} = \texttt{8C3D37C819544DA2}$$
$$H_1^{(0)} = \texttt{73E1996689DCD4D6}$$
$$H_2^{(0)} = \texttt{1DFAB7AE32FF9C82}$$
$$H_3^{(0)} = \texttt{679DD514582F9FCF}$$
$$H_4^{(0)} = \texttt{0F6D2B697BD44DA8}$$
$$H_5^{(0)} = \texttt{77E36F7304C48942}$$
$$H_6^{(0)} = \texttt{3F9D85A86A1D36C8}$$
$$H_7^{(0)} = \texttt{1112E6AD91D692A1}$$

These words were obtained by executing the *SHA-512/t IV Generation Function* with $t = 224$.

#### 5.3.6.2 SHA-512/256

For SHA-512/256, the initial hash value, $H^{(0)}$, shall consist of the following eight 64-bit words, in hex:

$$H_0^{(0)} = \texttt{22312194FC2BF72C}$$
$$H_1^{(0)} = \texttt{9F555FA3C84C64C2}$$
$$H_2^{(0)} = \texttt{2393B86B6F53B151}$$
$$H_3^{(0)} = \texttt{963877195940EABD}$$
$$H_4^{(0)} = \texttt{96283EE2A88EFFE3}$$
$$H_5^{(0)} = \texttt{BE5E1E2553863992}$$
$$H_6^{(0)} = \texttt{2B0199FC2C85B8AA}$$
$$H_7^{(0)} = \texttt{0EB72DDC81C52CA2}$$

These words were obtained by executing the *SHA-512/t IV Generation Function* with $t = 256$.

# 6. SECURE HASH ALGORITHMS

In the following sections, the hash algorithms are not described in ascending order of size. SHA-256 is described before SHA-224 because the specification for SHA-224 is identical to SHA-256, except that different initial hash values are used, and the final hash value is truncated to 224 bits for SHA-224. The same is true for SHA-512, SHA-384, SHA-512/224 and SHA-512/256, except that the final hash value is truncated to 224 bits for SHA-512/224, 256 bits for SHA-512/256 or 384 bits for SHA-384.

For each of the secure hash algorithms, there may exist alternate computation methods that yield identical results; one example is the alternative SHA-1 computation described in Sec. 6.1.3. Such alternate methods may be implemented in conformance to this standard.

## 6.1 SHA-1

SHA-1 may be used to hash a message, *M*, having a length of $\ell$ bits, where $0 \le \ell < 2^{64}$. The algorithm uses 1) a message schedule of eighty 32-bit words, 2) five working variables of 32 bits each, and 3) a hash value of five 32-bit words. The final result of SHA-1 is a 160-bit message digest.

The words of the message schedule are labeled $W_0, W_1, \ldots, W_{79}$. The five working variables are labeled ***a***, ***b***, ***c***, ***d***, and ***e***. The words of the hash value are labeled $H_0^{(i)}, H_1^{(i)}, \ldots, H_4^{(i)}$, which will hold the initial hash value, $H^{(0)}$, replaced by each successive intermediate hash value (after each message block is processed), $H^{(i)}$, and ending with the final hash value, $H^{(N)}$. SHA-1 also uses a single temporary word, *T*.

### 6.1.1 SHA-1 Preprocessing

1. Set the initial hash value, $H^{(0)}$, as specified in Sec. 5.3.1.

2. The message is padded and parsed as specified in Section 5.

### 6.1.2 SHA-1 Hash Computation

The SHA-1 hash computation uses functions and constants previously defined in Sec. 4.1.1 and Sec. 4.2.1, respectively. Addition (+) is performed modulo $2^{32}$.

Each message block, $M^{(1)}, M^{(2)}, \ldots, M^{(N)}$, is processed in order, using the following steps:

For $i$=1 to $N$:
{

1. Prepare the message schedule, $\{W_t\}$:

$$W_t = \begin{cases} M_t^{(i)} & 0 \le t \le 15 \\ ROTL^1(W_{t-3} \oplus W_{t-8} \oplus W_{t-14} \oplus W_{t-16}) & 16 \le t \le 79 \end{cases}$$

2. Initialize the five working variables, ***a***, ***b***, ***c***, ***d***, and ***e***, with the ($i$-1)st hash value:

$$a = H_0^{(i-1)}$$
$$b = H_1^{(i-1)}$$
$$c = H_2^{(i-1)}$$
$$d = H_3^{(i-1)}$$
$$e = H_4^{(i-1)}$$

3. For $t$=0 to 79:
{

$$T = ROTL^5(a) + f_t(b,c,d) + e + K_t + W_t$$
$$e = d$$
$$d = c$$
$$c = ROTL^{30}(b)$$
$$b = a$$
$$a = T$$

}

4. Compute the $i^{th}$ intermediate hash value $H^{(i)}$:

$$H_0^{(i)} = a + H_0^{(i-1)}$$
$$H_1^{(i)} = b + H_1^{(i-1)}$$
$$H_2^{(i)} = c + H_2^{(i-1)}$$
$$H_3^{(i)} = d + H_3^{(i-1)}$$
$$H_4^{(i)} = e + H_4^{(i-1)}$$

}

After repeating steps one through four a total of $N$ times (i.e., after processing $M^{(N)}$), the resulting 160-bit message digest of the message, $M$, is

$$H_0^{(N)} \| H_1^{(N)} \| H_2^{(N)} \| H_3^{(N)} \| H_4^{(N)}$$

### 6.1.3 Alternate Method for Computing a SHA-1 Message Digest

The SHA-1 hash computation method described in Sec. 6.1.2 assumes that the message schedule $W_0, W_1, \ldots, W_{79}$ is implemented as an array of eighty 32-bit words. This is efficient from the standpoint of the minimization of execution time, since the addresses of $W_{t-3}, \ldots, W_{t-16}$ in step (2) of Sec. 6.1.2 are easily computed.

However, if memory is limited, an alternative is to regard $\{W_t\}$ as a circular queue that may be implemented using an array of sixteen 32-bit words, $W_0, W_1, \ldots, W_{15}$. The alternate method that is described in this section yields the same message digest as the SHA-1 computation method described in Sec. 6.1.2. Although this alternate method saves sixty-four 32-bit words of storage, it is likely to lengthen the execution time due to the increased complexity of the address computations for the $\{W_t\}$ in step (3).

For this alternate SHA-1 method, let $MASK$=`0000000f` (in hex). As in Sec. 6.1.1, addition is performed modulo $2^{32}$. Assuming that the preprocessing as described in Sec. 6.1.1 has been performed, the processing of $M^{(i)}$ is as follows:

For $i$=1 to $N$:
{
1. For $t$=0 to 15:
   {
   $$W_t = M_t^{(i)}$$
   }

2. Initialize the five working variables, ***a***, ***b***, ***c***, ***d***, and ***e***, with the $(i\text{-}1)^{st}$ hash value:

   $$a = H_0^{(i-1)}$$
   $$b = H_1^{(i-1)}$$
   $$c = H_2^{(i-1)}$$
   $$d = H_3^{(i-1)}$$
   $$e = H_4^{(i-1)}$$

3. For $t$=0 to 79:
   {
   $$s = t \wedge MASK$$

If $t \geq 16$ then

{

$$W_s = ROTL^1(W_{(s+13)\wedge MASK} \oplus W_{(s+8)\wedge MASK} \oplus W_{(s+2)\wedge MASK} \oplus W_s)$$

}

$$T = ROTL^5(a) + f_t(b,c,d) + e + K_t + W_s$$
$$e = d$$
$$d = c$$
$$c = ROTL^{30}(b)$$
$$b = a$$
$$a = T$$

}

4. Compute the $i^{th}$ intermediate hash value $H^{(i)}$:

$$H_0^{(i)} = a + H_0^{(i-1)}$$
$$H_1^{(i)} = b + H_1^{(i-1)}$$
$$H_2^{(i)} = c + H_2^{(i-1)}$$
$$H_3^{(i)} = d + H_3^{(i-1)}$$
$$H_4^{(i)} = e + H_4^{(i-1)}$$

}

After repeating steps one through four a total of $N$ times (i.e., after processing $M^{(N)}$), the resulting 160-bit message digest of the message, $M$, is

$$H_0^{(N)} \| H_1^{(N)} \| H_2^{(N)} \| H_3^{(N)} \| H_4^{(N)}$$

## 6.2 SHA-256

SHA-256 may be used to hash a message, $M$, having a length of $\ell$ bits, where $0 \leq \ell < 2^{64}$. The algorithm uses 1) a message schedule of sixty-four 32-bit words, 2) eight working variables of 32 bits each, and 3) a hash value of eight 32-bit words. The final result of SHA-256 is a 256-bit message digest.

The words of the message schedule are labeled $W_0$, $W_1$,..., $W_{63}$. The eight working variables are labeled ***a***, ***b***, ***c***, ***d***, ***e***, ***f***, ***g***, and ***h***. The words of the hash value are labeled $H_0^{(i)}, H_1^{(i)}, \ldots, H_7^{(i)}$, which will hold the initial hash value, $H^{(0)}$, replaced by each successive intermediate hash value

(after each message block is processed), $H^{(i)}$, and ending with the final hash value, $H^{(N)}$. SHA-256 also uses two temporary words, $T_1$ and $T_2$.

### 6.2.1 SHA-256 Preprocessing

1. Set the initial hash value, $H^{(0)}$, as specified in Sec. 5.3.3.

2. The message is padded and parsed as specified in Section 5.

### 6.2.2 SHA-256 Hash Computation

The SHA-256 hash computation uses functions and constants previously defined in Sec. 4.1.2 and Sec. 4.2.2, respectively. Addition (+) is performed modulo $2^{32}$.

Each message block, $M^{(1)}, M^{(2)}, \ldots, M^{(N)}$, is processed in order, using the following steps:

For $i$=1 to $N$:
{

1. Prepare the message schedule, $\{W_t\}$:

$$W_t = \begin{cases} M_t^{(i)} & 0 \le t \le 15 \\ \sigma_1^{\{256\}}(W_{t-2}) + W_{t-7} + \sigma_0^{\{256\}}(W_{t-15}) + W_{t-16} & 16 \le t \le 63 \end{cases}$$

2. Initialize the eight working variables, ***a***, ***b***, ***c***, ***d***, ***e***, ***f***, ***g***, and ***h***, with the ($i$-1)st hash value:

$$a = H_0^{(i-1)}$$
$$b = H_1^{(i-1)}$$
$$c = H_2^{(i-1)}$$
$$d = H_3^{(i-1)}$$
$$e = H_4^{(i-1)}$$
$$f = H_5^{(i-1)}$$
$$g = H_6^{(i-1)}$$
$$h = H_7^{(i-1)}$$

3. For $t$=0 to 63:

{

$$T_1 = h + \sum_1^{\{256\}}(e) + Ch(e,f,g) + K_t^{\{256\}} + W_t$$
$$T_2 = \sum_0^{\{256\}}(a) + Maj(a,b,c)$$
$$h = g$$
$$g = f$$
$$f = e$$
$$e = d + T_1$$
$$d = c$$
$$c = b$$
$$b = a$$
$$a = T_1 + T_2$$

}

4. Compute the $i^{th}$ intermediate hash value $H^{(i)}$:

$$H_0^{(i)} = a + H_0^{(i-1)}$$
$$H_1^{(i)} = b + H_1^{(i-1)}$$
$$H_2^{(i)} = c + H_2^{(i-1)}$$
$$H_3^{(i)} = d + H_3^{(i-1)}$$
$$H_4^{(i)} = e + H_4^{(i-1)}$$
$$H_5^{(i)} = f + H_5^{(i-1)}$$
$$H_6^{(i)} = g + H_6^{(i-1)}$$
$$H_7^{(i)} = h + H_7^{(i-1)}$$

}

After repeating steps one through four a total of $N$ times (i.e., after processing $M^{(N)}$), the resulting 256-bit message digest of the message, $M$, is

$$H_0^{(N)} \| H_1^{(N)} \| H_2^{(N)} \| H_3^{(N)} \| H_4^{(N)} \| H_5^{(N)} \| H_6^{(N)} \| H_7^{(N)}$$

## 6.3 SHA-224

SHA-224 may be used to hash a message, $M$, having a length of $\ell$ bits, where $0 \le \ell < 2^{64}$. The function is defined in the exact same manner as SHA-256 (Section 6.2), with the following two exceptions:

1. The initial hash value, $H^{(0)}$, shall be set as specified in Sec. 5.3.2; and

2. The 224-bit message digest is obtained by truncating the final hash value, $H(N)$, to its left-most 224 bits:

$$H_0^{(N)} \| H_1^{(N)} \| H_2^{(N)} \| H_3^{(N)} \| H_4^{(N)} \| H_5^{(N)} \| H_6^{(N)}$$

## 6.4 SHA-512

SHA-512 may be used to hash a message, $M$, having a length of $\ell$ bits, where $0 \le \ell < 2^{128}$. The algorithm uses 1) a message schedule of eighty 64-bit words, 2) eight working variables of 64 bits each, and 3) a hash value of eight 64-bit words. The final result of SHA-512 is a 512-bit message digest.

The words of the message schedule are labeled $W_0, W_1, \ldots, W_{79}$. The eight working variables are labeled ***a***, ***b***, ***c***, ***d***, ***e***, ***f***, ***g***, and ***h***. The words of the hash value are labeled $H_0^{(i)}, H_1^{(i)}, \ldots, H_7^{(i)}$, which will hold the initial hash value, $H^{(0)}$, replaced by each successive intermediate hash value (after each message block is processed), $H^{(i)}$, and ending with the final hash value, $H^{(N)}$. SHA-512 also uses two temporary words, $T_1$ and $T_2$.

### 6.4.1 SHA-512 Preprocessing

1. Set the initial hash value, $H^{(0)}$, as specified in Sec. 5.3.5.

2. The message is padded and parsed as specified in Section 5.

### 6.4.2 SHA-512 Hash Computation

The SHA-512 hash computation uses functions and constants previously defined in Sec. 4.1.3 and Sec. 4.2.3, respectively. Addition (+) is performed modulo $2^{64}$.

Each message block, $M^{(1)}, M^{(2)}, \ldots, M^{(N)}$, is processed in order, using the following steps:

For $i$=1 to $N$:
{

1. Prepare the message schedule, $\{W_t\}$:

$$W_t = \begin{cases} M_t^{(i)} & 0 \le t \le 15 \\ \sigma_1^{\{512\}}(W_{t-2}) + W_{t-7} + \sigma_0^{\{512\}}(W_{t-15}) + W_{t-16} & 16 \le t \le 79 \end{cases}$$

2. Initialize the eight working variables, ***a***, ***b***, ***c***, ***d***, ***e***, ***f***, ***g***, and ***h***, with the $(i\text{-}1)^{st}$ hash value:

$$a = H_0^{(i-1)}$$
$$b = H_1^{(i-1)}$$
$$c = H_2^{(i-1)}$$
$$d = H_3^{(i-1)}$$
$$e = H_4^{(i-1)}$$
$$f = H_5^{(i-1)}$$
$$g = H_6^{(i-1)}$$
$$h = H_7^{(i-1)}$$

3. For $t$=0 to 79:

{

$$T_1 = h + \sum_1^{\{512\}}(e) + Ch(e,f,g) + K_t^{\{512\}} + W_t$$
$$T_2 = \sum_0^{\{512\}}(a) + Maj(a,b,c)$$
$$h = g$$
$$g = f$$
$$f = e$$
$$e = d + T_1$$
$$d = c$$
$$c = b$$
$$b = a$$
$$a = T_1 + T_2$$

}

4. Compute the $i^{\text{th}}$ intermediate hash value $H^{(i)}$:

$$H_0^{(i)} = a + H_0^{(i-1)}$$
$$H_1^{(i)} = b + H_1^{(i-1)}$$
$$H_2^{(i)} = c + H_2^{(i-1)}$$
$$H_3^{(i)} = d + H_3^{(i-1)}$$
$$H_4^{(i)} = e + H_4^{(i-1)}$$
$$H_5^{(i)} = f + H_5^{(i-1)}$$
$$H_6^{(i)} = g + H_6^{(i-1)}$$
$$H_7^{(i)} = h + H_7^{(i-1)}$$

}

After repeating steps one through four a total of $N$ times (i.e., after processing $M^{(N)}$), the resulting 512-bit message digest of the message, $M$, is

$$H_0^{(N)} \| H_1^{(N)} \| H_2^{(N)} \| H_3^{(N)} \| H_4^{(N)} \| H_5^{(N)} \| H_6^{(N)} \| H_7^{(N)}$$

## 6.5 SHA-384

SHA-384 may be used to hash a message, $M$, having a length of $\ell$ bits, where $0 \le \ell < 2^{128}$. The algorithm is defined in the exact same manner as SHA-512 (Sec. 6.4), with the following two exceptions:

1. The initial hash value, $H^{(0)}$, shall be set as specified in Sec. 5.3.4; and
2. The 384-bit message digest is obtained by truncating the final hash value, $H^{(N)}$, to its left-most 384 bits:

$$H_0^{(N)} \| H_1^{(N)} \| H_2^{(N)} \| H_3^{(N)} \| H_4^{(N)} \| H_5^{(N)}$$

## 6.6 SHA-512/224

SHA-512/224 may be used to hash a message, $M$, having a length of $\ell$ bits, where $0 \le \ell < 2^{128}$. The algorithm is defined in the exact same manner as SHA-512 (Sec. 6.4), with the following two exceptions:

1. The initial hash value, $H^{(0)}$, shall be set as specified in Sec. 5.3.6.1; and
2. The 224-bit message digest is obtained by truncating the final hash value, $H^{(N)}$, to its left-most 224 bits.

## 6.7 SHA-512/256

SHA-512/256 may be used to hash a message, $M$, having a length of $\ell$ bits, where $0 \le \ell < 2^{128}$. The algorithm is defined in the exact same manner as SHA-512 (Sec. 6.4), with the following two exceptions:

1. The initial hash value, $H^{(0)}$, shall be set as specified in Sec. 5.3.6.2; and
2. The 256-bit message digest is obtained by truncating the final hash value, $H^{(N)}$, to its left-most 256 bits.

# 7.     TRUNCATION OF A MESSAGE DIGEST

Some application may require a hash function with a message digest length different than those provided by the hash functions in this Standard. In such cases, a truncated message digest may be used, whereby a hash function with a larger message digest length is applied to the data to be hashed, and the resulting message digest is truncated by selecting an appropriate number of the leftmost bits. For guidelines on choosing the length of the truncated message digest and information about its security implications for the cryptographic application that uses it, see SP 800-107 [SP 800-107].

# APPENDIX A: Additional Information

## A.1    Security of the Secure Hash Algorithms

The security of the five hash algorithms, SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256 is discussed in [SP 800-107].

## A.2    Implementation Notes

Examples of SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256 are available at http://csrc.nist.gov/groups/ST/toolkit/examples.html.

## A.3    Object Identifiers

Object identifiers (OIDs) for the SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256 algorithms are posted at http://csrc.nist.gov/groups/ST/crypto_apps_infra/csor/algorithms.html.

# APPENDIX B: REFERENCES

[FIPS 180-3]        NIST, Federal Information Processing Standards Publication 180-3, *Secure Hash Standards (SHS)*, October 2008.

[SP 800-57]         NIST Special Publication (SP) 800-57, Part 1, *Recommendation for Key Management: General*, (Draft) May 2011.

[SP 800-107]        NIST Special Publication (SP) 800-107, *Recommendation for Applications Using Approved Hash Algorithms*, (Revised), (Draft) September 2011.

# APPENDIX C: Technical Changes from FIPS 180-3

1. In FIPS 180-3, padding was inserted before hash computation begins. FIPS 140-4 removed this restriction. Padding can be inserted before hash computation begins or at any other time during the hash computation prior to processing the message block(s) containing the padding.

2. FIPS 180-4 adds two additional algorithms: SHA-512/224 and SHA-512/256 to the Standard and the method for determining the initial value for SHA-512/*t* for a given value of *t*.

# ERRATUM

The following change has been incorporated into FIPS 180-4, as of the date indicated in the table.

| DATE | TYPE | CHANGE | PAGE NUMBER |
|---|---|---|---|
| 5/9/2014 | Editorial | Change "$t < 79$" to "$t \leq 79$" | Page 10, Section 4.1.1, Line 1 |

The attached draft FIPS 180-4 (provided here for **historical** purposes) has been superseded by the following FIPS publication:

Publication Number:     **FIPS 180-4**

Title:                  **Secure Hash Standard (SHS)**

Publication Date:       **08/2015**

- The 8/2015 release of FIPS 180-4 updates only the Applicability Clause.
- Final Publication of FIPS 180-4:
  DOI: http://dx.doi.org/10.6028/NIST.FIPS.180-4
  Direct link: http://nvlpubs.nist.gov/nistpubs/FIPS/NIST.FIPS.180-4.pdf

- Original (March 2012) publication of FIPS 180-4:
  http://www.nist.gov/manuscript-publication-search.cfm?pub_id=910977

- FIPS 180-4 on the CSRC FIPS publications page:
  http://csrc.nist.gov/publications/PubsFIPS.html#180-4

- Information on other NIST Computer Security Division publications and programs can be found at: http://csrc.nist.gov/

The following information was posted with the attached DRAFT document:

**FIPS 202, SHA-3 Standard: Permutation-Based Hash and Extendable-Output Functions and Revision to the Applicability Clause of FIPS 180-4, Secure Hash Standard**
***August 5, 2015***

NIST published a Federal Register Notice, on August 5, 2015 to announce the publication of Federal Information Processing Standard (FIPS) 202, SHA-3 Standard: Permutation-Based Hash and Extendable-Output Functions, and a Revision of the Applicability Clause of Federal Information Processing Standard (FIPS) 180-4, Secure Hash Standard. FIPS 202 specifies the SHA-3 family of hash functions, as well as mechanisms for other cryptographic functions to be specified in the future. The revision to the Applicability Clause of FIPS 180-4 approves the use of hash functions specified in either FIPS 180-4 or FIPS 202 when a secure hash function is required for the protection of sensitive, unclassified information in Federal applications, including as a component within other cryptographic algorithms and protocols.

**EXHIBIT "I"**

42 U.S.C. § 17615 STATUTE

(9) develop procedures for handling seized evidence;
(10) maintain--
(A) such reports and records as are required under this title [42 USCS §§ 17611 et seq.]; and
(B) such other reports and records as determined by the Attorney General; and
(11) seek to comply with national standards regarding the investigation and prosecution of Internet crimes against children, as set forth by the Attorney General, to the extent such standards are consistent with the law of the State where the task force is located.

(Oct. 13, 2008, P. L. 110-401, Title I, § 104, 122 Stat. 4235 .)

§ 17615. National Internet Crimes Against Children Data System

(a) **In general.** The Attorney General shall establish, consistent with all existing Federal laws relating to the protection of privacy, a National Internet Crimes Against Children Data System. The system shall not be used to search for or obtain any information that does not involve the use of the Internet to facilitate child exploitation.

(b) **Intent of Congress.** It is the purpose and intent of Congress that the National Internet Crimes Against Children Data System established in subsection (a) is intended to continue and build upon Operation Fairplay developed by the Wyoming Attorney General's office, which has established a secure, dynamic undercover infrastructure that has facilitated online law enforcement investigations of child exploitation, information sharing, and the capacity to collect and aggregate data on the extent of the problems of child exploitation.

(c) **Purpose of System.** The National Internet Crimes Against Children Data System established under subsection (a) shall be dedicated to assisting and supporting credentialed law enforcement agencies authorized to investigate child exploitation in accordance with Federal, State, local, and tribal laws, including by providing assistance and support to--
(1) Federal agencies investigating and prosecuting child exploitation;
(2) the ICAC Task Force Program established under section 102 [42 USCS § 17612];
(3) State, local, and tribal agencies investigating and prosecuting child exploitation; and
(4) foreign or international law enforcement agencies, subject to approval by the Attorney General.

(d) **Cyber safe deconfliction and information sharing.** The National Internet Crimes Against Children Data System established under subsection (a)--
(1) shall be housed and maintained within the Department of Justice or a credentialed law enforcement agency;
(2) shall be made available for a nominal charge to support credentialed law enforcement agencies in accordance with subsection (c); and

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

98922004

(3) shall--

(A) allow Federal, State, local, and tribal agencies and ICAC task forces investigating and prosecuting child exploitation to contribute and access data for use in resolving case conflicts;

(B) provide, directly or in partnership with a credentialed law enforcement agency, a dynamic undercover infrastructure to facilitate online law enforcement investigations of child exploitation;

(C) facilitate the development of essential software and network capability for law enforcement participants; and

(D) provide software or direct hosting and support for online investigations of child exploitation activities, or, in the alternative, provide users with a secure connection to an alternative system that provides such capabilities, provided that the system is hosted within a governmental agency or a credentialed law enforcement agency.

(e) **Collection and reporting of data.**

(1) In general. The National Internet Crimes Against Children Data System established under subsection (a) shall ensure the following:

(A) Real-time reporting. All child exploitation cases involving local child victims that are reasonably detectable using available software and data are, immediately upon their detection, made available to participating law enforcement agencies.

(B) High-priority suspects. Every 30 days, at minimum, the National Internet Crimes Against Children Data System shall--

(i) identify high-priority suspects, as such suspects are determined by indicators of seriousness of offense or dangerousness to the community or a potential local victim; and

(ii) report all such identified high-priority suspects to participating law enforcement agencies.

(C) Annual reports. Any statistical data indicating the overall magnitude of child pornography trafficking and child exploitation in the United States and internationally is made available and included in the National Strategy, as is required under section 101(c)(16) [42 USCS § 17611(c)(16)].

(2) Rule of construction. Nothing in this subsection shall be construed to limit the ability of participating law enforcement agencies to disseminate investigative leads or statistical information in accordance with State and local laws.

(f) **Mandatory requirements of network.** The National Internet Crimes Against Children Data System established under subsection (a) shall develop, deploy, and maintain an integrated technology and training program that provides--

(1) a secure, online system for Federal law enforcement agencies, ICAC task forces, and other State, local, and tribal law enforcement agencies for use in resolving case conflicts, as

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

98922004

provided in subsection (d);

(2) a secure system enabling online communication and collaboration by Federal law enforcement agencies, ICAC task forces, and other State, local, and tribal law enforcement agencies regarding ongoing investigations, investigatory techniques, best practices, and any other relevant news and professional information;

(3) a secure online data storage and analysis system for use by Federal law enforcement agencies, ICAC task forces, and other State, local, and tribal law enforcement agencies;

(4) secure connections or interaction with State and local law enforcement computer networks, consistent with reasonable and established security protocols and guidelines;

(5) guidelines for use of the National Internet Crimes Against Children Data System by Federal, State, local, and tribal law enforcement agencies and ICAC task forces; and

(6) training and technical assistance on the use of the National Internet Crimes Against Children Data System by Federal, State, local, and tribal law enforcement agencies and ICAC task forces.

(g) **National Internet Crimes Against Children Data System Steering Committee.** The Attorney General shall establish a National Internet Crimes Against Children Data System Steering Committee to provide guidance to the Network relating to the program under subsection (f), and to assist in the development of strategic plans for the System. The Steering Committee shall consist of 10 members with expertise in child exploitation prevention and interdiction prosecution, investigation, or prevention, including--

(1) 3 representatives elected by the local directors of the ICAC task forces, such representatives shall represent different geographic regions of the country;

(2) 1 representative of the Department of Justice Office of Information Services;

(3) 1 representative from Operation Fairplay, currently hosted at the Wyoming Office of the Attorney General;

(4) 1 representative from the law enforcement agency having primary responsibility for hosting and maintaining the National Internet Crimes Against Children Data System;

(5) 1 representative of the Federal Bureau of Investigation's Innocent Images National Initiative or Regional Computer Forensic Lab program;

(6) 1 representative of the Immigration and Customs Enforcement's Cyber Crimes Center;

(7) 1 representative of the United States Postal Inspection Service; and

(8) 1 representative of the Department of Justice.

(h) **Authorization of appropriations.** There are authorized to be appropriated for each of the fiscal years 2009 through 2016, $2,000,000 to carry out the provisions of this section.

(Oct. 13, 2008, P. L. 110-401, Title I, § 105, 122 Stat. 4236; Dec. 7, 2012, P. L. 112-206, § 8, 126 Stat. 1493 .)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**EXHIBIT "J"**

AFFIDAVIT OF ROBERT MAURO



**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FLORIDA**

**GENERAL AFFIDAVIT AND APPLICATION FOR SEARCH WARRANT**

**STATE OF FLORIDA )**
**) SS**
**COUNTY OF BROWARD )**

BEFORE THE UNDERSIGNED, THE HONORABLE M. DESTRY _______, Judge of the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, State of Florida, personally came Detective Robert Mauro, of the Fort Lauderdale Police Department, who after being first duly sworn, deposes and says:

**DESCRIPTION OF PREMISES TO BE SEARCHED:**

**9288 Chelsea Drive South, City of Plantation, County of Broward, State of Florida.**

9288 Chelsea Drive South is a villa style, single story, single family home. It is a masonry structure with a beige exterior. The gutters and entrance door are both pink in color. The roof of the structure is shake style and brown in color. The numbers "9288" are affixed in three-inch block lettering above the garage door. The single car garage is attached to the structure.

Your affiant has personally been to 9288 Chelsea Drive South, Plantation, Florida, and can positively identify the residence.

**STATUTE(S) BEING VIOLATED:**

| | |
|---|---|
| F.S. 827.071(5) | Possession of Material Depicting Sexual Performance by a Child |
| F.S. 827.071(4) | Possession of Material Depicting Sexual Performance by a Child with Intent to Promote. |
| F.S. 847.0137 | Transmission of Child Pornography by Electronic Device |

J

**PROPERTY SOUGHT:**

Your Affiant seeks to seize the below-described evidence and to conduct a forensic search of any of the listed items that may be in electronic or digital format.

1. Images or videos of children engaged in sexual conduct as defined in F.S. 827.071 and F.S. 847.001(3), in whatever format they may take, including, but not limited to, digital images, printed images, developed film, undeveloped film.

2. Computerized images with the following file names , or the printed versions thereof:

   SHA1: 2L3VPMMDYMNJHU566DIK26BXGCZJDOQY
   File Name: DSC06603_2.jpg

   SHA1: SJNX5JEQY2L3RWH4YSKFJL2BQA6SR6XJ
   File Name: hayley008.jpg

   SHA1:4GNSYJKR5WKBC5CXGMIOAX5MOVHKKN7C
   File Name: Homemade Underage - Ninfeta sexo - Kinder porno 29sec illegal preteen underage lolita kiddy child(1).mpg

3. Computers.

4. Computer input and output devices to include but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media.

5. Computer storage media and the digital content to include but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data or images of child pornography.

6. Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

7. Items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized.

8. Manuals and other documents (whether digital or written), which describe operation of items or software, seized.

9. Correspondence or other documents (whether digital or written) exhibiting an interest in the sexual exploitation of children.

10. Any and all correspondence, in electronic, printed or any other form, pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexual conduct, as defined in F.S. 827.071 and F.S. 847.001(3).

11. Any and all books and magazines, film, negatives, motion picture and video cassettes containing visual depictions of minors engaged in sexual conduct, as defined in F.S. 827.071 or F.S. 847.

12. Items that would tend to establish ownership or use of computers and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

13. Items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

14. Any and all address books, names, lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct in electronic, printed or any other form.

15. Any and all diaries, notebooks, notes and any other records, either electronic, printed or any other form, reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct.

16. Files and data on the computer that show the suspect's ownership, possession and control at time of the offense.

17. Encrypted, deleted and unallocated files on electronic media that contain any of the information listed in previous paragraphs.

18. At the discretion of peace officers serving the warrant, photographs and videotaped images may be obtained of the place to be searched for comparison with images and video recovered relating to the investigation of the exploitation of children.

## GROUNDS FOR ISSUANCE:

F.S. 933.18(6): (Dwelling)

- A weapon, instrumentality, or means by which a felony has been committed is contained therein.
- Evidence relevant to proving a felony has been committed is contained therein.

## PROBABLE CAUSE:

Your Affiant requests a search warrant be issued by this court authorizing and directing Detective Robert Mauro with necessary assistance, to search the herein described place to be searched for the above-described property, and declares that the grounds for issuance of said warrant are as follows:

In Summary: Your Affiant has determined that a computer located in Broward County, Florida was downloading and sharing child pornography on the Internet using peer-to-peer software. An individual located at 9288 Chelsea Drive South, Plantation, Broward County, State of Florida, installed software onto his or her computer that allows users to share digital files with one another while connected to the Gnutella network. An automated software program, Detective Brian Broughton, and your Affiant Robert Mauro have observed child pornography on a computer located at the above-referenced address. This child pornography was located in a folder that the computer user chose to publicly share. The data accumulated by the automated software was submitted to a central law enforcement database that is accessible to your Affiant. This affidavit will describe the methods, software and technology used by your Affiant and other law enforcement officers to determine that child pornography is currently located on a computer or electronic storage media at the above-listed address.

## AFFIANT'S QUALIFICATIONS

Your affiant, Robert Mauro, has been a police officer for approximately ten (10) years. Your affiant was a special police officer with the Brielle Police Department in New Jersey for approximately two (2) years. Your affiant has been a sworn police officer with the Fort Lauderdale Police Department for over eight (8) years. Four (4) of these years have been with the Investigations Division. My tour of duty in the Investigations Division has included

assignments in Narcotics, Street Crime, Vice, Special Victims Unit, and currently as a fulltime member of Internet Crimes Against Children Task (ICAC) Task Force. I have accomplished the following programs specific to internet crimes against children : Introduction to Internet Crime, Internet Investigations, Electronic Search and Seizure, IMAGESCAN training, Peer-To-Peer Investigations, Advanced Online Chat Investigations, ICAC Undercover Chat, Social Network Site Investigations, and Crimes Against Children. As a member of an ICAC Task Force, your affiant has had the opportunity to consult with numerous experts at the local, state and national levels in the area of child pornography, Internet child solicitation and computer forensics. The members of the Task Force work as a team and share their expertise on various topics on a daily basis. I have drafted, executed and assisted with several other search warrants regarding internet child exploitation. These search warrants have yielded lawful arrests and investigations. Based upon this interaction with these law enforcement professionals, your affiant has acquired a high degree of knowledge in these areas. It should also be noted that your affiant is currently a sworn special Deputy with the Broward County Sheriff's Office. Your affiant is also federally deputized as United States Special Deputy Marshall.

## INVESTIGATIVE METHODS

Your Affiant knows from training and experience that peer-to-peer networks are frequently used in the trading of child pornography. For purposes of this affidavit, the term "child pornography" refers to that term as it is used in F.S. 847.001(3) and children engaged in "sexual conduct" as it is used in F.S. 827.071(1)(g).

While examining P2P file sharing networks your Affiant learned that computer users can choose to install publicly available software, such as Limewire, BearShare and others, that facilitates the trading of images. Upon installing the client software, the user chooses which files or folders he or she wants to share with the rest of the network. When the user connects to the network, the software submits information about the files the user is sharing to an ultrapeer. An ultrapeer is a computer on the network that has been selected to act as an index server to assist other users in locating files.

The software, when installed, allows the user (peer) to search for pictures, videos, movies and other digital files by entering text as search terms. That text search is sent to an ultrapeer. Based upon the data submitted to it by other users, the ultrapeer determines whether any of the computers included in its index contain files that meet the search term submitted. Once relevant files have been located, the ultrapeer returns a list of files that are consistent with the search term to the requesting computer (peer). The user of that computer can then choose which of the files they want to download. When the user clicks on a file or files he wants to download, a direct

connection is established with the computer that contains all or part of that file and the transfer process begins. These users can receive the selected file from numerous sources at once. The software can balance the network load and recover from network failures by accepting pieces of the file from different users and then reassembling the file on the local computer.

P2P networks can only succeed in reassembling the file from different parts if the parts all come from the same original file. Multiple persons sharing one file can deliver different pieces of that file to the local software and the local software can insure that a complete and exact copy can be made from the parts. Your Affiant has been able to confirm from use of the software that different copies of the same file can be named differently.

P2P computer software has different methods to insure that two files are exactly the same. Your Affiant knows from training and experience that the method used by the P2P Operation described herein involves a compressed digital representation method called Secure Hash Algorithm Version 1 or SHA1. The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS). The United States of America has adopted the SHA1 hash algorithm described herein as a Federal Information Processing Standard.

Your Affiant knows that digital files can be processed by this SHA1 standard resulting in a digital signature. By comparing these signatures your Affiant can conclude that two files are or are not identical with a precision that greatly exceeds 99.9999 percent certainty. Your Affiant knows through the computer forensic community that there has never been a documented occurrence of two different files being found on the Internet having different contents while sharing the same SHA1value.

The use of SHA1 compressed digital representations for the matching of movies and images have proven to be extremely reliable. Your Affiant has never found two files with different contents but the same SHA1 value. Your Affiant has consulted with law enforcement officers with great levels of experience in this area none of those consulted has ever found two files with different contents but the same SHA1 value.

Your Affiant knows that the P2P network investigated in this operation uses the SHA1 digital signature to verify the unique identity of individual files. Users attempting to trade files on a P2P file-sharing network can place files from their local computer in a shared file directory. If that user then starts the P2P software that local computer calculates the SHA1 signature for each shared file and provides that information to other users wishing to trade files. When a user downloads a file from the Gnutella network, the SHA1 value of the file being downloaded is immediately transferred to the user's computer and this SHA1 value assists the software in locating other users that are sharing files with the same SHA1 value. A user can participate in sharing a file that has only be partially downloaded onto his computer.

Entering search terms in the P2P software results in a list of SHA1 digital signatures and file names that your Affiant can choose for download. By using this type of search your Affiant compares the offered SHA1 signatures with SHA1 signatures known to belong to movies or images of child pornography. Your Affiant confirms these SHA1 values as belonging to child pornography by examining the files from previous investigations with the matching SHA1 value. By watching these movies or viewing these images your Affiant is able to determine the exact file referenced by the given SHA1 value. Once a matching set of digital signatures is identified, your Affiant submits a download request for the file.

This method has proven to be extremely reliable, working just like software used by end users around the world in locating and downloading precise files. Once the download of child pornography is initiated your Affiant receives a list of download candidates that are participating in the possession, receipt and/or distribution of child pornography. This feature allows your Affiant to conduct undercover operations that involve images of child sexual abuse being traded on peer-to-peer networks.

Internet computers identify each other by an Internet Protocol or IP address. When a computer connects to the Internet, the company (ISP) providing the Internet connection assigns that computer a specific numerical identifier called an IP address. The IP address allows the computer to communicate with the Internet. ISPs control blocks of IP addresses and only assign a given IP address to one customer at a time. Your Affiant knows that these IP addresses can assist law enforcement in finding a particular computer on the Internet. Once an IP address is known, a subpoena can be issued to the appropriate ISP for business records related to the subscriber assigned to that IP address at a particular time and date. The ISP will typically provide information concerning the name, address and other identifying information of the subscriber using the particular ISP. This process has proven to be very reliable in identifying suspects using the Internet.

When a user submits a search term using P2P software, he is presented with a list of IP addresses and individual files that have been reported as available for download with specific digital signatures (SHA1). The files listed may be either completed downloads or partial downloads.

These computers are referred to as download candidates. A download candidate is a computer that was reported by an ultrapeer as a source for the file listed by SHA1 value. In almost every known case the download candidate serves those files to P2P users across the Internet.

Computers from throughout the world can download files from download candidates without regard to geographic location. Your Affiant knows that the files located on P2P download candidates are quickly available throughout the world due to the distributed sharing model of

P2P networks.

Your Affiant knows that cooperating police agencies pool their information to assist in identifying criminal conduct and build probable cause to further criminal investigations. Investigators around the country and world use a software program called the Child Protection System (CPS) to facilitate locating child pornography on the Gnutella network. Investigators licensed and trained to use CPS to search for child pornography on the Gnuetella network automatically submit their search results to a centralized law enforcement controlled database located in Boca Raton, Florida. The servers on which this data is stored are owned and controlled by the State Attorney's Office for the 15th Judicial Circuit. The data submitted by investigators includes the SHA1 value of child pornography images as well as the IP address where that image was observed. With this pooled information police get a better understanding of the global information available about a suspect that resides in their area or jurisdiction. The information is valuable when trying to regionalize a suspect to a certain jurisdiction, given the global scope of the Internet. Investigators from around the world gather and log information, which can be used by an investigator to build probable cause on one specific case.

Licensed and trained users of the CPS are authorized to view images and videos and attach labels to them that are reflective of their content. These labels are then available to other users of the database to facilitate finding child pornography. Since different jurisdictions may have different definitions of child pornography, instructors use the term "child notable" to label files they believe meet the definition of child pornography in their own jurisdictions. Although a "child notable" designation is relevant to patterns of conduct and supports probable cause, the primary probable cause for this affidavit is focused on those images and videos viewed and specifically described by your Affiant.

By examining a list of IP addresses contained within this database your Affiant can locate computers that are reported to be in your Affiant's jurisdiction. By comparison of the SHA1 digital signatures your Affiant can conclude that a computer, originating from an IP address known to be in this jurisdiction, has P2P software installed on it and contains complete or partial images or videos of child pornography. Information in the database contains data concerning the time and date a SHA1 value known to contain child pornography was observed at a specific IP address. With this information a request can be made to the Internet service provider to identify the specific physical address related to the user of P2P software in the exchange of child pornography. Your Affiant is aware from training, consultations with other investigators and personal experience that hundreds of search warrants around the country have been obtained by using the above method of investigation. This method has proven to be extremely reliable in determining the location of computers that were involved in the P2P-facilitated trading of child pornography.

Your Affiant has been involved in search warrants of this type and has consulted with many experienced investigators who have used this method of investigation. Nearly every case was verified through the following means:

1) Evidence of child pornography was found on the computer.

2) If no images of child pornography were found on the computer, interviews of persons using those computers verified that child pornography had been present at one time but, had been deleted or the computer with the child pornography had been removed from the premises. In rare cases, it was determined that the suspect accessed the customer's unsecured wireless router and thereby downloaded child pornography using his IP address. In such cases, the unsecured wireless router was an instrumentality of the crime subject to seizure in that it aided in the receipt and distribution of child pornography and potentially contained data logs.

3) Images were moved from a computer and stored on other media.

Your Affiant knows that Detective William Wiltse with the Salem, Oregon Police Department has created an automated system, called Peer Spectre that reads the publicly available advertisements from computers that are identifying child sexual abuse images available for distribution in a consistent and reliable manner. Instead of making law enforcement officers manually enter search terms to locate child pornography, this software allows law enforcement officers to enter a list of search terms commonly associated with child pornography into the software and subsequently allow the software to run around the clock, thus duplicating steps that would normally be done manually by individual law enforcement officers. The results are automatically entered into a central database that is available for review by law enforcement officers trained and certified in this investigative technique. The software reads these reported offers to participate in the sharing of child pornography and reports the time, date, SHA1 values and filename for each individual computer in the same way every time. Your Affiant has validated this software by running identical search terms through the manual method described above and the automated system using Peer Spectre and has confirmed that Peer Spectre performs in the same way with matching results as the previous manual investigative techniques used in this operation to date. In the summer of 2009 numerous law enforcement agencies in Florida participated in a sweep named Operation Orange Tree. Investigators trained to use this system of reviewing historical records from the database executed 70 search warrants for child pornography. The system proved to be reliable in each of the 70 cases. Hundreds of other investigations have also occurred in Florida in which the reliability of this system has been clearly established.

An investigator can review these details and identify a pattern of activity that links a single IP address to specific files of child pornography with an extremely high degree of accuracy. Peer Spectre automates the search process but conducts and reports the search in the same manner that has previously been done by individual investigators. Peer Spectre does not report details that are not also discoverable by the general public using Internet available software.

## INVESTIGATIVE FACTS

On December 27, 2010, your Affiant began an investigation using the procedures previously defined in this affidavit. While viewing the CPS database, your Affiant noted that a computer using IP 99.38.226.54 had been observed advertising over 200 files designated as "child notable" by licensed CPS users between the dates of December 8, 2010 and January 24, 2011. These files were observed by a computer program called Peer Spectre2. Peer Spectre2 works in basically the same way as the Peer Spectre program previously described, but captures more data about each file and stores its results on a private company's server that is dedicated to law enforcement use. Peer Spectre 2 shares the same reliability as Peer Spectre. Of the over 200 child notable files observed by Peer Spectre2, a sample of these files are as follows:

- pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tar (2) (1.jpg
- [ R@ygold - PTHC - Hussyfan ] 14yo Girl with Sister fucked by man.mpg
- pthc-2010 Tara 9yo sucksHarry.AVI
- Webcam - 13yo Dana strips shows body,inserts toy 02.10(3.63Mb)pthc underage pedo..avi
- Kdv - n117 - Blue Orchid - 12Yo Boy, 13Yo Boy Play With 14Yo Girl.mpg
- PTHC 006 11yo Sara drops cum.jpg
- Homemade Underage - Ninfeta sexo - Kinder porno 29sec illegal preteen underage lolita kiddy child(1).mpg

Although file names may be misleading and are not always accurate indicators of the contents of a specific file, the possession of numerous files with similar terms in their names is highly suggestive that a significant portion of them will contain child pornography. Since the files downloaded by this user were located by placing search terms into the Gnutella client, the fact that these terms appear repeatedly suggests the user was looking for such files. For example, child pornography images frequently contain the term PTHC in their titles. Your Affiant knows from training and experience that this stands for Preteen Hard Core. Collectors of child pornography are usually aware of the fact that using this search term will

frequently locate images or videos that contain child pornography. Some of the files advertised on the suspect computer contain that term. Other such terms typically associated with child pornography images/videos are Hussyfan, Pedo, Bibcam, BabyJ, R@ygold, Babyshivid, Babyj, Preteen as well as many others. These file names illustrate how the file names are suggestive of child pornography.

On or about January 4, 2011 your Affiant received a phone call from Detective Brian Broughton of the Martin County Sheriff's Office. Your affiant is familiar with Detective Broughton and knows him to be experienced, well trained, and well versed in Peer-to-Peer child pornography investigations. He advised that he had downloaded child pornography directly from IP 99.38.226.54 and subsequently issued a subpoena to Bellsouth to identify the subscriber of the account. Via mail, Detective Broughton provided your affiant with an affidavit outlining his investigation. He also provided the subpoena and response. These items are attached and labeled as "Attachment 1"

Detective Broughton's subpoena requested AT&T to determine which of their customers was assigned to 99.38.226.54 at 09:20hrs EST on 12/30/2010. This date and time corresponds to the date and time Det. Broughton downloaded child pornography from that IP address.

Detective Broughton provided your affiant received records provided by AT&T which indicated that IP address 99.38.226.54 was assigned to an AT&T U-Verse account. This account was established November 9, 2010. These records stated "U-Verse customers do not have traditional log on/off session records and have a unique IP provisioned to their account 99.38.226.54 has been provisioned to the following customer":

Andrea Plant
9288 Chelsea Drive South
Plantation, FL 33324
Account # 108516153
Member ID: andrea.plant@att.net
Cell: 305-970-4902
Email: aplant4u@gmail.com

Your affiant located Andrea Plant in the Florida drivers license database, with a listed address of 9288 Chelsea Drive South, Plantation, Florida.

Your affiant conducted research and records checks regarding the above persons and addresses. It was determined that James E. Price III and Jennifer Price both own 1906 Silverbell Terrace, Weston, Florida. She moved out of this residence on 09/11/2009 and they filed for divorce on 9/15/2009. According to a BSO Police Report, dated 12/03/2010 it shows Jennifer and James as separated and filing for divorce. In the report, James E Price's home residence is listed as 9288

Chelsea Drive South, Plantation, Florida 33324. In this same report, his occupation is listed as "IT Tech".
Also during 2010, James E Price III changed his drivers license address from 1906 Silverbell Terrace, Weston to 9288 Chelsea Drive South, Plantation, Florida.

As of February 7, 2011, James Price's drives license address is listed as 9822 Chelsea Drive South, Plantation, Florida.

His registered vehicle is a 2006 Silver Toyota 4-Runner, Tag W580FK.

Your affiant has observed this vehicle parked at 9288 Chelsea Drive South on several occasions during periodic surveillance between January 10 and February 11, 2011. On February 15, 2011 your affiant observed James Price enter and exit 9288 Chelsea Drive South.

A Florida Department of State Corporations search revealed James Price III is listed as director of "Maven Partners Inc" with a listed address of 9288 Chelsea Drive South, Plantation, Florida.

In an effort to personally verify the content of the files advertised in the suspect's shared folder, your affiant used a law enforcement modified program called ShareazaLE. On several occasions between December 20, 2010 and January 24, 2011, your Affiant was able to browse the shared folder of the suspect computer using IP 99.38.226.54. The browse function of most Gnutella software programs is a feature that allows users to view all of the files being shared by a specific user. After browsing the user's files, the other user can choose which of these shared files he/she wishes to download. This process also establishes a direct connection between the two computers, enabling an investigator to directly capture the IP address of the suspect's computer during the process. Your affiant used ShareazaLE, which verified that a direct connection from your affiant's computer was established with IP address 99.38.226.54. During these direct connections, the program and also verified at periodic times that the suspect computer possessed over 170 child notable images. Furthermore, ShareazaLE downloaded the following three files directly from the shared folder located upon the suspect computer connected to IP 99.28.226.54. Your affiant personally viewed the contents of these files, a description is below in *italics*.

SHA1: SJNX5JEQY2L3RWH4YSKFJL2BQA6SR6XJ 32<-
File Name: hayley008.jpg
*This image depicts a nude female child approximately 9-11 years of age. Her underdeveloped breasts are exposed and her vaginal area appears to be the focal point of the image. Her vaginal area lacks any pubic hair. This image has been classified as a NCMEC verified known child victim by other investigators using the CPS system.*

SHA1:4GNSYJKR5WKBC5CXGMIOAX5MOVHKKN7C
File Name: Homemade Underage - Ninfeta sexo - Kinder porno 29sec illegal preteen underage lolita kiddy child(1).mpg
*This video is approximately 20 seconds long. It depicts a nude female child approximately 12-14 years of age. The child is performing oral sex upon an erect adult male penis. The child's underdeveloped breasts and buttocks are exposed*

2L3VPMMDYMNJHU566DIK26BXGCZJDOQY
FILE NAME: DSC06603_2.jpg
*This image depicts a nude female child approximately 3-5 years of age with her legs lifted to her head. He vaginal area is clearly exposed as an adult sized finger is being inserted into her anus.*

On January 20, 2010 I received information that the FBI field office in Baltimore had information regarding James Price III. Supervising Special Agent David Musgrove provided me with FBI Reports. The reports indicated on 2/14/2000 Bellsouth Mobility notified the Atlanta FBI Division that James E. Price III downloaded child pornography (via his personal MindSpring email account) into his work station computer hard drive. A computer forensic examination of the hard drive was requested by the FBI to their CART Team however the results are not available at this time. The report indicated that Price retained an attorney and alleged that an unknown person placed the images onto his hard drive. The FBI maintains that Price had exclusive access to the hard drive.

**COMPUTER EVIDENCE**

Your Affiant knows from training and experience that digital evidence is not limited to computers. Your Affiant has been involved in numerous cases where persons with an interest in child sexual exploitation materials can access the Internet, display images of child pornography and communicate with other individuals with the same interest using digital communications

devices to include cellular telephones, email devices and personal digital assistants. These devices are frequently found to contain chat communications in the form of short message service (SMS) messages as well as enabling Internet and digital cellular network access. Your Affiant knows that there are P2P client applications for use on cell phones including at least one for the P2P network described herein.

Your Affiant knows from training and experience that searches and seizures of evidence from computers and other Internet access devices require agents to seize most or all electronic items (hardware, software, passwords and instructions) to be processed later by a qualified digital evidence expert in a controlled environment. Digital storage media may include but is not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers or other electronic devices to store or retrieve data or images of child pornography, which can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process renders it impractical to attempt this kind of data search on site.

Your Affiant knows from training and experience that searching digital evidence systems for criminal evidence requires experience in the computer and cellular telephone field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden", erased, compressed, password-protected, or encrypted files. Since digital evidence is extremely vulnerable to tampering or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

Your Affiant knows from training and experience that computers and other digital communications devices contain volatile memory that contains information only while the device is in a powered on and/or running state. Your Affiant knows that powering off the device may result in the loss of the volatile information. Your Affiant also knows that adding an external evidence storage device will cause minor changes to the state of the computer but will allow for the best effort in fully capturing the state of the running evidence. Your Affiant knows that this capture of information requires technical expertise to ensure the resulting data can be examined by all subsequent investigators. Your Affiant knows that this captured information may include current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details relevant to use of the system.

Your Affiant knows from training and experience that in order to fully retrieve data from a computer or other digital communications system, the analyst needs all magnetic storage media as well as the storage devices. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware access software or drivers) and any applications software

which may have been used to create the data (whether stored on hard drives or on external media) as well as documentation, items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.

Your Affiant knows from training and experience that persons trading in, receiving, distributing or possessing images involving the sexual exploitation of children or those interested in the actual sexual exploitation of children often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the origin of the images as well as provide evidence of a person's interest in child pornography or child exploitation.

Your Affiant knows from training and experience that files related to the sexual exploitation of children found on computers and other digital communications devices are usually obtained from the Internet or from cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.

Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

Your Affiant knows from training and experience that computers or other digital devices used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the device as well as ownership and use of Internet service accounts used for the Internet or cellular data network access.

Your Affiant knows from training and experience that digital crime scenes usually include items or digital information that would tend to establish ownership or use of digital devices and Internet access equipment and ownership or use of any Internet service or digital cellular service accounts to participate in the exchange, receipt, possession, collection or distribution of child pornography.

Your Affiant knows from training and experience that persons with an interest in the sexual exploitation of children frequently have trophies from victims, items for the grooming of children as well as collections of clothing and toys related to the exploitation of children.

Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence

and other identification documents.

Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

Your Affiant also knows that individuals who trade child pornography sometimes do so using laptop computers which are transported in their automobiles to their workplace or other locations and that such evidence may be located in the curtilage of their homes, including vehicles in the driveway or structures on the property.

The above information has led your Affiant to believe that probable cause exists to believe that the items listed in "Property Sought" are evidence of the attempted exploitation of children by means of the possession and attempted distribution of child pornography in violation of Florida Statute 827.071, (4) and (5) and F.S. 847.0137 and are concealed in the residence at 9288 Chelsea Drive South, Plantation, County of Broward, State of Florida.

In light of these concerns, your Affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described.

WHEREFORE, your Affiant hereby makes application for a Search Warrant authorizing the Affiant and the Sheriff and/or Deputy Sheriffs of Broward County, Florida, with proper and necessary assistance, including law enforcement officers and computer forensics examiners from other agencies, to search the above described premise in the daytime/nighttime or on Sunday, and to seize any and all of the aforesaid property found by virtue of such Search Warrant and to list the property seized on a return and inventory, to be filed within this Judicial Circuit within ten days of this date.

AFFIANT Detective Robert Mauro

SWORN TO AND SUBSCRIBED before me at Fort Lauderdale, Broward County, Florida, this 15 day of February, A.D. 2011.

JUDGE OF THE CIRCUIT COURT

M. Destry



**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FLORIDA**

**SEARCH WARRANT**

**TO THE SHERIFF AND/OR DEPUTY SHERIFFS OF BROWARD COUNTY, FLORIDA AND/OR TO AGENTS OF THE FOLLOWING LAW ENFORCEMENT AGENCIES:**

**Fort Lauderdale Police Department**
**Florida Office of the Attorney General**
**Plantation Police Department**

**AFFIANT(S) WHO SUPPORT(S) THIS SEARCH WARRANT BY GENERAL AFFIDAVIT AND APPLICATION:**

Detective Robert Mauro
Fort Lauderdale Police Department

**DESCRIPTION OF PREMISES TO BE SEARCHED:**

**9288 Chelsea Drive South, City of Plantation, County of Broward, State of Florida.**

9288 Chelsea Drive South is a villa style, single story, single family home. It is a masonry structure with a beige exterior. The gutters and entrance door are both pink in color. The roof of the structure is shake style and brown in color. The numbers "9288" are affixed in three-inch block lettering above the garage door. The single car garage is attached to the structure.

Your affiant has personally been to 9288 Chelsea Drive South, Plantation, Florida, and can positively identify the residence.

**STATUTE(S) BEING VIOLATED:**

| | |
|---|---|
| F.S. 827.071(5) | Possession of Material Depicting Sexual Performance by a Child |
| F.S. 827.071(4) | Possession of Material Depicting Sexual Performance by a Child with Intent to Promote. |
| F.S. 847.0137 | Transmission of Child Pornography by Electronic Device |

**PROPERTY SOUGHT:**

Your Affiant seeks to seize the below-described evidence and to conduct a forensic search of any of the listed items that may be in electronic or digital format.

1. Images or videos of children engaged in sexual conduct as defined in F.S. 827.071 and F.S. 847.001(3), in whatever format they may take, including, but not limited to, digital images, printed images, developed film, undeveloped film.

2. Computerized images with the following file names , or the printed versions thereof:

   SHA1: 2L3VPMMDYMNJHU566DIK26BXGCZJDOQY

   File Name: DSC06603_2.jpg

   SHA1: SJNX5JEQY2L3RWH4YSKFJL2BQA6SR6XJ
   File Name: hayley008.jpg

   SHA1:4GNSYJKR5WKBC5CXGMIOAX5MOVHKKN7C
   File Name: Homemade Underage - Ninfeta sexo - Kinder porno 29sec illegal preteen underage lolita kiddy child(1).mpg

3. Computers.

4. Computer input and output devices to include but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media.

5. Computer storage media and the digital content to include but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data or images of child pornography.

6. Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

7. Items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized.

8. Manuals and other documents (whether digital or written), which describe operation of items or software, seized.

9. Correspondence or other documents (whether digital or written) exhibiting an interest in the sexual exploitation of children.

10. Any and all correspondence, in electronic, printed or any other form, pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexual conduct, as defined in F.S. 827.071 and F.S. 847.001(3).

11. Any and all books and magazines, film, negatives, motion picture and video cassettes containing visual depictions of minors engaged in sexual conduct, as defined in F.S. 827.071 or F.S. 847.

12. Items that would tend to establish ownership or use of computers and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

13. Items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

14. Any and all address books, names, lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct in electronic, printed or any other form.

15. Any and all diaries, notebooks, notes and any other records. either electronic, printed or any other form, reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct.

16. Files and data on the computer that show the suspect's ownership, possession and control at time of the offense.

17. Encrypted, deleted and unallocated files on electronic media that contain any of the information listed in previous paragraphs.

18. At the discretion of peace officers serving the warrant, photographs and videotaped images may be obtained of the place to be searched for comparison with images and video recovered relating to the investigation of the exploitation of children.

At the discretion of peace officers serving the warrant, photographs and videotaped images may be obtained of the place to be searched for comparison with images and video recovered relating to the investigation of the exploitation of children

**GROUNDS FOR ISSUANCE:**

F.S. 933.18(6): (Dwelling)

- A weapon, instrumentality, or means by which a felony has been committed is contained therein.
- Evidence relevant to proving a felony has been committed is contained therein.

THE FACTS upon which the Affiant's belief is based have been stated under oath and are set out in Affiant's GENERAL AFFIDAVIT AND APPLICATION FOR SEARCH WARRANT.

NOW THEREFORE, the facts upon which the belief of said Affiant is based as set out in said GENERAL AFFIDAVIT AND APPLICATION FOR SEARCH WARRANT are hereby deemed sufficient to show probable cause for the issuance of a Search Warrant in accordance with the application of said Affiant.

I HEREBY COMMAND YOU, the Affiant, Detective Robert Mauro of the Fort Lauderdale Police Department, and law enforcement officers of the BROWARD SHERIFF'S OFFICE.

Plantation Police Department and Florida Office of the Attorney General, with necessary assistance, including the assistance of law enforcement officers and computer forensic examiners from other agencies, to search the premises previously described. You may also search the curtilage of said premises, including any vehicles or structures thereon. You may search for the property described previously and may remove any computers or electronic storage devices from the premises and conduct a computer forensic examination for the data listed in this warrant.

I FURTHER COMMAND that any property seized be listed on a RETURN AND INVENTORY filed within this Judicial Circuit within ten (10) days from this date. YOU ARE FURTHER COMMANDED to deliver a copy of this SEARCH WARRANT to the occupant of said premises. If property is taken under the warrant, you shall deliver to the occupant a written inventory of the property taken and receipt for the same. If no person is found in possession of the premises where such property is found, you shall leave the said receipt on the premises.

I GRANT AUTHORITY to execute this SEARCH WARRANT in the daytime/nighttime or on Sunday.

GIVEN UNDER MY HAND AND SEAL this 15 day of February, A.D. 2011.

JUDGE OF THE CIRCUIT COURT

M. DESTRY

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

# RETURN AND INVENTORY

**Fort Lauderdale Police Department / ICAC Task Force**

**Case Number: 11-17890**

**Affiant Who Received The Search Warrant:** Detective Robert Mauro

**Detective Serving Search Warrant:** Detective Robert Mauro

**Date of Issuance of Search Warrant:** February 15, 2011

**Date of Execution of Search Warrant:** February 16, 2011

**Location of Execution of Search Warrant:** 9288 Chelsea Drive South, Plantation

**Copy of Search Warrant and Inventory Left With JAMES PRICE III at 9288 Chelsea Drive South, Plantation**

---

## DESCRIPTION OF ITEMS TAKEN

*SEE ATTACHED PROPERTY RECIEPTS*

---

I, Detective Robert Mauro, a Fort Lauderdale Police Detective and Special Sheriff's Deputy who executed this Search Warrant, do swear that the attached inventory contains a true account of all of the property, goods, or chattels taken by me pursuant to said warrant.

[signature] #1471

**AFFIANT**

The forgoing instrument was acknowledged before me this 25 day of FEB, 2011, by Detective Mauro (authoring officer), who is known to me or has produced LEO ID as identification, and who did take an oath.

[signature] 11764 / BSO

NOTARY/WITNESSING OFFICER CCN/AGENCY

**Certificate of Service**

I hereby certify that two copies of the Supplemental Appendix for the United States were mailed to the Court of Appeals via Federal Express this 5th day of March 2014, and that on the same day, a copy was sent via Federal Express to: Robin Farnsworth, Assistant Federal Public Defender, One East Broward Boulevard, Suite 1100, Fort Lauderdale, Florida 33301.

/s/ *Jeanne M. Mullenhoff*
Jeanne M. Mullenhoff
Assistant United States Attorney

***gt***

**EXHIBIT "K"**

NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY,
("NIST"), SHA-1 COMPUTATION AND OUTPUT EXAMPLE

```
##############################################################

  Secure Hash Algorithm
    Message Digest Length = 160

##############################################################

One Block Message Sample

  Input Message: "abc"

==============================================================

Initial hash value:
  H[0] = 67452301
  H[1] = EFCDAB89
  H[2] = 98BADCFE
  H[3] = 10325476
  H[4] = C3D2E1F0

==============================================================

Block Contents:
  W[0] = 61626380
  W[1] = 00000000
  W[2] = 00000000
  W[3] = 00000000
  W[4] = 00000000
  W[5] = 00000000
  W[6] = 00000000
  W[7] = 00000000
  W[8] = 00000000
  W[9] = 00000000
  W[10] = 00000000
  W[11] = 00000000
  W[12] = 00000000
  W[13] = 00000000
  W[14] = 00000000
  W[15] = 00000018

              A         B         C         D         E
t= 0: 0116FC33  67452301  7BF36AE2  98BADCFE  10325476
t= 1: 8990536D  0116FC33  59D148C0  7BF36AE2  98BADCFE
t= 2: A1390F08  8990536D  C045BF0C  59D148C0  7BF36AE2
t= 3: CDD8E11B  A1390F08  626414DB  C045BF0C  59D148C0
t= 4: CFD499DE  CDD8E11B  284E43C2  626414DB  C045BF0C
t= 5: 3FC7CA40  CFD499DE  F3763846  284E43C2  626414DB
t= 6: 993E30C1  3FC7CA40  B3F52677  F3763846  284E43C2
t= 7: 9E8C07D4  993E30C1  0FF1F290  B3F52677  F3763846
t= 8: 4B6AE328  9E8C07D4  664F8C30  0FF1F290  B3F52677
t= 9: 8351F929  4B6AE328  27A301F5  664F8C30  0FF1F290
t=10: FBDA9E89  8351F929  12DAB8CA  27A301F5  664F8C30
t=11: 63188FE4  FBDA9E89  60D47E4A  12DAB8CA  27A301F5
```



```
t=12: 4607B664   63188FE4   7EF6A7A2   60D47E4A   12DAB8CA
t=13: 9128F695   4607B664   18C623F9   7EF6A7A2   60D47E4A
t=14: 196BEE77   9128F695   1181ED99   18C623F9   7EF6A7A2
t=15: 20BDD62F   196BEE77   644A3DA5   1181ED99   18C623F9
t=16: 4E925823   20BDD62F   C65AFB9D   644A3DA5   1181ED99
t=17: 82AA6728   4E925823   C82F758B   C65AFB9D   644A3DA5
t=18: DC64901D   82AA6728   D3A49608   C82F758B   C65AFB9D
t=19: FD9E1D7D   DC64901D   20AA99CA   D3A49608   C82F758B
t=20: 1A37B0CA   FD9E1D7D   77192407   20AA99CA   D3A49608
t=21: 33A23BFC   1A37B0CA   7F67875F   77192407   20AA99CA
t=22: 21283486   33A23BFC   868DEC32   7F67875F   77192407
t=23: D541F12D   21283486   0CE88EFF   868DEC32   7F67875F
t=24: C7567DC6   D541F12D   884A0D21   0CE88EFF   868DEC32
t=25: 48413BA4   C7567DC6   75507C4B   884A0D21   0CE88EFF
t=26: BE35FBD5   48413BA4   B1D59F71   75507C4B   884A0D21
t=27: 4AA84D97   BE35FBD5   12104EE9   B1D59F71   75507C4B
t=28: 8370B52E   4AA84D97   6F8D7EF5   12104EE9   B1D59F71
t=29: C5FBAF5D   8370B52E   D2AA1365   6F8D7EF5   12104EE9
t=30: 1267B407   C5FBAF5D   A0DC2D4B   D2AA1365   6F8D7EF5
t=31: 3B845D33   1267B407   717EEBD7   A0DC2D4B   D2AA1365
t=32: 046FAA0A   3B845D33   C499ED01   717EEBD7   A0DC2D4B
t=33: 2C0EBC11   046FAA0A   CEE1174C   C499ED01   717EEBD7
t=34: 21796AD4   2C0EBC11   811BEA82   CEE1174C   C499ED01
t=35: DCBBB0CB   21796AD4   4B03AF04   811BEA82   CEE1174C
t=36: 0F511FD8   DCBBB0CB   085E5AB5   4B03AF04   811BEA82
t=37: DC63973F   0F511FD8   F72EEC32   085E5AB5   4B03AF04
t=38: 4C986405   DC63973F   03D447F6   F72EEC32   085E5AB5
t=39: 32DE1CBA   4C986405   F718E5CF   03D447F6   F72EEC32
t=40: FC87DEDF   32DE1CBA   53261901   F718E5CF   03D447F6
t=41: 970A0D5C   FC87DEDF   8CB7872E   53261901   F718E5CF
t=42: 7F193DC5   970A0D5C   FF21F7B7   8CB7872E   53261901
t=43: EE1B1AAF   7F193DC5   25C28357   FF21F7B7   8CB7872E
t=44: 40F28E09   EE1B1AAF   5FC64F71   25C28357   FF21F7B7
t=45: 1C51E1F2   40F28E09   FB86C6AB   5FC64F71   25C28357
t=46: A01B846C   1C51E1F2   503CA382   FB86C6AB   5FC64F71
t=47: BEAD02CA   A01B846C   8714787C   503CA382   FB86C6AB
t=48: BAF39337   BEAD02CA   2806E11B   8714787C   503CA382
t=49: 120731C5   BAF39337   AFAB40B2   2806E11B   8714787C
t=50: 641DB2CE   120731C5   EEBCE4CD   AFAB40B2   2806E11B
t=51: 3847AD66   641DB2CE   4481CC71   EEBCE4CD   AFAB40B2
t=52: E490436D   3847AD66   99076CB3   4481CC71   EEBCE4CD
t=53: 27E9F1D8   E490436D   8E11EB59   99076CB3   4481CC71
t=54: 7B71F76D   27E9F1D8   792410DB   8E11EB59   99076CB3
t=55: 5E6456AF   7B71F76D   09FA7C76   792410DB   8E11EB59
t=56: C846093F   5E6456AF   5EDC7DDB   09FA7C76   792410DB
t=57: D262FF50   C846093F   D79915AB   5EDC7DDB   09FA7C76
t=58: 09D785FD   D262FF50   F211824F   D79915AB   5EDC7DDB
t=59: 3F52DE5A   09D785FD   3498BFD4   F211824F   D79915AB
t=60: D756C147   3F52DE5A   4275E17F   3498BFD4   F211824F
t=61: 548C9CB2   D756C147   8FD4B796   4275E17F   3498BFD4
t=62: B66C020B   548C9CB2   F5D5B051   8FD4B796   4275E17F
t=63: 6B61C9E1   B66C020B   9523272C   F5D5B051   8FD4B796
t=64: 19DFA7AC   6B61C9E1   ED9B0082   9523272C   F5D5B051
t=65: 101655F9   19DFA7AC   5AD87278   ED9B0082   9523272C
```

```
t=66: 0C3DF2B4  101655F9  0677E9EB  5AD87278  ED9B0082
t=67: 78DD4D2B  0C3DF2B4  4405957E  0677E9EB  5AD87278
t=68: 497093C0  78DD4D2B  030F7CAD  4405957E  0677E9EB
t=69: 3F2588C2  497093C0  DE37534A  030F7CAD  4405957E
t=70: C199F8C7  3F2588C2  125C24F0  DE37534A  030F7CAD
t=71: 39859DE7  C199F8C7  8FC96230  125C24F0  DE37534A
t=72: EDB42DE4  39859DE7  F0667E31  8FC96230  125C24F0
t=73: 11793F6F  EDB42DE4  CE616779  F0667E31  8FC96230
t=74: 5EE76897  11793F6F  3B6D0B79  CE616779  F0667E31
t=75: 63F7DAB7  5EE76897  C45E4FDB  3B6D0B79  CE616779
t=76: A079B7D9  63F7DAB7  D7B9DA25  C45E4FDB  3B6D0B79
t=77: 860D21CC  A079B7D9  D8FDF6AD  D7B9DA25  C45E4FDB
t=78: 5738D5E1  860D21CC  681E6DF6  D8FDF6AD  D7B9DA25
t=79: 42541B35  5738D5E1  21834873  681E6DF6  D8FDF6AD

H[0] = 67452301 + 42541B35 = A9993E36
H[1] = EFCDAB89 + 5738D5E1 = 4706816A
H[2] = 98BADCFE + 21834873 = BA3E2571
H[3] = 10325476 + 681E6DF6 = 7850C26C
H[4] = C3D2E1F0 + D8FDF6AD = 9CD0D89D

--------------------------------------------------------------

Message Digest is
                 A9993E36 4706816A BA3E2571 7850C26C 9CD0D89D

==============================================================

Two Block Message Sample

Input Message:

"abcdbcdecdefdefgefghfghighijhijkijkljklmklmnlmnomnopnopq"

==============================================================

Initial hash value:
  H[0] = 67452301
  H[1] = EFCDAB89
  H[2] = 98BADCFE
  H[3] = 10325476
  H[4] = C3D2E1F0

==============================================================

Block Contents:
  W[0] = 61626364
  W[1] = 62636465
  W[2] = 63646566
  W[3] = 64656667
  W[4] = 65666768
  W[5] = 66676869
  W[6] = 6768696A
```

W[7] = 68696A6B
W[8] = 696A6B6C
W[9] = 6A6B6C6D
W[10] = 6B6C6D6E
W[11] = 6C6D6E6F
W[12] = 6D6E6F70
W[13] = 6E6F7071
W[14] = 80000000
W[15] = 00000000

| | A | B | C | D | E |
|---|---|---|---|---|---|
| t= 0: | 0116FC17 | 67452301 | 7BF36AE2 | 98BADCFE | 10325476 |
| t= 1: | EBF3B452 | 0116FC17 | 59D148C0 | 7BF36AE2 | 98BADCFE |
| t= 2: | 5109913A | EBF3B452 | C045BF05 | 59D148C0 | 7BF36AE2 |
| t= 3: | 2C4F6EAC | 5109913A | BAFCED14 | C045BF05 | 59D148C0 |
| t= 4: | 33F4AE5B | 2C4F6EAC | 9442644E | BAFCED14 | C045BF05 |
| t= 5: | 96B85189 | 33F4AE5B | 0B13DBAB | 9442644E | BAFCED14 |
| t= 6: | DB04CB58 | 96B85189 | CCFD2B96 | 0B13DBAB | 9442644E |
| t= 7: | 45833F0F | DB04CB58 | 65AE1462 | CCFD2B96 | 0B13DBAB |
| t= 8: | C565C35E | 45833F0F | 36C132D6 | 65AE1462 | CCFD2B96 |
| t= 9: | 6350AFDA | C565C35E | D160CFC3 | 36C132D6 | 65AE1462 |
| t=10: | 8993EA77 | 6350AFDA | B15970D7 | D160CFC3 | 36C132D6 |
| t=11: | E19ECAA2 | 8993EA77 | 98D42BF6 | B15970D7 | D160CFC3 |
| t=12: | 8603481E | E19ECAA2 | E264FA9D | 98D42BF6 | B15970D7 |
| t=13: | 32F94A85 | 8603481E | B867B2A8 | E264FA9D | 98D42BF6 |
| t=14: | B2E7A8BE | 32F94A85 | A180D207 | B867B2A8 | E264FA9D |
| t=15: | 42637E39 | B2E7A8BE | 4CBE52A1 | A180D207 | B867B2A8 |
| t=16: | 6B068048 | 42637E39 | ACB9EA2F | 4CBE52A1 | A180D207 |
| t=17: | 426B9C35 | 6B068048 | 5098DF8E | ACB9EA2F | 4CBE52A1 |
| t=18: | 944B1BD1 | 426B9C35 | 1AC1A012 | 5098DF8E | ACB9EA2F |
| t=19: | 6C445652 | 944B1BD1 | 509AE70D | 1AC1A012 | 5098DF8E |
| t=20: | 95836DA5 | 6C445652 | 6512C6F4 | 509AE70D | 1AC1A012 |
| t=21: | 09511177 | 95836DA5 | 9B111594 | 6512C6F4 | 509AE70D |
| t=22: | E2B92DC4 | 09511177 | 6560DB69 | 9B111594 | 6512C6F4 |
| t=23: | FD224575 | E2B92DC4 | C254445D | 6560DB69 | 9B111594 |
| t=24: | EEB82D9A | FD224575 | 38AE4B71 | C254445D | 6560DB69 |
| t=25: | 5A142C1A | EEB82D9A | 7F48915D | 38AE4B71 | C254445D |
| t=26: | 2972F7C7 | 5A142C1A | BBAE0B66 | 7F48915D | 38AE4B71 |
| t=27: | D526A644 | 2972F7C7 | 96850B06 | BBAE0B66 | 7F48915D |
| t=28: | E1122421 | D526A644 | CA5CBDF1 | 96850B06 | BBAE0B66 |
| t=29: | 05B457B2 | E1122421 | 3549A991 | CA5CBDF1 | 96850B06 |
| t=30: | A9C84BEC | 05B457B2 | 78448908 | 3549A991 | CA5CBDF1 |
| t=31: | 52E31F60 | A9C84BEC | 816D15EC | 78448908 | 3549A991 |
| t=32: | 5AF3242C | 52E31F60 | 2A7212FB | 816D15EC | 78448908 |
| t=33: | 31C756A9 | 5AF3242C | 14B8C7D8 | 2A7212FB | 816D15EC |
| t=34: | E9AC987C | 31C756A9 | 16BCC90B | 14B8C7D8 | 2A7212FB |
| t=35: | AB7C32EE | E9AC987C | 4C71D5AA | 16BCC90B | 14B8C7D8 |
| t=36: | 5933FC99 | AB7C32EE | 3A6B261F | 4C71D5AA | 16BCC90B |
| t=37: | 43F87AE9 | 5933FC99 | AADF0CBB | 3A6B261F | 4C71D5AA |
| t=38: | 24957F22 | 43F87AE9 | 564CFF26 | AADF0CBB | 3A6B261F |
| t=39: | ADEB7478 | 24957F22 | 50FE1EBA | 564CFF26 | AADF0CBB |
| t=40: | D70E5010 | ADEB7478 | 89255FC8 | 50FE1EBA | 564CFF26 |
| t=41: | 79BCFB08 | D70E5010 | 2B7ADD1E | 89255FC8 | 50FE1EBA |
| t=42: | F9BCB8DE | 79BCFB08 | 35C39404 | 2B7ADD1E | 89255FC8 |

```
t=43: 633E9561  F9BCB8DE  1E6F3EC2  35C39404  2B7ADD1E
t=44: 98C1EA64  633E9561  BE6F2E37  1E6F3EC2  35C39404
t=45: C6EA241E  98C1EA64  58CFA558  BE6F2E37  1E6F3EC2
t=46: A2AD4F02  C6EA241E  26307A99  58CFA558  BE6F2E37
t=47: C8A69090  A2AD4F02  B1BA8907  26307A99  58CFA558
t=48: 88341600  C8A69090  A8AB53C0  B1BA8907  26307A99
t=49: 7E846F58  88341600  3229A424  A8AB53C0  B1BA8907
t=50: 86E358BA  7E846F58  220D0580  3229A424  A8AB53C0
t=51: 8D2E76C8  86E358BA  1FA11BD6  220D0580  3229A424
t=52: CE892E10  8D2E76C8  A1B8D62E  1FA11BD6  220D0580
t=53: EDEA95B1  CE892E10  234B9DB2  A1B8D62E  1FA11BD6
t=54: 36D1230A  EDEA95B1  33A24B84  234B9DB2  A1B8D62E
t=55: 776C3910  36D1230A  7B7AA56C  33A24B84  234B9DB2
t=56: A681B723  776C3910  8DB448C2  7B7AA56C  33A24B84
t=57: AC0A794F  A681B723  1DDB0E44  8DB448C2  7B7AA56C
t=58: F03D3782  AC0A794F  E9A06DC8  1DDB0E44  8DB448C2
t=59: 9EF775C3  F03D3782  EB029E53  E9A06DC8  1DDB0E44
t=60: 36254B13  9EF775C3  BC0F4DE0  EB029E53  E9A06DC8
t=61: 4080D4DC  36254B13  E7BDDD70  BC0F4DE0  EB029E53
t=62: 2BFAF7A8  4080D4DC  CD8952C4  E7BDDD70  BC0F4DE0
t=63: 513F9CA0  2BFAF7A8  10203537  CD8952C4  E7BDDD70
t=64: E5895C81  513F9CA0  0AFEBDEA  10203537  CD8952C4
t=65: 1037D2D5  E5895C81  144FE728  0AFEBDEA  10203537
t=66: 14A82DA9  1037D2D5  79625720  144FE728  0AFEBDEA
t=67: 6D17C9FD  14A82DA9  440DF4B5  79625720  144FE728
t=68: 2C7B07BD  6D17C9FD  452A0B6A  440DF4B5  79625720
t=69: FDF6EFFF  2C7B07BD  5B45F27F  452A0B6A  440DF4B5
t=70: 112B96E3  FDF6EFFF  4B1EC1EF  5B45F27F  452A0B6A
t=71: 84065712  112B96E3  FF7DBBFF  4B1EC1EF  5B45F27F
t=72: AB89FB71  84065712  C44AE5B8  FF7DBBFF  4B1EC1EF
t=73: C5210E35  AB89FB71  A10195C4  C44AE5B8  FF7DBBFF
t=74: 352D9F4B  C5210E35  6AE27EDC  A10195C4  C44AE5B8
t=75: 1A0E0E0A  352D9F4B  7148438D  6AE27EDC  A10195C4
t=76: D0D47349  1A0E0E0A  CD4B67D2  7148438D  6AE27EDC
t=77: AD38620D  D0D47349  86838382  CD4B67D2  7148438D
t=78: D3AD7C25  AD38620D  74351CD2  86838382  CD4B67D2
t=79: 8CE34517  D3AD7C25  6B4E1883  74351CD2  86838382

H[0] = 67452301 + 8CE34517 = F4286818
H[1] = EFCDAB89 + D3AD7C25 = C37B27AE
H[2] = 98BADCFE + 6B4E1883 = 0408F581
H[3] = 10325476 + 74351CD2 = 84677148
H[4] = C3D2E1F0 + 86838382 = 4A566572

===============================================================

Block Contents:
  W[0] = 00000000
  W[1] = 00000000
  W[2] = 00000000
  W[3] = 00000000
  W[4] = 00000000
  W[5] = 00000000
  W[6] = 00000000
```

```
W[7] = 00000000
W[8] = 00000000
W[9] = 00000000
W[10] = 00000000
W[11] = 00000000
W[12] = 00000000
W[13] = 00000000
W[14] = 00000000
W[15] = 000001C0

           A         B         C         D         E
t= 0: 2DF257E9  F4286818  B0DEC9EB  0408F581  84677148
t= 1: 4D3DC58F  2DF257E9  3D0A1A06  B0DEC9EB  0408F581
t= 2: C352BB05  4D3DC58F  4B7C95FA  3D0A1A06  B0DEC9EB
t= 3: EEF743C6  C352BB05  D34F7163  4B7C95FA  3D0A1A06
t= 4: 41E34277  EEF743C6  70D4AEC1  D34F7163  4B7C95FA
t= 5: 5443915C  41E34277  BBBDD0F1  70D4AEC1  D34F7163
t= 6: E7FA0377  5443915C  D078D09D  BBBDD0F1  70D4AEC1
t= 7: C6946813  E7FA0377  1510E457  D078D09D  BBBDD0F1
t= 8: FDDE1DE1  C6946813  F9FE80DD  1510E457  D078D09D
t= 9: B8538ACA  FDDE1DE1  F1A51A04  F9FE80DD  1510E457
t=10: 6BA94F63  B8538ACA  7F778778  F1A51A04  F9FE80DD
t=11: 43A2792F  6BA94F63  AE14E2B2  7F778778  F1A51A04
t=12: FECD7BBF  43A2792F  DAEA53D8  AE14E2B2  7F778778
t=13: A2604CA8  FECD7BBF  D0E89E4B  DAEA53D8  AE14E2B2
t=14: 258B0BAA  A2604CA8  FFB35EEF  D0E89E4B  DAEA53D8
t=15: D9772360  258B0BAA  2898132A  FFB35EEF  D0E89E4B
t=16: 5507DB6E  D9772360  8962C2EA  2898132A  FFB35EEF
t=17: A51B58BC  5507DB6E  365DC8D8  8962C2EA  2898132A
t=18: C2EB709F  A51B58BC  9541F6DB  365DC8D8  8962C2EA
t=19: D8992153  C2EB709F  2946D62F  9541F6DB  365DC8D8
t=20: 37482F5F  D8992153  F0BADC27  2946D62F  9541F6DB
t=21: EE8700BD  37482F5F  F6264854  F0BADC27  2946D62F
t=22: 9AD594B9  EE8700BD  CDD20BD7  F6264854  F0BADC27
t=23: 8FBAA5B9  9AD594B9  7BA1C02F  CDD20BD7  F6264854
t=24: 88FB5867  8FBAA5B9  66B5652E  7BA1C02F  CDD20BD7
t=25: EEC50521  88FB5867  63EEA96E  66B5652E  7BA1C02F
t=26: 50BCE434  EEC50521  E23ED619  63EEA96E  66B5652E
t=27: 5C416DAF  50BCE434  7BB14148  E23ED619  63EEA96E
t=28: 2429BE5F  5C416DAF  142F390D  7BB14148  E23ED619
t=29: 0A2FB108  2429BE5F  D7105B6B  142F390D  7BB14148
t=30: 17986223  0A2FB108  C90A6F97  D7105B6B  142F390D
t=31: 8A4AF384  17986223  028BEC42  C90A6F97  D7105B6B
t=32: 6B629993  8A4AF384  C5E61888  028BEC42  C90A6F97
t=33: F15F04F3  6B629993  2292BCE1  C5E61888  028BEC42
t=34: 295CC25B  F15F04F3  DAD8A664  2292BCE1  C5E61888
t=35: 696DA404  295CC25B  FC57C13C  DAD8A664  2292BCE1
t=36: CEF5AE12  696DA404  CA573096  FC57C13C  DAD8A664
t=37: 87D5B80C  CEF5AE12  1A5B6901  CA573096  FC57C13C
t=38: 84E2A5F2  87D5B80C  B3BD6B84  1A5B6901  CA573096
t=39: 03BB6310  84E2A5F2  21F56E03  B3BD6B84  1A5B6901
t=40: C2D8F75F  03BB6310  A138A97C  21F56E03  B3BD6B84
t=41: BFB25768  C2D8F75F  00EED8C4  A138A97C  21F56E03
t=42: 28589152  BFB25768  F0B63DD7  00EED8C4  A138A97C
```

```
t=43: EC1D3D61  28589152  2FEC95DA  F0B63DD7  00EED8C4
t=44: 3CAED7AF  EC1D3D61  8A162454  2FEC95DA  F0B63DD7
t=45: C3D033EA  3CAED7AF  7B074F58  8A162454  2FEC95DA
t=46: 7316056A  C3D033EA  CF2BB5EB  7B074F58  8A162454
t=47: 46F93B68  7316056A  B0F40CFA  CF2BB5EB  7B074F58
t=48: DC8E7F26  46F93B68  9CC5815A  B0F40CFA  CF2BB5EB
t=49: 850D411C  DC8E7F26  11BE4EDA  9CC5815A  B0F40CFA
t=50: 7E4672C0  850D411C  B7239FC9  11BE4EDA  9CC5815A
t=51: 89FBD41D  7E4672C0  21435047  B7239FC9  11BE4EDA
t=52: 1797E228  89FBD41D  1F919CB0  21435047  B7239FC9
t=53: 431D65BC  1797E228  627EF507  1F919CB0  21435047
t=54: 2BDBB8CB  431D65BC  05E5F88A  627EF507  1F919CB0
t=55: 6DA72E7F  2BDBB8CB  10C7596F  05E5F88A  627EF507
t=56: A8495A9B  6DA72E7F  CAF6EE32  10C7596F  05E5F88A
t=57: E785655A  A8495A9B  DB69CB9F  CAF6EE32  10C7596F
t=58: 5B086C42  E785655A  EA1256A6  DB69CB9F  CAF6EE32
t=59: A65818F7  5B086C42  B9E15956  EA1256A6  DB69CB9F
t=60: 7AAB101B  A65818F7  96C21B10  B9E15956  EA1256A6
t=61: 93614C9C  7AAB101B  E996063D  96C21B10  B9E15956
t=62: F66D9BF4  93614C9C  DEAAC406  E996063D  96C21B10
t=63: D504902B  F66D9BF4  24D85327  DEAAC406  E996063D
t=64: 60A9DA62  D504902B  3D9B66FD  24D85327  DEAAC406
t=65: 8B687819  60A9DA62  F541240A  3D9B66FD  24D85327
t=66: 083E90C3  8B687819  982A7698  F541240A  3D9B66FD
t=67: F6226BBF  083E90C3  62DA1E06  982A7698  F541240A
t=68: 76C0563B  F6226BBF  C20FA430  62DA1E06  982A7698
t=69: 989DD165  76C0563B  FD889AEF  C20FA430  62DA1E06
t=70: 8B2C7573  989DD165  DDB0158E  FD889AEF  C20FA430
t=71: AE1B8E7B  8B2C7573  66277459  DDB0158E  FD889AEF
t=72: CA1840DE  AE1B8E7B  E2CB1D5C  66277459  DDB0158E
t=73: 16F3BABB  CA1840DE  EB86E39E  E2CB1D5C  66277459
t=74: D28D83AD  16F3BABB  B2861037  EB86E39E  E2CB1D5C
t=75: 6BC02DFE  D28D83AD  C5BCEEAE  B2861037  EB86E39E
t=76: D3A6E275  6BC02DFE  74A360EB  C5BCEEAE  B2861037
t=77: DA955482  D3A6E275  9AF00B7F  74A360EB  C5BCEEAE
t=78: 58C0AAC0  DA955482  74E9B89D  9AF00B7F  74A360EB
t=79: 906FD62C  58C0AAC0  B6A55520  74E9B89D  9AF00B7F

H[0] = F4286818 + 906FD62C = 84983E44
H[1] = C37B27AE + 58C0AAC0 = 1C3BD26E
H[2] = 0408F581 + B6A55520 = BAAE4AA1
H[3] = 84677148 + 74E9B89D = F95129E5
H[4] = 4A566572 + 9AF00B7F = E54670F1

---------------------------------------------------------------

Message Digest is
                   84983E44 1C3BD26E BAAE4AA1 F95129E5 E54670F1
```

**EXHIBIT "L"**

AFFIDAVIT OF SPECIAL AGENT DAVID CATLIN

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

Your affiant is David J. Catlin II, Special Agent (SA) with the Federal Bureau of Investigation (FBI), who, being duly sworn, deposes and states as follows:

1. I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code. That is, I am an officer of the United States, who is empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18, United States Code, Sections 2422, 2423, 2251 and 2252, *et seq.*

2. Since April 2009 I have been a Special Agent (SA) with the Federal Bureau of Investigation (FBI). Currently, I am assigned to investigate multiple types of cases, to include counterterrorism, bank robbery, murder-for-hire, narcotics, and those involving crimes against children. These investigations have included the use of surveillance techniques, undercover activities, the interviewing of subjects and witnesses, and the planning and execution of search and arrest warrants.

3. I am conducting an investigation involving the sexual exploitation of children and related activities of the individual named herein. I have personally participated in the investigation, and because of my personal participation in and reports made to me by members of the participating law enforcement agencies, I am familiar with the facts and circumstances of this investigation. I have observed and reviewed examples of child pornography. I also have assisted in a child pornography and child exploitation investigation, which involved reviewing examples in all forms of media including computer media and have discussed and reviewed these materials with other law enforcement officers. As an FBI agent, I have reviewed multiple images and videos of child pornography.

4. I am investigating the activities of the internet account registered to a person residing at 9516 SW 118th Court, Miami, Florida 33186. Probable cause exists to believe that

someone using the internet account registered to Martha Garcia has received, possessed, and/or distributed child pornography, in violation of Title 18, United States Code, Sections 2252(a)(2) and (4)(B). I am submitting this affidavit in support of an application for a search warrant authorizing a search of the residence of Martha Garcia, 9516 SW 118th Court, Miami, Florida 33186 (Target Location), more particularly described in Attachment A, for the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of the foregoing violations. I am requesting authority to search the entire Target Location, including the Location dwelling and any computer and computer media located therein where the items specified in Attachment B may be found, and to seize and search all items listed in Attachment B.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(2) and (4)(B) are presently located in the Target Residence.

## I. DEFINITIONS

6. The following definitions apply to this Affidavit and its Attachments:

a. "Minor," as defined in 18 U.S.C. § 2256(1), means any person under the age of 18 years.

b. "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

c. "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in "sexually explicit conduct," as that term is defined in 18 U.S.C. § 2256(2).

d. "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means, which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. See 18 U.S.C. § 2256(5).

e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

f. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

g. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit

electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, flash memory cards, thumb drives and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

k. "Internet Service Providers" or "ISPs," are businesses that enable individuals to obtain access to the internet. ISPs provide their customers with access to the internet using telephone or other telecommunications lines, provide internet e-mail accounts that allow users to communicate with other internet users by sending and receiving electronic messages through the ISPs' servers, remotely store electronic files on their customers' behalf, and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, electronic mail transaction information, posting information, account application information, and other information both in computer data and written format.

l. An "Internet Protocol" or "IP" address is a unique numeric address used by computers on the internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer connected to the internet must have an assigned IP address so that internet traffic sent from and directed to that computer may be properly directed from its source to its destination. Most ISPs control a particular range of IP addresses. When a customer connects to the internet using an ISP service, the ISP assigns the computer an IP address. Any and all computers using the same ISP account during that session will share an IP address. The customer's computer retains the IP address for the duration of the internet session until the user disconnects. The IP address cannot be assigned to a user with a different ISP account during that session. When an internet user visits any website, that website receives a request for information from that customer's assigned IP address and sends the data to that IP address, thus giving the internet user access to the website.

m. The terms "records," "documents," and "materials," used herein include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as digital cameras, floppy diskettes, hard disks, CD ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, laptop computers or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## II. PEER-TO-PEER FILE SHARING AND ARES NETWORK

7. A growing phenomenon on the internet is peer-to-peer file-sharing (hereinafter referred to as P2P). P2P file sharing is a method of communication available to internet users through the use of special software. The software is designed to allow users to trade digital files through a worldwide network that is formed by linking computers together. P2P file sharing networks are frequently used to trade digital files of child pornography, including both image and movie files. Some of the largest P2P networks are Gnutella, eDonkey, ARES, and Bittorrent. The current investigation involves the ARES network.

8. To access the P2P networks, a user first obtains the P2P software, which is publicly available and can be downloaded from the Internet. This software is used for the purpose of sharing digital files. When P2P software is installed on a computer, the user is directed to specify a "shared" folder. The "shared" folder of P2P software is often placed onto

the computer's "Desktop" location by default. All files placed in that user's "shared" folder are available to anyone on the world-wide network for download. However, a user may modify settings to disable sharing the function.

9. A user searches for and obtains files by conducting keyword searches of the P2P network. When a user initially logs onto the P2P network, a list of the files that the user is sharing is transmitted to the network. The P2P software then matches files in these lists to keyword search requests from other users. A user looking to download files simply conducts a keyword search to locate certain types of files. For example, pedophiles searching for images of child pornography may type in "PTHC." I know from experience that this stands for Preteen Hard Core. Collectors of child pornography are usually aware of the fact that using this search term will frequently locate images or videos that contain child pornography. The results of the keyword search are displayed, and the user then selects the files that he/she wants to download.

10. The download of a file can be achieved through a direct connection between the computer requesting the file and the computer(s) hosting the file. Once a file has been downloaded, it is stored in the area previously designated as a "shared" folder by the user and will remain there until moved or deleted by the user.

11. Most of the P2P software applications keep logs of each download event. Thus, a person interested in sharing child pornography with others in the P2P network need only place those files in his/her "shared" folder(s), and those child pornography files are then available to all users of the P2P network for download regardless of their physical location.

12. A P2P files transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four groups of numbers that are separated by decimal points, is unique to a particular Internet connection during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

13. The computers that are linked together to form the P2P network are located throughout the world. Therefore, the P2P network operates in interstate and foreign commerce.

14. Even though the P2P network links together computers from all over the world and users can download files, it is not possible for one user to send a file to another user of the P2P network. The software is specifically designed only to allow files that have been selected to be downloaded. A user does not have the ability to send files from his/her computer to another user's computer without their permission or knowledge. Therefore, it is not possible for one user to send child pornography files to another user's computer without his/her active participation.

15. One of the advantages of P2P file sharing is that multiple files may be downloaded at one time. In addition, a user may download a file from numerous sources at once, thereby reducing the time it takes to download a file.

16. P2P computer software has different methods to ensure that two files are exactly the same. The ARES network uses a Secure Hash Algorithm (SHA-1).

17. Generally, hashing is simply a method of using a formula (or a hash algorithm) to store large data sets as smaller data sets in a computerized database, rendering a subsequent search for data much faster. Application of a hash algorithm to a data set yields hash values, which are unique to the data set from which they are derived. By comparing these unique signatures, it can be concluded that two files are or are not identical.

18. This mathematical algorithm essentially allows for the fingerprinting of files. Once a user checks a file with a SHA-1 hashing utility capable of generating this SHA-1 value (the fingerprint), that fingerprint becomes a fixed-length unique identifier for that file. The SHA-1 hash is the current Federal Information Processing and Digital Signature Algorithm. The SHA-1 is called secure because it is computationally infeasible for two files with different content to have the same SHA-1 hash value.

19. The client software processes files located in a user's shared directory. As part of this processing, a SHA-1 hash value is computed for each file located within a user's shared directory.

20. A user who is attempting to trade files can place files from their local computer into a "shared" file directory. If that user then starts the P2P software, that local computer calculates the ARES signature for each shared file and provides that information to other users wishing to trade files. When a user downloads a file from the ARES network, the SHA-1 hash value of the file being downloaded is immediately transferred to the user's computer and this hash value assists the software in locating other users that are sharing files with the same hash value.

21. A keyword search in the ARES software could also result in a list of ARES hash digital signatures to choose from. This search generates a list of ARES hash signatures which can be compared to a list of known ARES hash signatures that belong to movies or images of known child pornography. Once there is a match of the SHA-1 hash value being used as the search term, publicly available software can be used to request a list of internet network computers that are reported to have the same images for trade, or are participating in the trade of, *files with the same hash signature as those previously identified as images that appear to depict* child pornography. This feature allows for law enforcement officers to covertly locate and identify computers that contain images and/or movies containing known child pornography via their unique hash signatures.

## III. BACKGROUND OF THE INVESTIGATION

22. On September 13, 2012, FBI Special Agent Daniel J. Johns, using investigative software, identified a computer on the ARES P2P file sharing network whose shared folder had in it files believed to depict child pornography. Specifically, **IP address 76.18.18.10** was listed

as sharing twenty-one (21) files with hash values of images (including videos) of suspected child pornography. A small sample of the file names listed are below:

A. (((kingpass))) st Petersburg(y01)329.avi

B. (pthc)asian-cambodian prostitute.avi

C. Asian#018,,,,,,,,,Cambodian brothel, svay pak,,6,8,10,12real stuff.avi

D. C-kinderficker pthc ptsc hussyfan my step daughter-sdpa.avi

23. Based on the SHA-1 value of the above mentioned files, law enforcement downloaded files. During the download the IP address of the individual sharing the file is displayed. Both the specific file shared and the IP address sharing the file was displayed for each download. On September 13, 2012, law enforcement was able to successfully download five (5) completed video files and one (1) incomplete video file from IP address **76.18.18.10.**

24. The first complete file had an SHA-1 value (base32) listed as: "**HMRJTWE376L3QB6HYZBCPPZWUMEY7H5N.**" SA Johns downloaded this movie file from a single sharing client; the date and time of the IP address was recorded. I viewed the downloaded video file which depicted a fully clothed young girl under the age of eighteen (18) sitting on a bed who later takes off all of her clothes. The girl then holds on to the top bunk and lifts her lower body up to reveal her vaginal area. The girl continues to do different poses for approximately three minutes. The IP address assigned to the computer sharing the above-mentioned file was **76.18.18.10.**

25. The second complete downloaded file had an SHA-1 value (base32) listed as: "**CDDGFDHGHRG5QNLSJHJV2NOQP545HQKZ.**" SA Johns downloaded this movie file from a single sharing client; the date and time of the IP address was recorded. I viewed the downloaded file which consisted of a video depicting a young girl under the age of eighteen (18) giving oral sex to a male over the age of eighteen (18), three other young girls under the age of eighteen (18)

came into the video, and the male over the age of eighteen (18) using his hand began touching the vagina of one of the young girls and then engaged in intercourse with her.

26. The third complete downloaded file had an SHA-1 value (base 32) listed as: **"6GABHCOQ7FGALAJW5ITOYLSXYD265BCX."** SA Johns downloaded this movie file from a single sharing client; the date and time of the IP address was recorded. I viewed the downloaded file. The video depicts a male over the age of eighteen (18) with two naked, young girls under the age of eighteen (18). The young girls were showing their vaginas to the video camera and the male was touching the young girls' vaginas. There was another female over the age of (18) that gave directions to the young naked girls.

27. The fourth complete downloaded file had a SHA-1 value (base 32) listed as: **"2XYLL3IVSGHZ6BDEKVFEVH6CGBMPZ4JG."** SA Johns downloaded this movie file from a single sharing client which had an IP address that was recorded along with the time. I viewed the downloaded file. This video depicts a male over the age of eighteen (18) giving oral sex to a young girl under the age of eighteen (18). Later in the video, the male used his fingers to touch the young girl, and the young girl gave oral sex to the male.

28. In addition to these four (4) complete downloads, SA Johns was able to obtain one (1) other complete movie and one (1) incomplete movie that also displayed child pornography.

29. A search of a publicly available online database indicated that IP address **76.18.18.10** is registered to Comcast Internet Service. Results from an administrative subpoena sent to Comcast for the date and time the files were downloaded revealed that on those dates and times, the IP address was assigned to an account registered to Martha Garcia at the Target Location.

30. On November 27, 2012, I conducted physical surveillance of the Target Location. During the surveillance, I observed one (1) vehicle, silver Mazda coupe Florida license plate R30

M4N, parked in front of the Target Location. A records check revealed that license plate R30 M4N is registered to Roger Amado Garcia, social security number xxx-xx-3810. The Florida license/identification database was queried and Roger Amado Garcia lists the Target Location as his home address on his current Florida driver's license.

## IV. PERSONS INVOLVED IN THE POSSESSION AND DISTRIBUTION OF CHILD PORNOGRAPHY

31. Based upon experience in child sexual exploitation and child pornography investigations, and having worked with other experienced law enforcement officers in child exploitation investigations, I know the following:

a. Persons who are involved with child pornography generally also have other sexually explicit materials related to their interest in children, which may consist of photographs, motion pictures, videos, text material, computer graphics and digital or other images of children. Such persons may also have images of children or text writing that do not rise to the level of child pornography but nonetheless fuel their deviant sexual fantasies involving minors. Such persons have been known to take and maintain photographs and video recordings of fully clothed children, not just in sexually provocative poses, but in public places and elsewhere. I am aware that this type of material has been admitted into evidence at trial under Fed.R.Evid. 404(b) to prove such things as the possessor's knowledge, intent, motive and identity, as well as to prove the person has a sexual interest in minors under Fed.R.Evid. 414.

b. Individuals who maintain images of children as described above and child pornography often maintain these images on cameras, film, video cameras, videos, computers, and other photographic equipment. Such individuals have been known to connect their cameras, video cameras, and other photographic equipment to their computers in an effort to create added storage space for their images of children.

    c. Individuals who collect child pornography often seek out like-minded individuals, either in person or on the internet, to share information and trade depictions of child pornography and child erotica. They do this to gain status, trust, acceptance and support and to increase their collection of illicit images and child erotica. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, chat and file sharing programs, e-mail, e-mail groups, bulletin boards, Internet Relay Chat (IRC), newsgroups, Internet clubs, and various forms of Instant Messaging such as Yahoo! Messaging, and "chat" that is sometimes saved on the users' computer or other digital storage media.

d. Besides photos of minors and child erotica, such individuals often produce and/or collect other written material on the subject of sexual activities with minors, which range from fantasy stories to medical, sociological, and psychological writings, which they save to understand and justify their illicit behavior and desires.

e. Individuals who collect child pornography often collect, read, copy or maintain names, addresses, including e-mail addresses, phone numbers, and lists of persons who have advertised or otherwise made known in publications and on the internet that they have similar sexual interests, or have child pornography and child erotica for sale or trade. These contacts are maintained for personal referral, exchange or, sometimes, commercial profit. They may maintain these names on computer storage devices, web sites or other internet addresses, and their discovery can serve as leads to assist law enforcement in proving the instant case and in apprehending others involved in the underground trafficking of child pornography.

f. Individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect their collections of illicit materials from discovery, theft, and damage. The known desire of

such individuals to retain child pornography together with the sense of security afforded by using computers, provides probable cause to believe that computer images, especially child pornography and erotic nudity involving minors, will be retained by the collector indefinitely. These individuals may protect their illicit materials by passwords, encryption, and other security measures. These individuals may also protect their illicit materials by saving them on movable media such as memory cards, memory sticks, CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be easily secreted as they are very small in size—often as small as a postage stamp—or sent to third party image storage sites via the internet.

**V. COMPUTERS, CHILD PORNOGRAPHY, AND LAW ENFORCEMENT TOOLS**

32. Computers essentially serve four functions in connection with child pornography: (1) production; (2) communication; (3) distribution; and (4) storage.

33. Child pornographers can now easily transfer existing hard copy photographs into a computer-readable format with a scanner. With the advent of digital cameras, images can be transferred directly from the digital camera onto a computer. Moreover, a device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Through the internet, electronic contact can be made to literally millions of computers around the world.

34. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images at a very high resolution.

35. The internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

36. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the internet. Evidence of such online storage of child pornography is often found on the user's computer.

37. Communications made by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally. For example, traces of the path of an electronic communication may be automatically stored in many places such as temporary files or Internet Service Provider client software. In addition to electronic communications, a computer user's internet activities generally leave traces, or "footprints," in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that, in fact, a computer contains peer to peer software, when the computer was sharing files, and even some of the files which were uploaded or downloaded through this software. Such information may be maintained indefinitely until overwritten by other data.

38. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt

the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." By using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

39. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

40. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the internet are automatically downloaded into a temporary internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. A substantial amount of time is necessary to extract and sort through data in this free or unallocated space.

41. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computers can contain other forms of electronic evidence as well. In particular, records of how a computer has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the computer are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregated from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted, edited, or deleted in part such as a word processing file with a deleted paragraph. Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

## VI. SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND OTHER ELECTRONIC DEVICES

42. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored. It would be generally impossible to accomplish this data search on site; and

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. It is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

43. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all of the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as documentation, items containing

or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.

44. I know, from experience, that digital evidence is not limited to computers. Persons with an interest in child exploitation materials can access the internet, display images of child pornography and communicate with other individuals with the same interest using electronic media like wireless telephones, personal digital assistants (PDAs), and touch screen tablets. These devices are frequently found to contain chat communications in the form of short message service (SMS) messages as well as enabling internet and digital cellular network access. I know that there are P2P client applications for use on wireless telephones.

45. I know that files related to the exploitation of children found on computers and other electronic media are usually obtained from the internet or the wireless data networks using application software which often leaves files, logs or file remnants which would tend to show the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files.

46. I know that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

47. I know that computers or other electronic devices used to access the internet usually contain files, logs or file remnants which would tend to show ownership and use of the device, as well as ownership and use of internet service accounts used for the internet or cellular data network access.

**CONCLUSION**

48. Based on the aforementioned factual information, I respectfully submit that a computer that is involved in the distribution, receipt and possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (4)(B) can be located at the Target Location described in Attachment A. I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

David J. Catlin II
Special Agent, Federal Bureau of Investigation

Sworn and subscribed before me this 13th day of December 2012, in Miami, Florida.

THE HONORABLE ALICIA OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and correct copy of the original.
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By ______ Deputy Clerk
Date 12/13/12

**EXHIBIT "M"**

42 U.S.C. § 17612 STATUTE

§ 17612. Establishment of National ICAC Task Force Program

(a) **Establishment.**

(1) In general. There is established within the Department of Justice, under the general authority of the Attorney General, a National Internet Crimes Against Children Task Force Program (hereinafter in this title referred to as the "ICAC Task Force Program"), which shall consist of a national program of State and local law enforcement task forces dedicated to developing effective responses to online enticement of children by sexual predators, child exploitation, and child obscenity and pornography cases.

(2) Intent of Congress. It is the purpose and intent of Congress that the ICAC Task Force Program established under paragraph (1) is intended to continue the ICAC Task Force Program authorized under title I of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, and funded under title IV of the Juvenile Justice and Delinquency Prevention Act of 1974 [42 USCS §§ 5771 et seq.].

(b) **National program.**

(1) State representation. The ICAC Task Force Program established under subsection (a) shall include at least 1 ICAC task force in each State.

(2) Capacity and continuity of investigations. In order to maintain established capacity and continuity of investigations and prosecutions of child exploitation cases, the Attorney General, shall, in establishing the ICAC Task Force Program under subsection (a) consult with and consider all 59 task forces in existence on the date of enactment of this Act [enacted Oct. 13, 2008]. The Attorney General shall include all existing ICAC task forces in the ICAC Task Force Program, unless the Attorney General makes a determination that an existing ICAC [task force] does not have a proven track record of success.

(3) Ongoing review. The Attorney General shall--

(A) conduct periodic reviews of the effectiveness of each ICAC task force established under this section; and

(B) have the discretion to establish a new task force if the Attorney General determines that such decision will enhance the effectiveness of combating child exploitation provided that the Attorney General notifies Congress in advance of any such decision and that each state [State] maintains at least 1 ICAC task force at all times.

(4) Training.

(A) In general. The Attorney General may establish national training programs to support the mission of the ICAC task forces, including the effective use of the National Internet Crimes Against Children Data System.

(B) Limitation. In establishing training courses under this paragraph, the Attorney General may not award any one entity other than a law enforcement agency more than $4,000,000 annually to establish and conduct training courses for ICAC task force members and other

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

law enforcement officials.

(C) Review. The Attorney General shall--

(i) conduct periodic reviews of the effectiveness of each training session authorized by this paragraph; and

(ii) consider outside reports related to the effective use of Federal funding in making future grant awards for training.

(Oct. 13, 2008, P. L. 110-401, Title I, § 102, 122 Stat. 4233; Dec. 7, 2012, P. L. 112-206, § 5, 126 Stat. 1493 .)

## HISTORY; ANCILLARY LAWS AND DIRECTIVES

**References in text:**

"Title I of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998", referred to in this section, is Title I of Act Nov. 26, 1997, P. L. 105-119. For full classification of such Title, consult USCS Tables volumes.

**Explanatory notes:**

The bracketed words "task force" have been inserted in subsec. (b)(2) to indicate the probable intent of Congress to include them.

The bracketed word "State" has been inserted in subsec. (b)(3)(B) to indicate the capitalization probably intended by Congress.

**Amendments:**

**2012.** Act Dec. 7, 2012, in subsec. (b)(4)(B), substituted "$4,000,000" for "$2,000,000".

§ 17613. Purpose of ICAC task forces

The ICAC Task Force Program, and each State or local ICAC task force that is part of the national program of task forces, shall be dedicated toward--

(1) increasing the investigative capabilities of State and local law enforcement officers in the detection, investigation, and apprehension of Internet crimes against children offenses or offenders, including technology-facilitated child exploitation offenses;

(2) conducting proactive and reactive Internet crimes against children investigations;

(3) providing training and technical assistance to ICAC task forces and other Federal, State, and local law enforcement agencies in the areas of investigations, forensics, prosecution, community outreach, and capacity-building, using recognized experts to assist in the development and delivery of training programs;

(4) increasing the number of Internet crimes against children offenses being investigated and prosecuted in both Federal and State courts;

(5) creating a multiagency task force response to Internet crimes against children offenses within each State;

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**EXHIBIT "N"**

42 U.S.C. § 17616 STATUTE

**Amendments:**

**2012.** Act Dec. 7, 2012, in subsec. (e)(1)(B)(i), deleted "the volume of suspected criminal activity or other" following "determined by".

§ 17616. ICAC grant program

(a) **Establishment.**

(1) In general. The Attorney General is authorized to award grants to State and local ICAC task forces to assist in carrying out the duties and functions described under section 104 [42 USCS § 17614].

(2) Formula grants.

(A) Development of formula. At least 75 percent of the total funds appropriated to carry out this section shall be available to award or otherwise distribute grants pursuant to a funding formula established by the Attorney General in accordance with the requirements in subparagraph (B).

(B) Formula requirements. Any formula established by the Attorney General under subparagraph (A) shall--

(i) ensure that each State or local ICAC task force shall, at a minimum, receive an amount equal to 0.5 percent of the funds available to award or otherwise distribute grants under subparagraph (A); and

(ii) take into consideration the following factors:

(I) The population of each State, as determined by the most recent decennial census performed by the Bureau of the Census.

(II) The number of investigative leads within the applicant's jurisdiction generated by Operation Fairplay, the ICAC Data Network, the CyberTipline, and other sources.

(III) The number of criminal cases related to Internet crimes against children referred to a task force for Federal, State, or local prosecution.

(IV) The number of successful prosecutions of child exploitation cases by a task force.

(V) The amount of training, technical assistance, and public education or outreach by a task force related to the prevention, investigation, or prosecution of child exploitation offenses.

(VI) Such other criteria as the Attorney General determines demonstrate the level of need for additional resources by a task force.

(3) Distribution of remaining funds based on need.

(A) In general. Any funds remaining from the total funds appropriated to carry out this section after funds have been made available to award or otherwise distribute formula grants under paragraph (2)(A) shall be distributed to State and local ICAC task forces

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

98922004

based upon need, as set forth by criteria established by the Attorney General. Such criteria shall include the factors under paragraph (2)(B)(ii).

(B) Matching requirement. A State or local ICAC task force shall contribute matching non-Federal funds in an amount equal to not less than 25 percent of the amount of funds received by the State or local ICAC task force under subparagraph (A). A State or local ICAC task force that is not able or willing to contribute matching funds in accordance with this subparagraph shall not be eligible for funds under subparagraph (A).

(C) Waiver. The Attorney General may waive, in whole or in part, the matching requirement under subparagraph (B) if the State or local ICAC task force demonstrates good cause or financial hardship.

(b) **Application.**

(1) In general. Each State or local ICAC task force seeking a grant under this section shall submit an application to the Attorney General at such time, in such manner, and accompanied by such information as the Attorney General may reasonably require.

(2) Contents. Each application submitted pursuant to paragraph (1) shall--

(A) describe the activities for which assistance under this section is sought; and

(B) provide such additional assurances as the Attorney General determines to be essential to ensure compliance with the requirements of this title [42 USCS §§ 17611 et seq.].

(c) **Allowable uses.** Grants awarded under this section may be used to--

(1) hire personnel, investigators, prosecutors, education specialists, and forensic specialists;

(2) establish and support forensic laboratories utilized in Internet crimes against children investigations;

(3) support investigations and prosecutions of Internet crimes against children;

(4) conduct and assist with education programs to help children and parents protect themselves from Internet predators;

(5) conduct and attend training sessions related to successful investigations and prosecutions of Internet crimes against children; and

(6) fund any other activities directly related to preventing, investigating, or prosecuting Internet crimes against children.

(d) **Reporting requirements.**

(1) ICAC reports. To measure the results of the activities funded by grants under this section, and to assist the Attorney General in complying with the Government Performance and Results Act (Public Law 103-62; 107 Stat. 285), each State or local ICAC task force receiving a grant under this section shall, on an annual basis, submit a report to the Attorney General that sets forth the following:

(A) Staffing levels of the task force, including the number of investigators, prosecutors, education specialists, and forensic specialists dedicated to investigating and prosecuting

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Internet crimes against children.

(B) Investigation and prosecution performance measures of the task force, including--

(i) the number of investigations initiated related to Internet crimes against children;

(ii) the number of arrests related to Internet crimes against children; and

(iii) the number of prosecutions for Internet crimes against children, including--

(I) whether the prosecution resulted in a conviction for such crime; and

(II) the sentence and the statutory maximum for such crime under State law.

(C) The number of referrals made by the task force to the United States Attorneys office, including whether the referral was accepted by the United States Attorney.

(D) Statistics that account for the disposition of investigations that do not result in arrests or prosecutions, such as referrals to other law enforcement.

(E) The number of investigative technical assistance sessions that the task force provided to nonmember law enforcement agencies.

(F) The number of computer forensic examinations that the task force completed.

(G) The number of law enforcement agencies participating in Internet crimes against children program standards established by the task force.

(2) Report to Congress. Not later than 1 year after the date of enactment of this Act [enacted Oct. 13, 2008], the Attorney General shall submit a report to Congress on--

(A) the progress of the development of the ICAC Task Force Program established under section 102 [47 USCS § 17612]; and

(B) the number of Federal and State investigations, prosecutions, and convictions in the prior 12-month period related to child exploitation.

(Oct. 13, 2008, P. L. 110-401, Title I, § 106, 122 Stat. 4238 .)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**References in text:**

The "Government Performance and Results Act of 1993", referred to in this section, is Act August 3, 1993, P. L. 103-62, which appears in part as 5 USCS § 306 and 31 USCS §§ 1115-1119, 9703, and 9704. For full classification of such Act, consult USCS Tables volumes.

§ 17617. Authorization of appropriations

(a) **In general.** There are authorized to be appropriated to carry out this title [42 USCS §§ 17611 et seq.]--

(1) $60,000,000 for fiscal year 2009;

(2) $60,000,000 for fiscal year 2010;

(3) $60,000,000 for fiscal year 2011;

(4) $60,000,000 for fiscal year 2012;

(5) $60,000,000 for fiscal year 2013[;]

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

98922004

(6) $60,000,000 for fiscal year 2014;
(7) $60,000,000 for fiscal year 2015;
(8) $60,000,000 for fiscal year 2016;
(9) $60,000,000 for fiscal year 2017; and
(10) $60,000,000 for fiscal year 2018.

(b) **Availability.** Funds appropriated under subsection (a) shall remain available until expended.

(Oct. 13, 2008, P. L. 110-401, Title I, § 107, 122 Stat. 4241; Dec. 7, 2012, P. L. 112-206, § 7, 126 Stat. 1493 .)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Explanatory notes:**

The bracketed semicolon has been inserted in subsec. (a)(5) to indicate the probable intent of Congress to include such punctuation.

**Amendments:**

**2012.** Act Dec. 7, 2012, in subsec. (a), in para. (4), deleted "and" following the concluding semicolon, in para. (5), deleted a concluding period, and added paras. (6)-(10).

## ADDITIONAL MEASURES TO COMBAT CHILD EXPLOITATION

§ 17631. Additional regional computer forensic labs

(a) **Additional resources.** The Attorney General shall establish additional computer forensic capacity to address the current backlog for computer forensics, including for child exploitation investigations. The Attorney General may utilize funds under this title [this section] to increase capacity at existing regional forensic laboratories or to add laboratories under the Regional Computer Forensic Laboratories Program operated by the Federal Bureau of Investigation.

(b) **Purpose of new resources.** The additional forensic capacity established by resources provided under this section shall be dedicated to assist Federal agencies, State and local Internet Crimes Against Children task forces, and other Federal, State, and local law enforcement agencies in preventing, investigating, and prosecuting Internet crimes against children.

(c) **New computer forensic labs.** If the Attorney General determines that new regional computer forensic laboratories are required under subsection (a) to best address existing backlogs, such new laboratories shall be established pursuant to subsection (d).

(d) **Location of new labs.** The location of any new regional computer forensic laboratories under this section shall be determined by the Attorney General, in consultation with the Director of the Federal Bureau of Investigation, the Regional Computer Forensic Laboratory National

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**EXHIBIT "O"**

42 U.S.C. § 16987 STATUTE

§ 16987. Grants for online child safety programs

(a) **In general.** The Attorney General shall, subject to the availability of appropriations, make grants to States, units of local government, and nonprofit organizations for the purposes of establishing and maintaining programs with respect to improving and educating children and parents in the best ways for children to be safe when on the Internet.

(b) **Definition of State.** For purposes of this section, the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands.

(c) **Authorization of appropriations.** There are authorized to be appropriated to carry out this section such sums as are necessary for fiscal years 2007 through 2011.

(July 27, 2006, P. L. 109-248, Title VI, Subtitle C, § 630, 120 Stat. 640 .)

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

98922004

**EXHIBIT "P"**

31 U.S.C. § 3729(a)(1) STATUTE

§ 3729. False claims

(a) **Liability for certain acts.**

(1) In general. Subject to paragraph (2), any person who-

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(2) Reduced damages. If the court finds that-

(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B) such person fully cooperated with any Government investigation of such violation; and

(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

42473019

(3) Costs of civil actions. A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) **Definitions.**   For purposes of this section-

    (1) the terms "knowing" and "knowingly"-

        (A) mean that a person, with respect to information-

            (i) has actual knowledge of the information;

            (ii) acts in deliberate ignorance of the truth or falsity of the information; or

            (iii) acts in reckless disregard of the truth or falsity of the information; and

        (B) require no proof of specific intent to defraud;

    (2) the term "claim"-

        (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that-

            (i) is presented to an officer, employee, or agent of the United States; or

            (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-

                (I) provides or has provided any portion of the money or property requested or demanded; or

                (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

        (B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

    (3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

    (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

(c) **Exemption from disclosure.**   Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

(d) **Exclusion.**   This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986 [26 USCS §§ 1 et seq.].

(e) **[Redesignated]**

    (Sept. 13, 1982, P.L. 97-258, § 1, 96 Stat. 978; Oct. 27, 1986, P. L. 99-562, § 2, 100 Stat. 3153; July

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

42473019

5, 1994, P. L. 103-272, § 4(f)(1)(O), 108 Stat. 1362; May 20, 2009, P. L. 111-21, § 4(a), 123 Stat. 1621 .)

## HISTORY; ANCILLARY LAWS AND DIRECTIVES

**Prior law and revision:**

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 3729 ........ | 31:231 .............. | R.S. Sec. 3490. |

In the section, before clause (1), the words "a member of an armed force of the United States" are substituted for "in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States" and "military or naval service" for consistency with title 10. The words "is liable" are substituted for "shall forfeit and pay" for consistency. The words "by reason of the doing or committing such act" are omitted as surplus. The words "civil action" are substituted for "suit" for consistency in the revised title and with other titles of the Code. The words "and such forfeiture and damages shall be sued for in the same suit" are omitted as unnecessary because of rules 8 and 10 of the Federal Rules of Civil Procedure. In clauses (1)-(3), the words "false or fraudulent" are substituted for "false, fictitious, or fraudulent" and "fraudulent or fictitious" to eliminate unnecessary words and for consistency. In clause (1), the words "presents, or causes to be presented" are substituted for "shall make or cause to be made, or present or cause to be presented" for clarity and consistency and to eliminate unnecessary words. The words "officer or employee of the Government or a member of an armed force" are substituted for "officer in the civil, military, or naval service of the United States" for consistency in the revised title and with other titles of the Code. The words "upon or against the Government of the United States, or any department or officer thereof" are omitted as surplus. In clause (2), the word "knowingly" is substituted for "knowing the same to contain any fraudulent or fictitious statement or entry" to eliminate unnecessary words. The word "record" is substituted for "bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition" for consistency in the revised title and with other titles of the Code. In clause (3), the words "conspires to" are substituted for "enters into any agreement, combination, or conspiracy" to eliminate unnecessary words. The words "of the United States, or any department or officer thereof" are omitted as surplus. In clause (4), the words "charge", "or other", and "to any other person having authority to receive the same" are omitted as surplus. In clause (5), the words "document certifying receipt" are substituted for "certificate, voucher, receipt, or other paper certifying the receipt" to eliminate unnecessary words. The words "arms, ammunition, provisions, clothing, or other", "to any other person", and "the truth of" are omitted as surplus. In clause (6), the words "arms, equipments, ammunition, clothes, military stores, or other" are omitted as surplus. The words "member of an armed force" are substituted for "soldier, officer, sailor, or other person called into or employed in the military or naval service" for consistency with title 10. The words "such soldier, sailor, officer, or other person" are omitted as surplus.

**Amendments:**

**1986.** Act Oct. 27, 1986, substituted "(a) Liability for certain acts. Any person who--" for introductory matter which read: "A person not a member of an armed force of the United States is liable to the United States Government for a civil penalty of $2,000, an amount equal to 2 times the amount of

© 2017 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

42473019