B"H

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

~~Sealed~~

Case No. _1:17-CV-20859-RNS_

FILED by __MM__ D.C.

MAR 15 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA, AND
THE STATE OF FLORIDA

ex rel.,

JAMES PRICE,                               **FILED UNDER SEAL PURSUANT TO:**
SHELDON JOEL RAMNARAINE,                   **TITLE 31 U.S.C. § 3730(b)(2);**
AND LAWRENCE S. SMITH,                     **FLA. STAT. § 68.082**

        Plantiff/Relators,

v.

CHILD RESCUE COALITION, INC., AND
TRANSUNION, INC., AND
TRANSUNION INTERMEDIATE HOLDINGS, INC., AND
TLO, LLC., AND
TRANSUNION RISK AND ALTERNATIVE
DATA SOLUTIONS, INC., AND
THE EXECUTIVE OFFICE OF THE
UNITED STATES ATTORNEY GENERAL, AND
CAROLYN ASHER-YOOST, AND
ELIZA DESIREE ASHER, AND
DANIEL MACLACHLAN, AND
WILLIAM WILTSE, AND
DERECK DUBNER, AND
OLE POULSEN, AND
JOHN WALSH, AND
GARY MYHRE,

        Defendants.

_____/

**AMENDED COMPLAINT**

FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 et seq., and
FLORIDA FALSE CLAIMS ACT, FLA. STAT. §§ 68.081 et seq.

**COMES NOW**, James Price, Sheldon Joel Ramnaraine, and Lawrence S. Smith (hereinafter "the Relators"), on behalf of the United States of America (hereinafter "United States"), and the State of Florida (hereinafter "Florida"), and respectfully represents the following:

## I.   INTRODUCTION

1.     The Relators bring this action on behalf of the United States of America and the State of Florida against the Defendants for treble damages and civil penalties arising from the Defendants' false claims and fraud, in violation of the federal False Claims Act, Title 31 U.S.C. § 3729 et seq. (hereinafter "FCA"), and the Florida False Claims Act (hereinafter "FFCA"), FLA. STAT. § 68.081 et seq.

2.     The United States was defrauded by TransUnion, Inc. ("TransUnion"), TransUnion Risk and Alternative Data Solutions Inc. ("TRADS"), TransUnion Intermediate Holdings ("TIH"), TLO, LLC. ("TLO"), and the Child Rescue Coalition, Inc. ("the CRC") (hereinafter collectively referred to as "the Defendants"), where: (1) the Defendants knowingly and willfully presented information known to be false to law enforcement agents and the Internet Crimes Against Children ("ICAC") task force; (2) where that fraudulent information was the basis for fully-funded criminal investigations and prosecutions; and (3) where the United States issued monetary reimbursement to law enforcement agencies and the ICAC task force,

for operations based on fraudulent information provided by the Defendants. Specifically, the Defendants deliberately misrepresented "loose-link values" as "SHA-1 values," to fifty (50) state jurisdictions including Florida, ninety-three (93) federal districts, and fifty-five (55) international jurisdictions, to effectuate the fraud.

3.     As required by the FCA, 31 U.S.C. § 3729(b)(2), the Relators made disclosures and provided a statement of all material evidence and information regarding the Complaint to the Office of the Honorable Jeff Sessions, United States Attorney General, and the Office of the Honorable Pamela Jo Bondi, Attorney General for the State of Florida.   See "Firm Mailing Book for Accountable Mail" at Exhibit "A".   That disclosure statement was supported by material evidence known to the Relators at the time of their filing, infra, and established the existence of the Defendants' false claims. The Relators understand the disclosure to be confidential as it included attorney communications, the Relators' work product, and was submitted to the aforementioned government officials in their capacity as potential co-counsel in the litigation.

## II.   JURISDICTION AND VENUE

4.     This action arises under the FCA and the FFCA.   This Court has jurisdiction over the entire case pursuant to Title 31 U.S.C. § 3732(a) and (b).   This Court also has jurisdiction pursuant to Title 28 U.S.C. §§ 1331, § 1345, and § 1367.

5.     The venue is proper in this District, pursuant to Title 31 U.S.C. § 3732(a) and Title 28 U.S.C. § 1391(b), where all of the illegal acts

complained of herein either occurred in this District, or arose out of the same occurrences or transactions as such acts; and where each and every Defendant resides and or transacts business in this District.

## III.   A PRELIMINARY HISTORY OF THE DEFENDANTS

6.    A preliminary understanding of the various Defendants, and their relationships to each other, is necessary to understand the issue at hand. These matters begin with Henry "Hank" Asher. Asher was a technology innovator and the owner/founder of Technology Investors Incorporated. Asher developed a specialized form of data mining by leveraging business intelligence methods and predictive analytics techniques to "fuse", i.e., "loosely-link," vast amounts of data collected from various sources. That data was organized in a manner to build comprehensive profiles and records of internet users and their activity worldwide. Asher was also well known to the Drug Enforcement Agency and the Federal Bureau of Investigation as a **cocaine smuggler.** See DE:438 at Pg. 3, USBCFLSD, Case No. 14-01793, at Exhibit "E".

7.    William Wiltse was a disgraced former detective from Salem, Oregon, where, inter alia, he was charged with official misconduct. See Troy Hudson, Sr. et al., v. Officer William Wiltse, et al., 2009 U.S. Dist. LEXIS 38511 (2009). Wiltse, along with Flint Waters of the Wyoming Division of Criminal Investigations, co-opted various open-source software packages and amalgamated them into a program called Peer Precision, also known as the "Wyoming Toolkit". See Third Affidavit of William Wiltse, at Exhibit "B". Wiltse co-opted Peer Precision, renaming it Peer Spectre, and distributed it to other law enforcement agents. Peer Spectre identified networks and computers alleged to be trafficking in child pornography. Wiltse later

3

relocated to Boca Raton, Florida, **a location renown for internet scams**, to work with Asher.

8.     On March 20, 2009, TLO, LLC. ("TLO"), now known as TLFO, LLC., was co-founded by John Walsh and Technology Investors Inc., i.e., Hank Asher. Asher's daughters, Carolyn Asher-Yoost and Eliza Desiree Asher served as co-CEOs of TLO; Dereck Dubner served as corporate counsel. See Affidavit of Dereck Dubner, at Exhibit "D". Ole Poulsen was a longtime associate of Asher and joined TLO as its Chief Science Officer. Poulsen directed product development for TLO's operating concept. See Bloomberg Company Overview Report, at Exhibit "C". As Chief Science Officer, Poulsen possessed intimate knowledge of the Defendants' technical infrastructure, operations, and the innerworkings of the products. Daniel MacLachlan was TLO's Chief Financial Officer. In his role, MacLachlan had detailed knowledge of the Defendants' revenues and operational expenses. Additionally, MacLachlan was an integral part of the Defendants' management team with key influence on the Defendants' business and operating strategy. In this capacity, MachLachlan was material to the effectuation of the fraud. See TransUnion Risk and Alternative Data Solutions, Inc. v. MacLachlan, 2016 U.S. Dist. LEXIS 24569 (2016). Finally, Gary Myhre was the architect of the "Business Plan" i.e., the Defendants' business plan. Myhre's role was critical to the success of the Defendants' operations, where he developed the strategic operation plan and the tactical implementation strategy. Myhre sought $25 million in compensation for his role in developing the "Business Plan". See Myhre v. TLFO, LLC., 2015 U.S. Dist. LEXIS 49497 (2015).

9.     TLO/TLFO implemented Asher's data mining operation, and predictive analytics technology, i.e, Asher's "loose-link algorithm", to

identify, track, and rank persons allegedly engaged in criminal activity. It was used under contract by the United States Government. See TransUnion Risk and Alternative Solutions, Inc. v. Challa, 2016 U.S. Dist. LEXIS 3781 (2016); United States v. Ocasio, 2015 W.L. 2458617, n. 1, at Pg. 8 (2015). The founders, however, disguised TLO's true objectives, claiming it provided "data solutions for identity, authentication, fraud prevention, and debt recovery." Wiltse thereafter contributed "his" Peer Spectre program to further facilitate TLO's objectives. Peer Spectre placed special focus on crimes involving the sexual exploitation of children, to capitalize on the increased federal funding for law enforcement technology and training.

10.     TLO exploited a flaw in Asher's loose-linking algorithms, where data was **partially matched** based on the "likelihood of its reliability," rather than being **fully matched** based on its "factual (i.e., actual) reliability." TLO began offering these services to the United States as early as 2009. It created "criminal investigatory leads" for law enforcement and the ICAC task force, which became the basis for fully-funded, i.e. reimbursed, criminal investigations. The information therein was fraudulent and formed the basis of **false claims for financial reimbursement** by local, state and federal agencies.

11.     TLO collected both private and public data from disparate sources, including but not limited to, financial institutions and other companies that **specialized in data aggregation.** TLO specifically collected proprietary data including, but not limited to, financial, identity, Internet, and utility data. After its collection, the data was ingested, normalized and structured to create "actionable views". That is to say, the private and public data was **co-mingled** and presented in such a way as to be readable and accessible for use by Government agents and prosecutors in criminal

cases.   In  simple  terms,  TLO  indiscriminately  collected,  co-mingled,  and organized,  any  and  all  types  of  data  regarding  every  Internet-connected person  in  the  world.   **TLO  then  utilized  Asher's  loose-linking  algorithms  to "loosely-link"  people  as  possible  suspects  in  potential  crimes.**

12.   TLO  entered  bankruptcy  soon  after  Asher's  death  in  2013.   The company  immediately  agreed  to  sell  the  majority  of  its  assets  to  TIH,  a subsidiary  company  of  TransUnion,  whose  corporate  partner  was  TLO.   See DE:438,  USBCFLSD  Case  No.  14-01793-PGH,  at  Exhibit  "E".   The  remaining portion  of  TLO  was  reorganized  as  a  Florida-based  501(c)(3)  non-profit organization  called  the  Child  Rescue  Coalition,  Inc.,  where  Carolyn  Asher-Yoost  serves  as  CEO,  Eliza  Desiree  Asher  serves  as  Director,  and  Wiltse serves  as  President.   See  Florida  Department  of  State,  Division  of  Corp. Entity  Record,  at  Exhibit  "F".   Thereafter,  CRC  and  TRADS,  continued  to utilize  Asher's  loose-linking  algorithm  and  exploit  its  weaknesses.   Like  TLO, CRC  and  TRADS  created  "criminal  investigative  leads"  on  individuals  allegedly involved  in  child  exploitation  and  child  pornography  via  the  the  internet. **Currently,  the  CRC,  TLO  and  TRADS  continue  to  operate  from  the  same physical  location  in  Boca  Raton  and  share  communications,  hardware  and resources.**

13.   The  functions  and  operations  of  CRC  are  identical  to  that  of TLO's,  with  specific  focus  placed  on  crimes  involving  child  pornography. After  it's  formation  through  the  bankruptcy/restructuring  of  TLO,  CRC became  the  provider  of  data  and  services  available  exclusively  through  the Child  Protection  System  ("CPS").   The  Child  Protection  System  became  the "one-stop-shop"  for  any  and  all  information  necessary  to  identify,  locate, indict,  prosecute,  and  convict  individuals  for  their  alleged  involvement  in child  pornography.

## IV.   THE CHILD PROTECTION SYSTEM AND ITS CONTRACTUAL SERVICE TO THE GOVERNMENT

14.    CPS was provided to the Government, by the Defendants, as a combination of services including specialized software, applications, and training for law enforcement agents and Assistant United States Attorneys ("AUSAs").  It was distributed to fifty-six (56) countries throughout the world, including the United States.  On its surface, the Defendants, their business model, and their services appeared as an effective and efficient cooperative effort, between the private sector and law enforcement, to protect children from dangerous sexual predators.  That, however, is simply untrue. In point of fact, CPS provided, and continues to provide, fraudulent information that is **unaudited, unauthenticated and fraudulent** to law enforcement agents and the ICAC task force.  The fraudulent information provided by the Defendants is the primary source, and often the sole source, of information and evidence used to prosecute and convict individuals of crimes relating to child pornography.  In **2013**, Wiltse testified that the system had already created over **10 billion "criminal investigative leads"** thus far, using Asher's loose-linking algorithm.  See <u>First Affidavit of William Wiltse</u>, at Exhibit "G".  Based on fraudulent information, those leads implicated an unknown number of people in **potential** crimes.

## V.   THE GOVERNMENT, SHA-1 AND THE CHILD PROTECTION SYSTEM

15.     The United States Department of Commerce, the National Institute of Standards and Technology ("NIST"), and the National Security Agency ("NSA") developed the Secure Hash Algorithm version 1 ("SHA-1"). A SHA-1 value is the product of the SHA-1 algorithm (i.e., a sequence of mathematical equations), infra.  The Department of Justice's Office of the United States Attorney defined SHA-1 as the **definitive standard** for identifying and authenticating digital files alleged to be child pornography. **SHA-1 values are fundamentally different from "loose-link values".**  Asher's loose-link algorithm identifies and presents "loose-link values" **instead of calculating SHA-1 values.**  The instant Complaint of fraud is brought based on the fraudulent substitution of loose-link values in lieu of SHA-1 values.

16.     When conducting investigations involving child pornography, an investigator first calculates the SHA-1 value of file(s) alleged to be child pornography.  The investigator then compares the calculated value to a centralized repository of child pornography with known SHA-1 values.  This database is maintained by the National Center for Missing and Exploited Children ("NCMEC"), as directed by Congress under 42 U.S.C. § 17615.  See Exhibit "I".  If the SHA-1 value calculated by the investigator matches that of a SHA-1 value available in the NCMEC database, the file is confirmed as being child pornography.

17.     As previously explained, the CPS software automates the investigative process by purportedly providing investigators with "pre-calculated" SHA-1 values for the files alleged to be child pornography. Investigators therefore, **do not** calculate SHA-1 values themselves, **nor do**

they **compare** those values with verified SHA-1 values available in the NCMEC database.   See <u>Affidavit of Robert Mauro</u>, Pgs.7-8 ¶1 at Exhibit "J". Furthermore, contrary to its claims, CPS **does not** calculate SHA-1 values; it **does not** utilize the SHA-1 algorithm nor does it provide investigators with SHA-1 values.   Rather, **the CPS software provides investigators with loose-link values and fraudulently represents them as SHA-1 values.   Unlike SHA-1 values, loose-link values DO NOT uniquely identify any specific file.**   Loose-link values are assigned using an undocumented, unaudited, and unauthenticated source, and are **fraudulently alleged** to identify and authenticate files that are asserted to be child pornography.   The Defendants fraudulently misrepresented loose-link values as SHA-1 values to law enforcement officers, the ICAC task forces, and United States Attorneys (hereinafter collectively referred to as the "Government").

## VI.   UNDERSTANDING SHA-1

18.    To better understand the severity and harm caused by the Defendants' fraudulent information, one must understand the key differences between **valid** SHA-1 values and the fraudulent values i.e., "loose-link values", fraudulently **misrepresented as SHA-1** by the Defendants.   **A valid SHA-1 value is a 40-character Hexadecimal value.**   In simple terms, valid SHA-1 values are 40-characters long and contain only the letters "a" through "f", and the numbers "0" through "9".   See <u>FIPS PUB 180-4</u>, Pg. 18, ¶ 6.1 at Exhibit "H".

19.    In numerous cases, the Government proffered valid SHA-1 values.  See NIST SHA-1 Computation and Output Example, Pg. 3 at Exhibit "K" and United States v. Burns, 2015 U.S. Dist. LEXIS 50220 (2015), where the Government offered three (3) valid SHA-1 values, listed below:

| | | | | | |
|---|---|---|---|---|---|
| **1.)** | 519814bc | 620eb52d | 8babb54b | 7f7b086f | 7d5196ab |
| **2.)** | 29807e70 | 52c9ec75 | 9fe7027e | fc6b0732 | 642ff7e0 |
| **3.)** | 2dcbe0bf | 3a4e8f3c | 03bd83ee | 52249de6 | 027bd7d3 |

20.    Conversely, in United States v. Price, 582 Fed. Appx. 846 (11th Cir. 2014), and more than 10,000 other § 2252/§ 2252A cases, the Government proffered a series of loose-link values that were fraudulently misrepresented as SHA-1 values from the Defendants.  Three (3) of those loose-link values, provided by the Defendants to the Government, are listed below:

| | |
|---|---|
| **1.)** | 2L3VMMDDYMNJHU566DIK26BXGCZJD0QY |
| **2.)** | SJNX5JEQY2L3RWH4YSKFJL2BQA6SR6SJ |
| **3.)** | 4GNSYJKR5WKBC5CXGMI0AX5M0VHKKN7C |

21.    The values in Price do not follow the form of valid SHA-1 values. Specifically, the values in Price contain only **32 characters**, where all valid SHA-1 values contain **40 characters**.  Additionally, the values in Price contain characters that are **not part of the Hexadecimal number system**.  That is, the values in Price contain all letters of the alphabet where valid SHA-1 values contain **only** the letters "a" through "f", and the numbers "0" through "9". A plain comparison of the values proffered in Burns, verses those in Price, reveal that the values proffered in Price are **not valid SHA-1 values**, in direct conflict with the Government's claims.

22.     The OUSA was aware of the key difference between SHA-1 values and loose-link values. However, it knowingly and willfully misrepresented loose-link values as SHA-1 values in order to obtain unlawful convictions. In United States v. Roger Garcia, U.S. Dist. Court, Southern Dist. of Florida, Case No. 1:13-CR-20764-MGC (2013), the OUSA failed to correct the error where Special Agent David Catlin of the Federal Bureau of Investigation incorrectly identified loose-link values as SHA-1 values. See Affidavit of Special Agent David Catlin, Pg. 8-9 at Exhibit "L". The OUSA's failure in its duty to correct the error was deliberate and subsequently resulted in Garcia's unlawful conviction.

23.     The bottom line is simple: Valid SHA-1 values are required at the beginning of every case to **establish and maintain chain-of-custody** of any file(s) alleged to be child pornography. It is the only method accepted by United States courts to certify and prove, **to the legal standard,** that file(s) are **the exact files originally alleged** to a defendant, and produced in evidence, by the Government. Absent valid SHA-1 values, the Government **fails** to meet the required burden of proof to show: (1) that the particular file(s) are the **exact** file(s) alleged in the beginning of a case; and (2) that the files did, in fact, belong to the defendant. In Price and Garcia, and countless other cases alleged to involve child pornography, the Government failed to produce valid SHA-1 values. Rather, the Government produced loose-link values, and knowingly misrepresented them as SHA-1 values, to obtain unlawful convictions. **The false claims of law enforcement and the ICAC task forces were based solely on the fraudulent information provided by the Defendants, through CPS.**

## VII.    DATA PROVIDED BY THE DEFENDANTS
## WAS KNOWN TO BE FRAUDULENT

24.    The Defendants, by and through CPS, provided fraudulent information to the Government.  Subsequently, the Government proffered loose-link values in **thousands of cases nationwide.**  Furthermore, the Government falsely claimed to have audited and verified the information it proffered based on the fraudulent information from the Defendants.  These claims are proven false by the fact that the values proffered by the Government are **NOT SHA-1 values.**  Therefore, all "certifications" proffered by the Government were rendered facially invalid and of questionable admissibility.  The OUSA was on notice of the fraudulent information provided by the Defendants for more than five (5) years, but continued to rely on the fraudulent information to obtain unlawful convictions, and receive financial reimbursement from the United States for its fraudulent operations.  See also EEOC v. Freeman, 778 F.3d 463 (4th Cir. 2015) where the court rejected the Government's "expert", who was previously found to be unreliable by four (4) other courts.

25.    When courts ordered the independent examination of the Defendants' source code, object code and any CPS related application components, or the data it produced, **the OUSA moved to dismiss the indictments,** or supersede the indictments to dismiss all sex offense counts in more than seventy (70) cases.  Four examples of those occurrences are as follows:

    a. In United States v. John Crowe, U.S. Dist. Court, Case No. 11-CR-1690-MV, the OUSA withdrew from the case following an order for testing of the CPS software and dismissed counts 1 through 5 and 7.

b. In <u>United States v. Angel Ocasio</u>, U.S. Dist. Court, Western Dist. of Texas, Case No. EP-11-CR-2728-KC-1, the Government superseded the indictment, dismissed all sex offenses, and agreed to a plea following a court Order compelling inspection of the CPS Source Code, training documentation, and Government contracts.

c. In <u>United States v. Todd Hartman</u>, U.S. Dist. Court, Central Dist. of California, Case No. SA-CR-15-63(A)-JLS, the Government dismissed the indictment following a court Order to compel inspection of the CPS software.

d. In <u>United States v. Edward Shia</u>, U.S. Dist. Court, Northern Dist. of California, Case No. CR-15-257-VC, where the Court ordered the CPS software examined by an independent expert. Further, the trial court stated, **"A non-party, third party, fighting crime for the Government under contract makes this even more suspect...** We know more about police dogs and training than we do of this software that is being used all over the country in hundreds of prosecutions."

## VIII.   THE CLAIMS AND THE ACTS OF FRAUD

26.     The Internet Crimes Against Children ("ICAC") task force is a program established by Congress under 42 U.S.C. § 17612 (See Exhibit "M") to prevent child abuse and child exploitation throughout the United States. The Attorney General is authorized to "award grants to State and local ICAC task forces to assist in carrying out [its] duties and functions." 42 U.S.C. § 17616 (See Exhibit "N"). The United States was defrauded by the Defendants and the OUSA where: (1) the United States authorized appropriations and grants for ICAC operations, based on fraudulent information provided by the Defendants; and (2) where the OUSA took aggressive measures to conceal the ongoing fraud.

27.    Under Title 31 U.S.C. § 3729(a), the Defendants are:

"liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person."

28.    Specifically, the Defendants and the OUSA violated 31 U.S.C. §§ 3729(a)(1)(B), § 3729(a)(1)(C), § 3729(a)(1)(E) and § 3729(a)(1)(G), where the Defendants and the OUSA:

"(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspire[d] to commit a violation of subparagraph (A), (B), (C), (D), (E), (F), or (G)...;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true...;

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

29.    The   Relators   present   the   following   claims   under   the aforementioned statutes:

a.   **CLAIM ONE:**   The Defendants by and through key executives and employees developed, organized and participated in a scheme (the "SHA-1 Scam"), wherein it presented fraudulent loose-link values to law enforcement agencies in lieu of **actual SHA-1 values**, and in direct conflict with the Defendants' marketing, documentation and training materials.

b.   **CLAIM TWO:**   The Defendants, by and through key executives and employees developed, organized and participated in a scheme, wherein it provided  training,  documentation  and  other  materials  which  contained fraudulent information and claims in furtherance of their "SHA-1 Scam".

c.   **CLAIM THREE:**   The OUSA was an active participant and beneficiary of the "SHA-1 Scam".  The OUSA acted in such a manner as to conceal the otherwise plain, fraudulent conduct of the Defendants.  The OUSA aided and abetted the fraud where it knowingly dismissed counts, or superseded indictments: (1) to divert attention away from cases which risked exposure of the "SHA-1 Scam"; (2) to curtail investigations into the fraudulent conduct of the "SHA-1 Scam" to prevent exposure of the fraud; and (3) where it knowingly continued to prosecute defendants, and obtain unlawful convictions, based on the fraudulent information from the Defendants, as a product of the "SHA-1 Scam".

d.   **CLAIM FOUR:**   The Defendants, by and through key executives and employees developed, organized and participated in a scheme "the SHA-1 Scam", wherein they knowingly made or caused to be made or used false

15

claims for monetary reimbursement from the United States, for operations involving and related to the "SHA-1 Scam".

30.   The specific elements of the "SHA-1 Scam" are as follows:

a.   The Defendants developed software to "fuse" large volumes of disparate data from multiple sources using flawed algorithms specifically designed by Hank Asher and Ole Poulsen.

b.   The Defendants through their key executives and employees provided its services, in the form of CPS, for use by law enforcement agencies. The Defendants falsely claimed that their software and services (CPS): (1) identified and located alleged child pornography traffickers; and (2) identified alleged files of child pornography by providing the valid SHA-1 values **of those files** to law enforcement agents and prosecutors. In point of fact, the Defendants **did not** provide valid SHA-1 values, nor did they implement the SHA-1 algorithm. Instead, the Defendants provided law enforcement agents and prosecutors with loose-link values and **fraudulently misrepresented those values as actual SHA-1 values.**

c.   Law enforcement agencies used the fraudulent information provided by the Defendants to conduct ICAC task force operations and **received reimbursements for false claims** from the United States based on the fraudulent information provided by the Defendants.

d.   The OUSA, as a part of the Executive Office of the United States Attorney General ("EOUSAG") was aware that the information provided by the Defendants was fraudulent but continued to seek and obtain, criminal convictions based on the fraudulent information and false claims. The OUSA moved to dismiss charges, and indictments, in cases where the "SHA-1 Scam" was at risk of exposure through further prosecution. In so doing, **the OUSA directly and aggressively sought to conceal the fraudulent conduct and false claims from the United States, the courts, and the EOUSAG.**

16

e. The United States was defrauded by the Defendants where: (1) the ICAC task force submitted claims for monetary reimbursement by the United States, for ICAC operations based on fraudulent information provided by the Defendants and (2) where the United States financed full criminal investigations and prosecutions, including but not limited to costs and fees, based on the fraudulent information provided by the Defendants through the "SHA-1 Scam".

f. The Defendants, their executives and key employees continue to operate the "SHA-1 Scam" with the assistance of the OUSA.

31.    In 2008 the "Providing Resources, Officers, and Technology to Eradicate Cyber Threats to Our Children Act" ("the Protect Act", PL 110-401, codified at 42 U.S.C. § 17601) established the basis of federal funding for law enforcement technology and training related to child pornography. The following year, 2009, the Ashers (Hank, Desiree, and Carolyn), Poulsen and Wiltse formed TLO, LLC and devised the "SHA-1 Scam" as a **Bait-and-Switch** scheme to obtain Government contracts and leverage the **more than $212.7 million taxpayer dollars** authorized by Congress from FY 2009 through FY 2014. The Ashers and Wiltse cemented the scheme by giving John Walsh eight (8) million shares of TLO in exchange for his joining the scheme to "sell" the fraudulent scheme to law enforcement agencies leveraging his notoriety.

32.    The Office of the United States Attorney subsequently benefited from the conspiracy with the Defendants. In this manner, the OUSA actively furthered the fraud by failing in its duty to report the fraudulent conduct, investigate plain view evidence of fraudulent claims, and conspired with the Defendants, to conceal the fraudulent conduct. The OUSA devised a system to conceal material records in the state courts and routinely failed to produce

17

"a true and legible copy of... all documents previously filed" in the record of the federal proceedings as required under the local rules (See Local Rule 7.2 of the Southern Distirct of Florida) in every jurisdiction to further conceal the fraudulent conduct and false claims.

33.     The Relators assert that direct evidence of payment for false claims exists.   Claims submitted by ICAC task force agencies and other parties resulting from the fraudulent conduct of the Defendants, rest in reports required by 42 U.S.C § 17616(d).   These reports are on file with the Office of the United States Attorney General.

## IX.   CONCLUSION

34.     In sum, the Defendants knowingly and willfully misrepresented loose-link values as SHA-1 values.   The Government relied on that fraudulent information to conduct fully-funded investigations, seek indictments, and obtain unlawful convictions.   The Office of the United States Attorney was aware of the fraud, and sought to conceal the fraud, by moving to dismiss criminal cases where the Defendants and the fraudulent scheme risked exposure through further prosecution.   The United States was defrauded by the Defendants where the United States authorized monetary reimbursements to law enforcement agencies and the ICAC task force, pursuant to 42 U.S.C. § 17616 (see Exhibit "N"), for operations based on the fraudulent values.   As such, any and all monetary reimbursements issued by the United States, in connection with the aforementioned statutes and 42 U.S.C. § 16987 (see Exhibit "O"), were issued based on false claims by the Defendants and their key executives and employees, in violation of 31 U.S.C. § 3729(a)(1).   See Exhibit "P".

35.     Due to the extensive relationship between the Department of Justice attorneys, the various U.S. Attorneys, law enforcement and the Defendants, the Relators move this Court to appoint a **special prosecutor** in this matter.

36.     **WHEREFORE,** the Relators respectfully request this Court to enter judgement against the Defendants, jointly and severally, as follows:

a.   That the United States be awarded damages in the amount of three (3) times the damage sustained by the United States because of the false claims and fraud alleged within this Complaint, as the FCA, 31 U.S.C. §§ 3729 et seq. provides;

b.   That civil penalties of $10,000 be imposed for each and every false claim that the Defendants made, caused to be made, or arose as a result of their actions to be presented to the United States and/or its grantees;

c.   That pre- and post-judgement interest be awarded along with reasonable attorney's fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

d.   That this Court grant permanent injunctive relief to prevent and recurrence of the violations of the FCA  for which redress is sought in this Complaint;

e.   That the Relators be awarded the maximum amounts allowed to them pursuant to the FCA;

f.   That this Court award such other and further relief as deemed fair and equitable.

Respectfully Submitted,

_____
James Price - 98922004
Federal Correctional Institution
P.O. Box 779800
Miami, Florida 33177
305-259-2100
PriceJamesE@Outlook.com

_____
Sheldon Joel Ramnaraine - 55635018
Federal Correctional Institution
P.O. Box 779800
Miami, Florida 33177
305-259-2100

_____
Lawrence S. Smith - 42473019
Federal Correctional Institution
P.O. Box 779800
Miami, Florida 33177
305-259-2100

## CERTIFICATE OF SERVICE

**United States v. Child Rescue Coalition, Inc.**

Case No.: 1:17cv-20859-RNS

 

We, the Relators, hereby declare that on this date, March __, 2017, have filed the enclosed AMENDED COMPLAINT pursuant to the "Mailbox Rule" for incarcerated persons with the Clerk of the Court. The AMENDED COMPLAINT is served upon this Court under SEAL for review in camera pursuant to 31 U.S.C. § 3730(b)(2).

 

We declare that under the penalty of perjury, pursuant to Title 28 U.S.C. § 1746, the foregoing is true and correct.

 

Executed on March 13, 2017.

 

By: _____
James Price - 98922004

_____
Sheldon Joel Ramnaraine - 55635018

_____
Lawrence S. Smith - 42473019

C1 of 1